**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OKLAHOMA**

|  |  |
|---|---|
| **(1) OAK LAND AND DEVELOPMENT, LLC; (2) OAK PHASE I PROPERTY OWNER, LLC; (3) OAK HOTEL OWNER, LLC; (4) OAK BLOCK 2, LLC; (5) OAK BLOCK 3, LLC; (6) OAK SE CORNER, LLC; (7) NWPF, LLC; and (8) VERITAS DEVELOPMENT, LLC,** | |
| *Plaintiffs*, | Case No. 5:25-cv-01444-PRW |
| v. | **FIRST AMENDED COMPLAINT** |
| | **DEMAND FOR JURY TRIAL** |
| **(1) SIMON PROPERTY GROUP, INC.; (2) SIMON PROPERTY GROUP, L.P.; (3) PENN SQUARE MALL, LLC; and (4) DAVID SIMON,** | |
| *Defendants*. | |

## COMPLAINT

Plaintiffs Oak Land and Development, LLC, Oak Phase I Property Owner, LLC, Oak Hotel Owner, LLC, Oak Block 2, LLC, Oak Block 3, LLC, Oak SE Corner, LLC, NWPF, LLC, and Veritas Development, LLC hereby file this Complaint against Defendants Simon Property Group, Inc., Simon Property Group, L.P., Penn Square Mall, LLC (together, "SPG"), and David Simon, alleging, by and through their undersigned counsel, on knowledge as to Plaintiffs, and on information and belief as to all other matters, as follows:

## INTRODUCTION

1.      This case seeks to stop an anticompetitive campaign by SPG, the largest owner of shopping malls in the U.S., and its billionaire Chairman and CEO, David Simon, to wield SPG's enormous economic power to destroy OAK, a new lifestyle retail and mixed-use project that competes directly with SPG's Penn Square Mall in Oklahoma City. By leveraging their national portfolio of properties, Defendants bully and effectively force prospective tenants away from OAK and other competitors, thereby illegally restraining competition in Oklahoma City, stifling interstate commerce, and harming consumers.

2.      Plaintiffs are Oklahoma-based companies that have been working for more than a decade to develop OAK, a transformative project that aims to unite world-class shopping, luxury residences, boutique hotel accommodations, class-A office space, and international award-winning public art centered around a vibrant park and community spaces. These community spaces define the heart of the project and were designed to

provide an opportunity for Oklahoma City residents and consumers to enjoy locally curated or seasonal events, such as live music, farmer's markets, and other signature programming.



3.      OAK represents an experience-driven, hospitality-focused way of living, shopping, and dining that is a first for Oklahoma City. As *The Oklahoman* has observed, "Only when visiting OAK in person can one truly appreciate the intimacy of the development."[1] OAK also enjoys broad community support and has been described as "[o]ne of the most anticipated developments" in Oklahoma City and contributing to the city's rapid evolution "as a premier destination" for visitors.[2]

---

[1] Steve Lackmeyer, *Public gets first glimpse of OAK, upcoming showcase of fine dining, lodging, retail and art*, THE OKLAHOMAN (Sept. 19, 2024), https://www.oklahoman.com/story/news/ 2024/09/19/oak-development-oklahoma-city-opens-hotel-art-installation/75169873007.

[2] Selena Romero, *A Glimpse into OKC's Dynamic Community Development: OAK*, VELOCITY (May 20, 2024), https://www.velocityokc.com/blog/development/ a-glimpse-into-okc-s-dynamic-community-development-the-oak.

4.    A core element of OAK is its fresh, open-air shopping experience, combining new-to-Oklahoma City retail brands alongside locally owned businesses, such as The Oil Tree, a gourmet grocer specializing in olive oils and balsamic vinegars.

5.    In February 2025, the Urban Land Institute recognized OAK with its highest honor for Oklahoma—the Distinguished Merit Award. The Lively Hotel on Oak was awarded the Best New Build in 2025 for the Hilton-Tapestry brand. Two iconic sculptures at OAK—Cloud Puncher and Cloud Trees—were recognized by CODAworx as the international first-place winner for top sculpture in a commercial setting and a top ten most popular sculpture to visit in 2025, respectively. These awards and accolades demonstrate Plaintiffs' commitment to the Oklahoma community and culture, meticulous attention to detail, and enduring passion to elevate the retail offerings in Oklahoma City.

6.    OAK's primary competitors for retail tenants and customers are Penn Square Mall and Classen Curve. Penn Square Mall is a 64-year-old enclosed mall with approximately one million square feet of leasable space, located almost directly across the street from OAK. SPG acquired Penn Square Mall in 2002 as part of a reported $1.55 billion transaction involving the purchase of 13 malls in Oklahoma, Texas, and other states.[3] On information and belief, Penn Square Mall is operated by Defendant Penn Square Mall, LLC, which is almost entirely owned by Defendants Simon Property Group, Inc. and Simon Property Group, L.P.

---

[3] *Simon property buys Penn Square Mall*, THE JOURNAL RECORD (Feb. 8, 2002), https://journalrecord.com/2002/02/08/simon-property-buys-penn-square-mall/.

7.    With a market capitalization that currently exceeds $50 billion, and interests in more than 190 retail properties nationwide with over 170 million square feet of leasable space, SPG wields immense, monopolistic power in retail leasing markets across the country. That market power extends to Oklahoma City.

8.    Rather than fairly compete with OAK for retail tenants and customers by investing in Penn Square Mall to spur interest in Oklahoma City, Defendants have abused SPG's monopoly power to prevent prominent retail brands from opening stores at OAK or, in some cases, from opening stores anywhere in Oklahoma City. Among other conduct, Defendants have used SPG's vast portfolio of properties to restrain tenants' choices, including by offering prospective tenants that are considering leasing space at OAK preferred terms or "package deals" involving leases at SPG properties in other states that are conditioned on the prospective tenant either leasing or renewing space at Penn Square Mall, or blocking prospective tenants from leasing space at any competing shopping center in Oklahoma City. This conduct constitutes a classic "tying" arrangement in violation of federal and Oklahoma antitrust law.

9.    Defendants' actions are part of a long pattern of similar misconduct. Around 2010, the Federal Trade Commission investigated SPG for monopolistic and anticompetitive behavior. That investigation resulted in a consent agreement between the Federal Trade Commission and SPG. Around 2017, the New York Attorney General conducted an extensive antitrust investigation into SPG's conduct, which resulted in settlement. In 2018, a federal jury in Indiana found that SPG had willfully acquired or maintained monopoly power "by engaging in anticompetitive conduct" and "imposed a

tying arrangement" in violation of federal antitrust law.[4] Despite all this, Defendants have persisted in using unlawful, anticompetitive tactics to attempt to "kneecap" competitors.

10.    These practices cause harm not only to Plaintiffs, but also to the competitive process and the broader community. Through OAK, Plaintiffs seek to attract businesses and retail brands that do not currently have a presence in Oklahoma City, thereby growing the local economy and helping the city continue to develop into a vibrant home for locals and a premier travel destination for visitors. Defendants' illegal tactics seek to maintain the status quo and to prevent new, innovative destinations like OAK from succeeding.

11.    Plaintiffs bring this action to stop Defendants' anticompetitive conduct and to remedy the enormous injuries that their conduct has already caused and will continue to cause.

## PARTIES

12.    Plaintiff Oak Land and Development, LLC ("Oak Land and Development") is an Oklahoma limited liability company with its principal place of business in Oklahoma City. Oak Land and Development, LLC is identified as the developer in the plat and declaration filings relating to the land that OAK occupies.

13.    Plaintiff Oak Phase I Property Owner, LLC ("Oak Phase I") is an Oklahoma limited liability company with its principal place of business in Tulsa. Oak Phase I has been involved in the first phase of OAK's development plan, including by negotiating and signing leases with retail and other tenants.

---

[4] *Gumwood HP Shopping Partners LP v. Simon Property Group, Inc.*, Dkt. No. 435 at 2163-64, No. 3:11-cv-00268-JD (N.D. Ind. Jun. 19, 2018).

14.    Plaintiff Oak Hotel Owner, LLC ("Oak Hotel") is an Oklahoma limited liability company with its principal place of business in Oklahoma City. Oak Hotel owns and operates the Lively Hotel on Oak, a hotel constructed at OAK.

15.    Plaintiff Oak Block 2, LLC ("Oak Block 2") is an Oklahoma limited liability company with its principal place of business in Oklahoma City. Among other things, Oak Block 2 has been involved in negotiating and executing leases with retail and other tenants for leasable space to be constructed and opened primarily during the second phase of OAK's development plan.

16.    Plaintiff Oak Block 3, LLC ("Oak Block 3") is an Oklahoma limited liability company with its principal place of business in Oklahoma City. Among other things, Oak Block 3 is responsible for negotiating and executing leases with retail and other tenants for leasable space to be constructed and opened primarily during the third phase of OAK's development plan.

17.    Plaintiff Oak SE Corner, LLC ("Oak SE Corner") is an Oklahoma limited liability company with its principal place of business in Oklahoma City. Oak SE Corner owns a parcel of land that is to be developed and eventually included within OAK's footprint.

18.    Plaintiff NWPF, LLC ("NWPF") is an Oklahoma limited liability company with its principal place of business in Tulsa. NWPF wholly owns, either directly or through one or more wholly owned subsidiaries, Oak Land and Development, Oak Phase I, Oak Hotel, Oak Block 2, Oak Block 3, and Oak SE Corner.

19.    Plaintiff Veritas Development, LLC ("Veritas") is an Oklahoma limited liability company with its principal place of business in Tulsa. Veritas is responsible for developing OAK in exchange for certain development fees and other consideration.

20.    Defendant Simon Property Group, Inc. ("SPG Inc.") is a Real Estate Investment Trust incorporated under the laws of Delaware, with its principal place of business in Indianapolis, Indiana.

21.    Defendant Simon Property Group, L.P. ("SPG L.P.") holds, directly or indirectly, substantially all of SPG Inc.'s assets, including SPG Inc.'s ownership interests in joint ventures, and conducts substantially all of SPG Inc.'s business. SPG Inc. is the General Partner of SPG L.P., which in turn has hundreds of limited partners based in numerous states.

22.    SPG Inc. and SPG L.P. effectively operate as one company. As explained in their combined Form 10-K: "We operate [SPG Inc.] and [SPG L.P.] as one business. The management of [SPG Inc.] consists of the same members as the management of [SPG L.P.]. As general partner with control of [SPG L.P.], [SPG Inc.] consolidates [SPG L.P.] for financial reporting purposes, and [SPG Inc.] has no material assets or liabilities other than its investment in [SPG L.P.]."

23.    On information and belief, Defendant Penn Square Mall, LLC is a limited liability company incorporated under the laws of Delaware, with its principal place of business in Oklahoma City. On information and belief, Penn Square Mall, LLC operates Penn Square Mall. On information and belief, at all relevant times, Defendants SPG Inc.

and SPG L.P. have a majority ownership interest in Penn Square Mall, LLC, and it has been directed and controlled by SPG Inc. and SPG L.P.

24.    Defendant David Simon is the Chairman and CEO of SPG Inc. and SPG L.P. On information and belief, at all relevant times, Mr. Simon has been a resident of Indiana.

## JURISDICTION AND VENUE

25.    This Court has subject matter jurisdiction over Plaintiffs' federal antitrust claims pursuant to 15 U.S.C. § 26 and 28 U.S.C. §§ 1331 and 1337. The Court has supplemental jurisdiction over Plaintiffs' state-law claims pursuant to 28 U.S.C. § 1367.

26.    This Court has personal jurisdiction over Defendants because some or all of the challenged conduct emanated from or occurred in this District.

27.    Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in this District.

28.    In the alternative, personal jurisdiction and venue are proper under Section 12 of the Clayton Antitrust Act, 15 U.S.C. § 22, because Defendants may be found in or transact business in this District.

## FACTUAL ALLEGATIONS

### I.    BACKGROUND

#### A.    The Shopping Center Industry

29.    The modern American shopping center industry emerged in the mid-20th century alongside rapid suburbanization and increasing vehicle ownership. Early neighborhood and community centers evolved into regional and super-regional malls.

These malls were typically anchored by department stores that served as primary traffic drivers for surrounding specialty retailers. Over the ensuing decades, the industry adapted to shifting consumer preferences and retail formats, including the rise of big-box chains, category specialists, and value-oriented concepts. Developers increasingly curated a mix of tenants, refined how they chose sites on which to develop shopping centers, and made investments that matured shopping centers into a distinct segment of commercial real estate.

30.     Today, shopping centers come in a variety of formats. One such format is a fully enclosed mall, which generally serves regional trade areas with a mix of fashion retailers, specialty retailers, soft goods retailers, entertainment, and dining. Fully enclosed malls frequently have multiple levels, with the entrances to retailers facing inward towards common walkways within the mall.

31.     A second format is a lifestyle center. Lifestyle centers are most often located near affluent residential neighborhoods and cater to the retail needs and "lifestyle" pursuits of consumers in its trading area. Lifestyle centers typically have an open-air configuration and include at least 50,000 square feet of retail space occupied by upscale specialty retailers. In a lifestyle center, those specialty retailers are usually accompanied by restaurants, entertainment offerings, and design elements that are conducive to casual browsing, such as fountains and backyard furniture. Lifestyle centers may also be anchored by one or more conventional specialty department stores.

32.     Many other shopping center formats exist as well. Those formats include an outlet center (which focuses on value-oriented brand offerings and destination shopping

for wide trade areas), super-regional centers (larger shopping centers with a deeper selection of merchandise and more anchor tenants), neighborhood and community centers (anchored by supermarkets or other daily-needs tenants), and mixed-use centers (which consist of well-integrated entertainment, office, hotel, residential, recreation, and similar uses alongside retail shopping).

33.    Different shopping center types tend to attract different retailer categories. Enclosed malls and lifestyle centers typically draw first-to-market brands, upscale specialty retailers, and full-service restaurants seeking curated co-tenancies and longer lease terms. Those centers also support entertainment uses and digitally native brands that seek to expand into physical showrooms.

34.    Despite the growth of e-commerce, physical shopping centers remain vibrant and highly desired by consumers. Retailers across categories continue to invest in high-performing stores, including by expanding into new trade areas to acquire new customers, build brand equity, and drive profitability. For consumers, well-located shopping centers provide convenience, immediacy, and experiential value—such as dining, entertainment, events, and social interaction—that cannot be easily replicated online. For communities, shopping centers generate significant employment, produce sales and property taxes, and serve as civic gathering places that contribute to neighborhood vitality.

35.    Lifestyle centers cannot be successful unless they attract prominent retailers to lease retail space. The identity of those key retailers differs depending on the type of shopping center being operated. As noted above, fully enclosed malls and lifestyle centers generally cater to specialty, high-end retailers and dining establishments. As a result, these

properties cannot be successful unless they attract a core group of key specialty retail and dining tenants. Examples of such tenants include North Italia, Apple, Nike, Restoration Hardware (or RH), Lululemon, Vuori, Alo, Aritzia, Arhaus, L'Occitane, Free People, Uniqlo, Zara, and similar restaurants and retailers.

### B.    SPG Has Vast Economic Power and a History of Abusing that Power to Engage in Anticompetitive Conduct

36.    SPG dates to the 1960s, when the company's predecessor, Melvin Simon & Associates ("MSA"), was founded by Melvin and Herbert Simon. In 1993, MSA went public as SPG in what was then the largest initial public offering in U.S. history.

37.    SPG is now the largest public, retail-focused real estate company in the United States. As of December 31, 2024, it owned or held interests in 194 income-producing properties across the country, consisting of enclosed and outlet malls, lifestyle centers, and other retail properties in 37 states and Puerto Rico. Together, these properties account for over 170 million square feet of gross leasable area.

38.    SPG also has substantial international operations. As of December 31, 2024, SPG owns or has an interest in at least 229 properties comprising more than 245 million square feet of gross leasable area throughout North America, Europe, and Asia.

39.    In 2024, SPG generated more than ***$5.9 billion in revenue***, of which approximately 90%—or $5.3 billion—was lease income from retail, dining, entertainment, and other tenants of SPG's properties. That substantial revenue stems in part from the fact that SPG owns many of the country's most profitable malls and shopping centers, including the Forum Shoppes at Caesars in Las Vegas, the Galleria in Houston, the Aventura Mall in

Miami, the Fashion Valley Mall in San Diego, Lenox Square in Atlanta, and Roosevelt Field in New York. Given the breadth of SPG's holdings, SPG is often the largest landlord for many national retailers. In 2024 alone, SPG executed more than 5,000 leases involving more than 21 million square feet.

40.    SPG's Chairman, CEO, and President is Defendant David Simon. Simon has led the company for more than 30 years. Described by *The Wall Street Journal* as "America's Last Mall King," Simon himself has admitted that he is "a domineering-type CEO," whose style is, "We're going to do it this way or we're not going to do it."[5] Despite SPG's large international portfolio, Simon is often directly involved in managing individual properties, including by personally negotiating leasing deals with prospective tenants. Former employees of SPG have described Simon as the "ultimate micromanager" who "wants to know the minutiae of every deal."[6]

41.    Under Simon's leadership, SPG has developed a reputation for acquiring, maintaining, and protecting its market power through anticompetitive conduct. On information and belief, the anticompetitive conduct that Defendants commonly employ includes, among other things: (i) explicitly or implicitly threatening to refuse to renew an existing lease if a tenant is considering opening retail locations in a competing shopping center, even if that competing shopping center is in a different geographic market; (ii) forcing tenants to relocate their stores and bear the cost of relocation if they are opening

---

[5] Kate King, *America's Last Mall King Is Still in Charge, Even After a Deadly Diagnosis*, THE WALL STREET JOURNAL (June 15, 2025).

[6] *Id.*

stores at competing shopping centers; (iii) increasing a tenant's rental rates or otherwise insisting on unfavorable lease terms in retaliation for a tenant considering a competing shopping center; (iv) decreasing a tenant's rental rates or other expenses across large portions of SPG's portfolio to manipulate that tenant's behavior in a particular geographic area; and (v) demanding that a tenant forgo entering a new geographic market entirely if that tenant will not choose to do so at a property owned by SPG.

42.    SPG has been caught repeatedly wielding its enormous economic power to restrain trade in markets for leasable space in shopping centers, leading to regulatory investigations and even a jury verdict finding SPG liable for violating federal antitrust law.

### 1.    SPG Is Investigated by the Federal Trade Commission

43.    In 2010, the Federal Trade Commission ("FTC") served SPG with a draft complaint that alleged a violation of Section 7 of the Clayton Act. According to the draft complaint, SPG entered into an acquisition agreement that could have "***anticompetitive effects***" and "***tend to create a monopoly***" in the markets for retail space at outlet centers in Orlando, Chicago, and southwest Ohio.[7] Among other things, the draft complaint alleged that SPG's proposed acquisition would "eliminat[e] actual, direct and substantial competition between" SPG and its proposed acquisition target, and "increas[e] the likelihood that [SPG] will unilaterally exercise market power in the relevant markets."[8]

---

[7] *See* https://www.ftc.gov/sites/default/files/documents/cases/2010/11/101110simoncmpt.pdf (emphasis added).

[8] *Id.*

44.    The FTC's draft complaint further alleged that SPG exacerbated the potential anticompetitive effects of its acquisition by including stringent "radius restrictions" in tenant leases, which made it "very expensive for outlet tenants to open an outlet store within the designated proscribed radius of an existing [SPG] outlet center."[9] According to the draft complaint, SPG thereby "***prevent[ed] potential entry*** because new developers cannot sign tenants subject to radius restrictions."[10]

45.    In 2010, SPG entered into a consent agreement with the FTC that averted filing of the draft complaint and initiation of an enforcement action.[11] The agreement required SPG to divest one of its properties in Ohio and to notify all its tenants in the relevant geographic areas that it would not enforce any of its anticompetitive radius restrictions for at least four years.[12]

2.    SPG Is Investigated by the New York Attorney General

46.    In or about 2017, the Antitrust Division of the New York Attorney General's Office ("NYAG") commenced an investigation of SPG for, among other things, potential violations of state and federal antitrust law.

47.    Following an extensive investigation, the NYAG found, among other things, that SPG held "***monopoly power***" over "retail space in outlet centers" in the relevant market and used restrictions in lease agreements with its tenants to "maintain[] and enhanc[e]

---

[9] *Id.*

[10] *Id.* (emphasis added)

[11] *See* https://www.ftc.gov/sites/default/files/documents/cases/2011/01/110121simondo.pdf.

[12] *See id.*

SPG's monopoly power . . . where its market position could otherwise be threatened by new tenants."[13] The NYAG further concluded that these restrictions were "***likely to . . . prevent other outlet developers from obtaining the necessary quantity and variety of Outlet Retailers to open a competing outlet center***" in the relevant market and to "prevent existing outlet centers and hybrid centers from obtaining the necessary outlet tenants to successfully compete with [SPG]."[14] The NYAG further determined that SPG's restrictions "would likely maintain and enhance a monopoly position and unreasonably restrain competition" in violation of state and federal antitrust laws.[15]

48.    To avoid further enforcement efforts, SPG entered into an agreement with the NYAG under which it agreed to substantially modify the challenged lease restrictions and to refrain from engaging in numerous other anticompetitive tactics, including "***[c]onditioning the availability of a material benefit or other item of significant pecuniary value in a leasehold on a Retailer's agreement not to open an Outlet Store in the Relevant Area***," "[t]erminating or suspending any validly existing lease or other agreement with the Retailer because the Retailer intends to open, or opens, an Outlet Store in the Relevant Area," and "[r]equiring terms and conditions in a leasehold that are different than otherwise would have been the case because the Retailer intends to open, or opens, an outlet store in the Relevant Area."[16]

---

[13] https://www.naag.org/wp-content/uploads/2020/10/720.civil_.NY-v.-Simon-Woodbury-Commons-3.pdf (emphasis added).

[14] *Id*. (emphasis added).

[15] *Id.*

[16] *Id.* (emphasis added).

3.    A Jury Finds SPG Liable for Violating Federal Antitrust Law

49.    In 2011, Gumwood HP Shopping Partners, L.P. ("Gumwood"), the developer of an outdoor shopping center in Indiana called Heritage Square, sued SPG for violations of federal antitrust law.[17] Gumwood alleged that SPG used anticompetitive tactics, including "(1) refusing to renew existing leases or making renewals conditioned upon the tenant not opening stores in a competing development in another market; (2) requiring a tenant to relocate a store (as well as bear the cost of relocation) without giving it an opportunity to renew an existing lease as a means of preventing the tenant from opening a store in a competing center; and (3) increasing rates or otherwise making the terms of renewals less favorable in retaliation if a tenant opens a store in a competing center."[18]

50.    The conduct alleged by Gumwood constituted, among other things, a quintessential type of illegal, anticompetitive conduct known as "tying," in which a party with sufficient economic power in a particular market conditions the sale of a product or service (the "tying" product) on the buyer's agreement to purchase another, separate product or service (the "tied" product), or to refrain from buying the product or service from someone else. *See, e.g.*, *N. Pac. Ry. Co. v. United States*, 356 U.S. 1, 5–6 (1958). The party imposing the "tying" arrangement thereby "'force[s] a purchaser to do something that he would not do in a competitive market.'" *Eastman Kodak Co. v. Image Tech. Servs., Inc.*,

---

[17] *See Gumwood HP Shopping Partners, L.P. v. Simon Property Group, Inc.*, No. 3:11-cv-00268-JD (N.D. Ind.).

[18] *Id.*, Dkt. No. 1 (Complaint) ¶ 15.

504 U.S. 451, 464 (1992) (quoting *Jefferson Par. Hosp. Dist. No. 2 v. Hyde*, 466 U.S. 2, 14 (1984)).

51.    In 2018, Gumwood's case against SPG was tried before a jury. At trial, Gumwood introduced evidence that included, among other things, internal SPG communications in which company representatives involved with lease negotiations stated:

- "We are putting the full court pressure on all others who are interested in the market. *I was very clear that [the tenants'] decision can and will jeopardize our willingness to proceed on new deals and renewals*."[19]

- "I will still help where needed but in essence DS [David Simon] is trying to meet with Kay Krill [Ann Taylor's CEO]. . . . I don't believe John [Scotti, Ann Taylor's negotiator] has told Kay the severity of [the] situation. *If they go ahead with Heritage, we're going to cancel Woodbury and Dadeland*. Lose a pinky - take an arm!"[20]

52.    With respect to at least one particularly valuable tenant, the evidence showed that SPG insisted on negotiating more than 50 new leases or lease renewals that were pending as a single package in order to leverage and exploit its market power.[21]

53.    Following a 12-day trial, the jury found SPG liable on all counts, concluding, among other things, that:

- SPG "*imposed a tying arrangement*";

---

[19] *Id.*, Dkt. No. 402 (June 7, 2018 Trial Tr., Vol. IV, AM) at 559–60 (emphasis added).
[20] *Id.* at 603 (emphasis added).
[21] *See id.* at 589–90, 601.

- SPG "had sufficient market power in the [relevant] markets . . . to enable [SPG] to restrain competition";

- "the alleged tying arrangement foreclosed a substantial volume of commerce in the market in which [the competing center] operates";

- SPG "*has monopoly power in [the relevant] market*"; and

- SPG "*willfully acquired or maintained monopoly power in that market by engaging in anticompetitive conduct*."[22]

## II.  SPG'S PENN SQUARE MALL AND PLAINTIFFS' LIFESTYLE CENTER

54.    Despite having been repeatedly investigated by state and federal authorities, and having been found liable by a jury for violations of antitrust law, SPG has continued to engage in illegal, anticompetitive conduct, including unlawful tying arrangements, in an effort to coerce tenants into leasing or renewing leases of space in its properties, and to refrain from leasing space in its competitors' properties. SPG has done so throughout the country including, as relevant here, in Oklahoma.

### A.    SPG's Properties in Oklahoma

55.    SPG owns two enclosed malls and an outlet mall in Oklahoma: Penn Square Mall in Oklahoma City, Woodland Hills Mall in Tulsa, and the Tulsa Premium Outlets. As of December 31, 2024, SPG's properties in Oklahoma had more than 2.6 million square feet of leasable retail space.

---

[22] *Id.*, Dkt. No. 435 (June 22, 2018 Trial Tr., Vol. XII-PM) at 2163–64 (emphasis added).

56.    Originally constructed in 1960, Penn Square Mall contains more than one million square feet of leasable retail space. SPG acquired Penn Square Mall in 2002 as part of a reported $1.55 billion transaction by which SPG acquired thirteen malls in Oklahoma, Texas, and other states.

57.    For many years, Penn Square Mall controlled the market for leasing retail space to specialty retailers in central Oklahoma. Penn Square Mall had few viable competitors, which enabled SPG to acquire and maintain a dominant position. That began to change in and around 2012 when two other shopping centers opened in Oklahoma City that catered to new-to-market and specialty retailers. Those shopping centers are Classen Curve and The Triangle. Unlike Penn Square Mall, Classen Curve and The Triangle are not traditional, fully enclosed malls, but instead offer open-air shopping and dining experiences. On information and belief, this alternative format is one reason why these shopping centers catered to new-to-market and specialty retailers.

58.    Despite these newer alternatives to Penn Square Mall in Oklahoma City, SPG chose not to meaningfully invest in that property to redevelop it into an attractive alternative for specialty retailers and upscale dining establishments. To the contrary, SPG let Penn Square Mall's facilities languish. As Penn Square Mall's infrastructure aged and grew outdated, its occupancy rates decreased. On information and belief, Penn Square Mall suffered an approximately 10% drop in occupancy between December 2016 and June 2025, resulting in a steady decline in Penn Square Mall's revenues.[23]

---

[23] *See Rating Action: Moody's Ratings downgrades four classes of MSCI 2016-PSQ*, MOODY'S RATINGS (Nov. 25, 2025).

59.     On information and belief, SPG devised a strategy to reverse these trends by reestablishing its chokehold on the market in Oklahoma City. SPG could accomplish this by leveraging its economic power to force tenants to open stores at Penn Square Mall or block those tenants from opening stores at competing shopping centers. If this strategy were successful, SPG could starve competing shopping centers of the means to further grow and could use any additional revenues generated by increased occupancy at Penn Square Mall to redevelop and update that property. In fact, Defendant David Simon recently disclosed that SPG has implemented a nationwide strategy that focuses on SPG's "B malls" by adding tenants, filling empty space, and "updating the look [and] feel" of those properties.[24] As documented in the press, SPG has been working to achieve this strategy in at least one other market in the midwestern United States since early 2024.[25]

60.     Defendants appear to have applied this strategy to Penn Square Mall. Indeed, on information and belief, Penn Square Mall represents more than 70% of the gross leasable area for specialty retail in Oklahoma City, which has enabled SPG to acquire, maintain, and reestablish monopoly power in that market. For instance, on information and belief, SPG has charged its retail tenants supracompetitive rental rates, in some cases up to three times the amount of comparable rental rates available at Classen Curve and The Triangle. SPG also wields enormous influence over prospective tenants considering

---

[24] Daphne Howland, *Simon Property Group turns to 'B' malls for growth*, RETAIL DIVE (Feb. 5, 2025), https://www.retaildive.com/news/simon-property-group-turns-b-mall-growth-strategy/739284/.

[25] Kate King, *A $400 Million Bet Says This Is the Mall of the Future*, THE WALL STREET JOURNAL (Mar. 8, 2024).

opening a store in Oklahoma City by virtue of SPG's vast retail holdings in other markets throughout the country. In short, despite the entrance of alternatives to Penn Square Mall, SPG has leveraged its economic power to further entrench its hold on the market in Oklahoma City.

61.    Not only has SPG's conduct reduced the competitive threat posed by Classen Curve and The Triangle, but, as detailed further below, SPG has also engaged in anticompetitive conduct to hamper the success of one of its newest competitors in Oklahoma City: OAK.

**B.    OAK**

62.    OAK is a mixed-used, lifestyle retail project that Plaintiffs have worked for more than a decade to plan, fund, and develop. OAK is similar to the mixed-use lifestyle retail projects that have been established in cities across the country, including Los Angeles, Atlanta, San Jose, Austin, and Scottsdale.

63.    Plaintiffs' goal was to establish an attractive lifestyle retail shopping center that would attract new-to-market and specialty retail brands to Oklahoma City, enhancing the premium shopping experience for those living in or traveling to Oklahoma, enabling retailers to achieve high sales potentials for this region, and expanding the retail sales tax base for the community.

64.    OAK was spearheaded by Ryan McNeill, a local developer who grew up in Western Oklahoma and the Oklahoma City area. McNeill founded Veritas, an Oklahoma-based real estate development company, with the objective of one day building a transformative, mixed-use development in McNeill's hometown of Oklahoma City.

65.     Soon after its formation, Veritas and other partners began developing the vision and securing the funding to make OAK a reality. Beginning in 2011, McNeill personally canvassed the Wileman Fourth Addition neighborhood to gain support for amending the governing private covenants (known as a plat) that limited most of the tracts where OAK was to be built to residential use. To amend the plat, at least 60% of the 135 lot owners within the Wileman neighborhood needed to approve. During a multi-year period, Plaintiffs successfully amended the relevant plat three times, and each time secured the notarized approval of at least 82 lot owners to enable OAK to develop the area for commercial use. This required an investment of numerous resources and thousands of hours, including more than one hundred meetings with lot owners in living rooms, on porches, and in local community buildings.

66.     In 2016, Plaintiffs acquired the first three acres where OAK would be built. As time went on, Plaintiffs acquired even more parcels, expanding the project's footprint to approximately 20 acres. The land that Plaintiffs acquired—and on which OAK would later be constructed—sits almost directly across the street from Penn Square Mall, setting the stage for the enclosed mall and mixed-use properties to directly compete for specialty retail tenants and patrons.



67.     As Plaintiffs built OAK, they set out to achieve their vision of developing it into a successful mixed-use lifestyle center. The development plan had multiple phases. One phase involved construction and development of a mix of specialty retail and dining spaces, residences, community areas, and a hotel. Another phase would expand OAK's footprint to include additional specialty retailers, restaurants, and desirable office space. Another phase would expand the footprint yet again to include more specialty retail space and state-of-the-art office space.

68.     Plaintiffs also acquired an interest in several parcels of land directly to the east of OAK's current footprint with the goal of developing it as part of a future phase of the project. Plaintiff NWPF also acquired a right of first refusal for a parcel of land adjoining OAK that is currently owned by a third party, with the intention of eventually purchasing that parcel and further expanding OAK's footprint.

69.     Plaintiffs began the hard work to achieve the goals for the first phase by negotiating with potential tenants. A critical component for a successful lifestyle center is a balanced mix of tenants across soft goods (apparel), restaurant services, and durable goods (such as home furnishings). To obtain this balanced mix, Plaintiffs began negotiating with a core group of key tenants who, at the time, did not have any retail presence in Penn Square Mall. Those tenants included RH, Arhaus, Alo, North Italia, Free People, and Free People Movement, among others.

70.     Plaintiffs' negotiations with North Italia, Alo, and similar high-end apparel retailers were particularly important. Given the strong brand recognition and sales performance these companies enjoy, obtaining them as tenants at OAK would motivate other specialty retailers to consider leasing space at OAK as well. In fact, many retailers would not consider leasing space at OAK at all unless one or more of these key tenants also opened retail locations at OAK. Such co-tenancy requirements are a common feature in lease agreements with specialty retailers at malls and lifestyle centers, and it is widely understood in the industry that reaching lease agreements with a core set of key tenants is crucial for a lifestyle center to succeed. That was particularly true for OAK. Plaintiffs could not accomplish the OAK's development plan without first obtaining a core set of well-regarded specialty retail (particularly apparel brands) and dining tenants.

71.     As explained below, Defendants leveraged SPG's economic power to stop OAK in its tracks.

III.    **SPG'S ILLEGAL CAMPAIGN TO RESTRAIN COMPETITION IN THE OKLAHOMA CITY MARKET**

A.    **SPG Identifies OAK as a Threat**

72.    As detailed earlier, after Plaintiffs acquired sufficient land on which to build OAK, they worked to secure approval for critical zoning changes that were necessary to enable OAK to include retail, restaurants, offices, residences, a hotel, and a central green space as part of the same development.

73.    News of Plaintiffs' plans soon reached Defendants, who recognized that OAK was a threat to SPG's Penn Square Mall. Defendants began lobbying aggressively against OAK, including by urging the Oklahoma City Council to reject any requested zoning changes, and by discouraging the Oklahoma City Council from awarding any financial incentives to OAK.

74.    At a meeting of the Oklahoma City Council in 2019 to consider Veritas's requested zoning changes, Defendants sent an attorney who made clear that SPG and its property, Penn Square Mall, were opposed to fair competition in Oklahoma City. Among other things, Defendants' attorney asserted, "This is almost another Penn Square Mall in the same area."[26]

75.    Defendants' lobbying efforts were unsuccessful, and their objections were overwhelmed by OAK's widespread support from local residents in Oklahoma City. In

---

[26] Brian Brus, *Rezoning for mixed-use development near Penn Square Mall approved*, THE JOURNAL RECORD (Aug. 13, 2019), https://journalrecord.com/2019/08/13/rezoning-for-mixed-use-development-near-penn-square-mall-approved/.

August 2019, the Oklahoma City Council approved the requested zoning changes, enabling OAK to proceed to site preparation in early 2022.

**B.    Defendants Interfere with OAK's Efforts to Attract Tenants**

76.    For an emerging lifestyle center or mixed-use development, like OAK, success is heavily dependent on securing attractive tenants during the early stages of the project. These so-called "anchor tenants," such as well-known, national retail brands, are essential because they generate significant foot traffic and act as a magnet for other tenants seeking to capitalize on the increased visibility and customer activity generated by popular brands.

77.    Recognizing the importance of securing attractive early tenant commitments, on February 28, 2022, Plaintiffs executed a "Landlord Rep Brokerage Agreement" with G&E Real Estate, LLC, which does business as Open Realty. In addition to representing landlords, like Plaintiffs, Open Realty also represents numerous tenants, including Restoration Hardware (RH), Lululemon, Apple, Altar'd State, Madewell, and J. Crew.

78.    Anchor tenants are equally vital for more established properties, including those owned by Defendants. A 2024 SEC filing by Defendants Simon Property Group, Inc. and Simon Property Group, L.P. states that certain SPG "properties depend on anchor stores or other large nationally recognized tenants to attract shoppers and [SPG] could be materially and adversely affected by the loss of one or more of these anchors or tenants."[27]

---

[27] Simon Property Group, Inc. 2024 Annual Report at 11.

The same filing identifies "the potential loss of anchor stores or major tenants" as among the "risks" that could negatively impact the company's financial performance.[28]

79.    On information and belief, Defendants recognized that if they could deprive OAK of valuable anchor tenants and other tenants in the early stages of its development, OAK would not be able to successfully compete with Penn Square Mall, further cementing Defendants' market power in Oklahoma City. Indeed, Defendants are keenly aware of the importance of acquiring and maintaining key tenants, given the recent declines in Penn Square Mall's occupancy rates and corresponding decrease in revenues.

80.    Defendants thus set out on a calculated campaign to interfere with Plaintiffs' negotiations with numerous key tenants by, among other things, leveraging SPG's economic power to force those tenants to substantially delay any agreements to lease space at OAK, to decline to lease space at OAK and instead lease space at Penn Square Mall, or to decline to come to Oklahoma City at all.

### 1.    Defendants Interfere with Plaintiffs' Negotiations with North Italia

81.    The Cheesecake Factory, Inc. ("CAKE") is a preeminent leader in experiential dining throughout North America. CAKE operates hundreds of restaurants under nationally well-regarded brands, including The Cheesecake Factory, North Italia, Flower Child, and others. CAKE also owns and operates Culinary Dropout, a newer and rapidly growing brand, through one of CAKE's wholly owned subsidiaries.

---

[28] *Id.* at 75.

82.     As of 2024, CAKE generated nearly $3.6 billion in annual sales from the operation of more than 350 restaurants throughout North America.[29] North Italia has become a key brand for CAKE due to its significant growth. In 2024, North Italia enjoyed 16% year-over-year sales gains, far exceeding the 3% sales gains experienced by The Cheesecake Factory restaurants.[30] CAKE has opened more than 40 North Italia restaurants, and it recognized in its most recent annual report that a "failure to effectively develop, grow and operate North Italia" is among CAKE's most sensitive risk factors that "could materially affect [CAKE's] financial performance."[31]

83.     North Italia and Culinary Dropout are highly desirable dining tenants for Oklahoma City because they attract affluent, upscale dining customers. Indeed, North Italia generates above-average sales (approximately $7.7 million in 2024) and sales per square foot ($1,100 in 2024), as well as high foot traffic.[32]

84.     Securing tenants like North Italia and Culinary Dropout are thus integral to the success of a lifestyle shopping center like OAK. In fact, as Plaintiffs began negotiating with specialty retail tenants, many insisted on co-tenancy requirements involving North Italia and Culinary Dropout. In other words, if Plaintiffs could not obtain lease agreements with North Italia and Culinary Dropout, other tenants would decline to lease space at OAK or would demand lease terms that were much less favorable to Plaintiffs.

---

[29] *See* The Cheesecake Factory 2024 Annual Report ("CAKE Annual Report") at 4, 60.

[30] *See* Letter from David Overton to The Cheesecake Factory Shareholders accompanying The Cheesecake Factory 2024 Annual Report.

[31] CAKE Annual Report at 3, 9.

[32] *Id.* at 9.

85.     In October 2022, Plaintiffs began negotiations with CAKE to open North Italia and Culinary Dropout locations at OAK. After several years of due diligence and negotiations, CAKE confirmed in July 2024 that it was committing to OAK with plans to open its first restaurant in 2025. That commitment launched extensive design coordination discussions and detailed negotiations that culminated in a formal letter of intent that was agreed to in or around December 2024.

86.     After the letter of intent was agreed to, the parties took the next steps to bring to fruition the opening of CAKE restaurants at OAK. CAKE submitted concept building plans for North Italia in early December 2024 and began compiling construction documents so that they could apply for the necessary permits. CAKE's North Italia construction plans were designed in coordination with OAK and completed by early March 2025. CAKE then applied for building permits and, on March 28, 2025, Plaintiffs instructed their general contractor to proceed with construction work for North Italia at OAK.

87.     A similar process occurred for Culinary Dropout. CAKE completed Culinary Dropout's construction documents in the spring of 2025 and filed applications for building permits in June 2025.

88.     CAKE planned to open North Italia at OAK in 2025 and Culinary Dropout at OAK in 2026. The anticipated arrival of these prominent restaurant brands at OAK was covered by the Oklahoma City press, including the popular *OKCTalk* online news forum.[33]

---

[33] *See, e.g.*, *Culinary Dropout coming to OAK*, OKC TALK (June 23, 2025), https://www.okctalk.com/content.php?r=1106-Culinary-Dropout-coming-to-OAK; *North Italia planning OKC location*, OKC TALK (Mar. 2, 2025), https://www.okctalk.com/content.php?r=1085-North-Italia-planning-OKC-location.

89.    Defendants, however, had other plans. On information and belief, SPG and Simon were aware of Plaintiffs' discussions with CAKE and its plans to open North Italia and Culinary Dropout restaurants at OAK. On information and belief, Defendants also learned that CAKE had agreed to a letter of intent with OAK and was negotiating the terms of formal lease agreements to be executed in 2025.

90.    Defendants took actions to thwart CAKE's plans to open North Italia and Culinary Dropout locations at OAK. As the largest retail mall owner in North America, SPG's properties represent approximately 30% of CAKE's entire portfolio of restaurant locations, including The Cheesecake Factory, North Italia, Culinary Dropout, and other brands. This gives Defendants enormous leverage to compel CAKE to accede to their demands.

91.    On information and belief, in or about late 2024 or early 2025, Defendants began pressuring CAKE not to open the planned North Italia restaurant at OAK and to instead lease space at Penn Square Mall.

92.    On information and belief, CAKE initially rebuffed Defendants, notifying Defendants in or about January and/or February 2025 that it was not interested in leasing space at Penn Square Mall. On information and belief, Defendants responded by using SPG's enormous market power to force CAKE to suspend its lease negotiations with OAK and enter a contractual investigation period to further evaluate potential locations at Penn Square Mall. As a result, in April 2025, CAKE informed Plaintiffs that further discussions regarding its planned locations at OAK would be delayed as it investigated options to instead open a new North Italia location at Penn Square Mall.

93.     On information and belief, in July 2025, CAKE informed Defendants that it had completed its evaluation of Penn Square Mall and intended to move forward with finalizing its negotiations with Plaintiffs to open North Italia next to Culinary Dropout at OAK.

94.     On information and belief, after hearing of CAKE's decision, Defendants further increased their pressure campaign on CAKE. According to a CAKE representative, at the time that CAKE informed Defendants that they wished to proceed with OAK rather than Penn Square Mall, CAKE had approximately 60 restaurants throughout North America located within SPG properties that were up for renewal within the next five years. On information and belief, Defendants, among other things, threatened to not renew some of those restaurants' leases, or to otherwise impose unfavorable renewal terms, if CAKE did not acquiesce to Defendants' demand that North Italia lease space at Penn Square Mall instead of at OAK. On information and belief, as part of their pressure campaign, Defendants also threatened to delay or cancel new leases for CAKE brand restaurants at other properties owned by SPG, and promised CAKE certain financial incentives if CAKE withdrew from its ongoing negotiations with Plaintiffs to open a North Italia location at OAK (which would make it difficult to open Culinary Dropout at OAK as well). In a conversation with Plaintiffs' representative, a CAKE representative described Defendants' actions as tantamount to "bribery"—that Defendants were offering to "pay all these monies" to CAKE that had "nothing to do with the leasehold" at Penn Square Mall and instead related to properties in different markets.

95.    Due to Defendants' extraordinary market power, including its control of properties representing a substantial proportion of CAKE's current and anticipated future restaurant locations, CAKE predictably succumbed to Defendants' pressure campaign. On or around September 10, 2025, CAKE informed Plaintiffs that it could no longer work towards opening North Italia at OAK and stated that CAKE was instead planning to open a North Italia restaurant at Penn Square Mall. CAKE made clear in its communications with Plaintiffs' representative that CAKE preferred OAK to Penn Square Mall but explained that it was impossible for CAKE to defy Defendants' demands.

96.    As a result of Defendants' coercive conduct, Plaintiffs' negotiations with CAKE were terminated, and Plaintiffs were unable to consummate a final lease agreement for North Italia at OAK.

97.    The loss of North Italia and likely Culinary Dropout as anchor tenants was devastating for OAK. As alleged above, other prospective OAK tenants had insisted on co-tenancy requirements involving North Italia and Culinary Dropout. By unlawfully interfering with and thwarting Plaintiffs' ability to secure leases with those tenants, Defendants' conduct caused enormous damage to OAK, including the loss of those key tenants; the inability to secure certain premium tenants that insisted on co-tenancy with North Italia and Culinary Dropout; the inability to secure lease terms from other tenants that agreed to lease space at OAK that are as favorable as could have been obtained with North Italia and Culinary Dropout as anchor tenants; and materially worse loan terms. In addition, the loss of North Italia and Culinary Dropout as tenants resulted in lower foot traffic at OAK than it otherwise would have achieved had CAKE opened North Italia and

Culinary Dropout restaurants at OAK, and it has further delayed Plaintiffs' ability to progress and complete OAK's development plan.

98.     Defendants unlawfully interfered with and restrained competition for CAKE's business to benefit Defendants' interests and to prevent Plaintiffs from competing on an equal playing field in Oklahoma City. These actions not only harmed Plaintiffs, but also CAKE, which has been forced to forego its preferred location in Oklahoma City, and Oklahoma City consumers, who at a minimum have been denied a North Italia location opening in 2025, as was planned at OAK but will not occur until some later date at Penn Square Mall. Defendants' actions also harmed competition by reinforcing SPG's monopolistic grip on the market for leasable space in specialty retail malls and lifestyle centers in Oklahoma.

2.     Defendants Interfere with Plaintiffs' Negotiations with Alo

99.     Defendants also interfered with Plaintiffs' negotiations with Alo, a popular and rapidly growing direct-to-consumer fashion brand founded in 2007 that competes in the "athleisure" market alongside brands like Lululemon.

100.     In recent decades, athleisure has become a dominant growth segment of the apparel industry. Specialty retailers selling premium athleisure products, such as Alo, are essential to develop a vibrant lifestyle shopping center, like OAK. The presence of Alo in a shopping center attracts other apparel and soft goods retailers, which can result in a density of key retailers that draw other specialty retailers, drive customer demand, induce cross-shopping, and result in increased sales performance.

101.    Alo has quickly become recognized as a key anchor tenant for lifestyle shopping centers. In the past few years, Alo's market share has grown dramatically, and it has rapidly opened new stores across the U.S., with more than 115 locations open and another 11 scheduled to open soon as of November 2025.[34]

102.    Many of Alo's retail locations are at properties owned by SPG. On information and belief, SPG is Alo's largest landlord.

103.    In December 2023, Plaintiffs began negotiating with Alo to lease space at OAK. At the time, Alo had no locations in the state of Oklahoma. In June 2024, following several months of negotiations and diligence, Alo agreed to a letter of intent to lease space at OAK. Over the approximately four months that followed, representatives for Plaintiffs and Alo engaged in extensive discussions regarding Alo's anticipated tenancy at OAK, including detailed information needed for Alo to apply for permits. They also extensively negotiated the terms of a formal lease.

104.    Given the parties' expectation that Alo would be opening a location at OAK, Alo authorized the design and creation of "coming soon" graphics to be displayed at OAK, which signal to customers and other prospective tenants that a tenant is expected to open a location at the property. This was a significant step. Specialty retailers typically do not authorize the creation of such graphics unless they are strongly committed to opening a store in the location where the graphics are to be displayed. The following graphic, which indicated that Alo was "Coming Spring 2025" to OAK, and also said "We're Hiring," was

---

[34] *See* https://www.aloyoga.com/pages/stores#united-states.

designed with Alo's approval. The graphic was installed on the exterior of what was expected to be Alo's storefront at OAK, with a black cover over the text that was to be removed once the lease was signed:



105.    Alo also authorized Plaintiffs to design, create, and install graphics on the base barricade of one of the buildings being constructed at OAK, depicted here:



106.    Alo's name was covered by black vinyl, which would be removed as soon as the lease was signed. That Alo authorized the display of these graphics reflected its intent to open a store at OAK in spring 2025, a fact that was also publicly reported in the local Oklahoma City press.

107.    Alo's public commitment to opening at OAK was particularly important to certain other prospective tenants, including similar upscale and rapidly growing apparel brands that were expected to follow Alo by also leasing space at OAK, further solidifying the density of apparel tenants.

108.    In early October 2024, a final draft lease was circulated for signature by representatives of Alo and OAK. Soon thereafter, an Alo representative confirmed that the

deal was effectively done and had received all necessary approvals except a signature from Alo's CEO. OAK's representative promptly signed the lease, so all that remained was for Alo to sign it.

109.    Unbeknownst to Plaintiffs at the time, Defendants learned of the imminent deal for Alo to lease space at OAK and quickly took steps to kill it. On information and belief, Defendant David Simon personally called Alo's owner to pressure him into pulling out of opening a store at OAK and to instead open a location at Penn Square Mall.

110.    On information and belief, properties owned by SPG represent a significant proportion of Alo's current and planned U.S. locations, and Defendants used SPG's enormous power over Alo's portfolio and growth plans to force it to submit to Defendants' demands, including conditioning favorable offers and deal terms pertaining to at least one other SPG-owned property in another state on Alo's agreement not to go forward with OAK and to instead lease space at Penn Square Mall.

111.    On or about November 15, 2025—barely a month after the lease with OAK had been fully negotiated and half executed, and months after Alo had conditionally authorized "coming soon" graphics at OAK—Alo informed Plaintiffs that it would no longer be moving forward with OAK and instead planned to open a store at Penn Square Mall.

112.    Alo's abrupt decision to abandon a fully negotiated and nearly consummated deal with OAK was, on information and belief, a direct result of Defendants' anticompetitive conduct, not fair competition. An Alo representative disclosed to Plaintiffs that Penn Square Mall performs "worse [than OAK] across all the metrics that [Alo] use[s]

to evaluate sites," and that Alo's decision to open a store at Penn Square Mall rather than OAK "makes no sense." The Alo representative also stated that, in their experience, it is a "common maneuver" by SPG and Simon to intervene in a competitor's negotiations with a desirable tenant to attempt to "strangl[e the] competing center," rather than simply focusing on "getting the best co-tenancy" possible for SPG's property. On information and belief, Alo has been subjected to such conduct by Defendants in other markets, including Minneapolis and Houston.

113.    Despite Plaintiffs' best efforts, Alo declined to execute its lease with OAK and instead moved forward with SPG's property. On or about October 17, 2025, Alo opened a store at Penn Square Mall.

114.    Plaintiffs suffered substantial negative impacts from Alo's decision not to lease space at OAK. In addition to the loss of Alo itself, Alo's withdrawal has made it much more difficult for Plaintiffs to attract other specialty retailers to OAK, resulted in reduced foot traffic at OAK, deprived Plaintiffs of substantial revenue, and impaired Plaintiffs' ability to move forward with the development plan for OAK.

115.    Defendants thus unlawfully interfered with Plaintiffs' relationship with Alo by engaging in oppressive and anticompetitive conduct that artificially restrained competition. In addition to harming Plaintiffs, Defendants' unlawful conduct also harmed Alo by forcing it to forego a location at OAK and instead open at Penn Square Mall—a shopping center that, on information and belief, is inferior to OAK on most or all of the business metrics that Alo normally evaluates in making leasing decisions. Defendants' conduct also harmed consumers by delaying the opening of an Alo store in Oklahoma City

by many months and interfering with OAK's ability to attract other specialty retail brands to the Oklahoma City market, reducing the retail sales tax base that would have otherwise been available.

        3.      <u>Defendants Interfere with Plaintiffs' Relationship with Retailer No. 3</u>

116.    Retailer No. 3 is a fast-growing performance apparel brand specializing in activewear and athleisure. It has a rapidly expanding footprint in the U.S. retail market, which includes locations at many SPG properties throughout the country. Retailer No. 3 does not currently have any retail locations in Oklahoma.

117.    Based on its belief that Alo, North Italia, and other key prospective tenants planned to lease space at OAK, a representative of Retailer No. 3 toured OAK in late August 2024. After the tour, the representative stated that Retailer No. 3 was interested in leasing a space at OAK that neighbored the space Alo intended to occupy. On or about October 10, 2024, Plaintiffs provided Retailer No. 3 with a letter of intent.

118.    Retailer No. 3 originally conveyed to Plaintiffs an interest in a 10-year lease on the space adjacent to Alo at a favorable rental rate. After Alo succumbed to Defendants' tactics and abandoned its plan to open a location at OAK, Retailer No. 3 initially communicated an interest in the space that Alo would no longer occupy. After that initial interest, however, Retailer No. 3 fell silent, ceasing to communicate with Plaintiffs for several months.

119.    In January 2025, a representative of Retailer No. 3 indicated to Plaintiffs' representative that Retailer No. 3 had discontinued its negotiations with Plaintiffs due to

concern that SPG would be displeased if it learned that Retailer No. 3 was considering opening a store at OAK. Retailer No. 3's representative explained that Defendants were "tying portfolio deals" together and "tying [Retailer No. 3] to other things that [it] can't say no to" in order to dissuade Retailer No. 3 from moving forward with leasing space at competing shopping centers in other markets. According to the representative, if Retailer No. 3 were to try to move forward with OAK, Retailer No. 3 believed that Defendants similarly would leverage their economic power to condition agreements between Retailer No. 3 and Defendants in markets outside of Oklahoma City on Retailer No. 3's commitment not to open a store at OAK. Retailer No. 3 thus understood, in other words, that Defendants would tie more favorable terms on lease agreements in other markets to an agreement by Retailer No. 3 to refuse to move forward with a lease for space at OAK.

120.    Retailer No. 3 has not signed a lease for space at OAK and has communicated to Plaintiffs that it will not do so in the near future. On information and belief, this is the direct result of Defendants' unlawful and anticompetitive conduct, including its successful effort to force Alo not to go forward with its lease, and Retailer No. 3's concern that it too will be subject to Defendants' tactics if it continues to pursue a lease at OAK.

121.    Defendants' conduct has directly harmed Plaintiffs, including denying them a lease with Retailer No. 3, as well as the benefits of co-tenancy that would flow from such a lease. Those lost benefits include the ability to attract other specialty retailers to OAK, increased foot traffic at OAK, and the substantial revenue that Plaintiffs would have otherwise earned. Defendants' interference and anticompetitive conduct have also impaired Plaintiffs' ability to move forward with the development plan for OAK.

122. Defendants' unlawful abuse of their economic power has artificially restrained competition and harmed Oklahoma City consumers. Among other things, Defendants dissuaded Retailer No. 3 from opening its first location in Oklahoma sooner, depriving Oklahoma City consumers of the ability to shop at Retailer No. 3 and interfering with OAK's ability to attract other specialty brands to the Oklahoma City market. Defendants' conduct has also harmed competition by compelling Retailer No. 3 to limit its consideration of the Oklahoma City market to space at Penn Square Mall, rather than space at OAK or in other, competing shopping centers.

4.    Defendants Interfere with Plaintiffs' Relationship with Retailer No. 4

123. Retailer No. 4 is a preeminent, high-end fashion retailer offering a curated collection of women's clothing. It leases space at more than 15 SPG properties in the United States, but it does not currently have any retail locations in Oklahoma.

124. On information and belief, Retailer No. 4 became interested in OAK after hearing that Alo, North Italia, and other tenants were moving forward with plans to open locations at OAK, which together would help create the density of apparel retailers necessary for Retailer No. 4 to open a location at OAK.

125. In early October 2024, a representative of Retailer No. 4 toured OAK and, on information and belief, Penn Square Mall for the purpose of assessing whether to lease space at either property.

126. On information and belief, at or about the time of these property visits, Defendants learned of Retailer No. 4's interest in OAK.

127.    Plaintiffs were advised by a representative of Retailer No. 4 that, shortly after the property visits, Defendants contacted Retailer No. 4's founder and stated that Retailer No. 4 "need[s] to come to Penn Square Mall or don't come to Oklahoma at all."

128.    Retailer No. 4's representative subsequently informed Plaintiffs that, in light of Defendants' threats, Retailer No. 4 needed to delay, potentially indefinitely, any plans to lease space at OAK.

129.    Approximately one year later, a representative of Retailer No. 4 disclosed to Plaintiffs that Retailer No. 4 had negotiated an agreement to lease space at Penn Square Mall rather than at OAK.

130.    Plaintiffs once again suffered substantial negative impacts from Retailer No. 4's decision not to lease space at OAK. Not only did Plaintiffs lose Retailer No. 4 as a tenant, but it has also been more difficult to attract other specialty retailers to OAK after Retailer No. 4 declined to lease space at OAK. This has resulted in reduced foot traffic at OAK, depriving Plaintiffs of revenue and impairing their ability to complete the development plan for OAK.

131.    Defendants unlawfully interfered with Plaintiffs' relationship with Retailer No. 4 and engaged in oppressive and anticompetitive conduct that artificially restrained competition. Defendants' conduct harmed both Plaintiffs and Retailer No. 4 by forcing Retailer No. 4 to choose to lease space at Penn Square Mall rather than at OAK. Defendants' conduct also harmed consumers by delaying the opening of Retailer No. 4's store (which still has not opened) and interfering with OAK's ability to attract other specialty retail brands to the Oklahoma City market.

5.    Defendants Interfere with Plaintiffs' Relationship with Retailer
      No. 5

132.    Retailer No. 5 is a world-leading athletic apparel and footwear brand, with hundreds of retail stores across the United States that consistently drive significant customer traffic. Retailer No. 5 leases space at dozens of U.S. properties owned by SPG.

133.    In or about the spring of 2022, following initial negotiations, Retailer No. 5 indicated to Plaintiffs that it was set to approve a plan to lease space at OAK. On information and belief, Defendants became aware of Retailer No. 5's intentions and began to exert pressure on Retailer No. 5. Among other things, on information and belief, Defendants conveyed threats and enticements to Retailer No. 5 based on that retailer's substantial business at other SPG properties. On information and belief, Defendants' threats and enticements implicated approximately 30 other deals between Retailer No. 5 and SPG involving locations in numerous markets.

134.    In late April 2022, Plaintiffs were informed that Retailer No. 5 no longer intended to lease space at OAK. Plaintiffs received an email stating that they needed to "throw the BRAKES" on further discussions with OAK because Retailer No. 5 needed to "kowtow to SIMON." Plaintiffs' discussions with Retailer No. 5 thereafter stalled, and Retailer No. 5 has not signed a lease for space at OAK.

135.    Plaintiffs were harmed by Retailer No. 5's decision not to lease space at OAK. Plaintiffs lost the revenue they would have earned from Retailer No. 5 as a tenant and lost the ability to use Retailer No. 5's tenancy to attract other specialty retailers to OAK. Without Retailer No. 5 as a tenant, OAK experienced reduced foot traffic, which

deprived Plaintiffs of additional revenue and impaired their ability to execute the development plan for OAK.

136.    Defendants unlawfully interfered with Plaintiffs' relationship with Retailer No. 5 and engaged in anticompetitive conduct that artificially restrained competition. In addition to harming Plaintiffs, Defendants' conduct harmed Retailer No. 5 by removing OAK as a viable location in which to open a store. Defendants' conduct also harmed consumers by interfering with OAK's ability to attract other specialty retail brands to the Oklahoma City market and depriving consumers of the ability to shop at Retailer No. 5, particularly because Retailer No. 5 currently has no store in either OAK or Penn Square Mall.

### 6.    Defendants Interfere with Plaintiffs' Relationship with RH

137.    RH (formerly Restoration Hardware) is a leading luxury furniture and home brand, whose flagship stores drive significant traffic to retail developments. Prior to OAK, there were no RH retail locations in Oklahoma City.

138.    In August 2018, Plaintiffs visited RH's headquarters in Corte Madera, California, and received an initial assurance that RH had "approved" the Oklahoma City market and considered OAK of serious interest. Thereafter, RH became one of OAK's contemplated "anchor tenants," with the parties contemplating a "gallery concept" store that would eventually occupy three stories and span approximately 38,000 square feet.

139.    Plaintiffs engaged in years of negotiations with RH and made significant financial commitments to persuade RH to open a store at OAK. In late March 2021, RH agreed to a final letter of intent to lease space at OAK.

140.   On information and belief, Defendants learned of RH's discussions with OAK and, in 2021, began applying extreme pressure to RH's CEO and other executives to pull out of its negotiations with OAK. An RH representative informed Plaintiffs that Defendants urged RH to instead accept a "package deal" that included leases at Penn Square Mall and several other SPG-owned properties in other states, which RH eventually rejected. According to the RH representative, after the "package deal" was rejected, Defendants engaged in other anticompetitive conduct, including demanding that RH should not come to Oklahoma City at all if it did not come to Penn Square Mall.

141.   On October 10, 2022—nearly four years after Plaintiffs' August 2018 visit to RH's headquarters—RH signed a lease with OAK. By then, Defendants' conduct had already caused significant damage to Plaintiffs. Among other things, on information and belief, Defendants' conduct caused RH to delay its lease with OAK by as much as one year, delaying Plaintiffs' ability to proceed with their development plan, thereby depriving Plaintiffs of substantial revenue and forcing Plaintiffs to incur substantial costs due to the delay and other harms. Defendants' unlawful conduct also harmed the Oklahoma City market and its consumers by, among other things, delaying the opening of RH's first store in Oklahoma by many months and impeding Plaintiffs' ability to proceed with the development plan for OAK.

7.   Defendants' Interference with Other Prospective OAK Tenants

142.   On information and belief, Defendants have engaged in similar anticompetitive conduct with respect to other prospective OAK tenants, including offering incentives and making threats regarding locations at other SPG-owned properties that were

conditioned on the tenant agreeing to lease space at Penn Square Mall instead of OAK, or refraining from entering the Oklahoma City market rather than leasing space at OAK.

143.    On information and belief, tenants subjected to these practices by Defendants have declined to pursue leases at OAK or, like RH, delayed pursuing such leases, thereby harming Plaintiffs, the Oklahoma City market, and consumers.

144.    As a result of Defendants' illegal and anticompetitive conduct, Plaintiffs have struggled to secure agreements with many key prospective tenants, which has diminished Plaintiffs' ability to compete against Penn Square Mall. Defendants' conduct has harmed the competitive process and reduced the quantity and quality of specialty retail and dining options available to consumers in Oklahoma City.

## FIRST CAUSE OF ACTION

### Unlawful Tying in Violation of Sherman Act §§ 1 and 2
### (15 U.S.C. §§ 1, 2, 15)
### Against Simon Property Group, Inc., Simon Property Group, L.P., and Penn Square Mall, LLC

145.    Plaintiffs incorporate by reference each allegation contained in the preceding paragraphs as if fully set forth here.

146.    Section 1 of the Sherman Act prohibits "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations." 15 U.S.C. § 1.

147.    A person violates section 2 of the Sherman act if that person "monopolize[s], or attempt[s] to monopolize, or combine[s] or conspire[s] with any other person or persons,

to monopolize any part of the trade or commerce among the several States, or with foreign nations." 15 U.S.C. § 2.

148.    Leasable space at Penn Square Mall (the tied product) and leasable space at other SPG properties (the tying products) are separate products.

149.    Defendants Simon Property Group, Inc., Simon Property Group, L.P., and Penn Square Mall, LLC worked together to engage in conduct that constitutes unlawful tying. Among other things, Defendants conditioned the sale or renewal of leasable space at other SPG properties outside of Oklahoma (the tying products) on the purchase of leasable space at Penn Square Mall (the tied products) or the nonpurchase of leasable space at OAK (a competitor in the tied product market). Defendants also conditioned certain favorable terms applicable to the sale or renewal of leasable space at other SPG properties on the purchase or renewal of leasable space at Penn Square Mall or an agreement not to purchase leasable space at OAK.

150.    Defendants possess sufficient economic power in the markets for leasable space in specialty retail malls and lifestyle centers in other cities in which SPG properties operate (the tying product markets) to enable Defendants to restrain trade in the market for leasable space in specialty retail malls and lifestyle centers in Oklahoma City (the tied product market).

151.    Defendants' illegal conduct affected a not insubstantial amount of interstate commerce, including by inhibiting national retailers and dining establishments from freely choosing where to open locations in Oklahoma City and reducing the flow of consumers and spending across state lines.

152.   There are no lawful or procompetitive justifications for Defendants' conduct.

153.   As a direct and proximate cause of the acts and conduct of Defendants, Plaintiffs have been unable to complete lease transactions for retail space at OAK with the prospective tenants affected by Defendants' anticompetitive conduct, have been delayed in their ability to complete such transactions, or have been forced to complete transactions on less favorable terms than would have been available but for Defendants' conduct. Defendants' conduct has also caused OAK to experience reduced foot traffic and lower residential and hotel occupancy rates.

154.   As a direct result of these harms, Plaintiffs have suffered substantial lost revenues and have been substantially delayed in their ability to pursue additional phases of development for OAK (including the construction and lease of additional retail space and highly desirable office space). Plaintiffs have been forced to incur (and are continuing to incur) additional costs as a result of this delay, and they have lost out on opportunities that they otherwise could have taken advantage of absent Defendants' unlawful conduct.

155.   Defendants' conduct has harmed the competitive process, degraded the quality of choices available to prospective tenants, and reduced the availability of shopping and entertainment options for consumers in Oklahoma City.

156.   Plaintiffs are entitled to an award of damages to remedy the harm that Plaintiffs have suffered to date, as well as to remedy future harm (including, but not limited to, lost profits, decreased market share, lost business opportunities, and delayed development) that Plaintiffs will suffer as a result of Defendants' anticompetitive conduct.

Plaintiffs are also entitled to injunctive relief to remedy all irreparable harms that have been caused by Defendants and to stop Defendants' ongoing unlawful conduct.

## SECOND CAUSE OF ACTION

**Monopolization and Monopoly Maintenance of the Market for Leasable Space in Specialty Retail Malls and Lifestyle Centers in Oklahoma City in Violation of Sherman Act § 2**
**(15 U.S.C. §§ 2, 15)**

**Against Simon Property Group, Inc., Simon Property Group, L.P., and Penn Square Mall, LLC**

157.    Plaintiffs incorporate by reference each allegation contained in the preceding paragraphs as if fully set forth here.

158.    Section 2 of the Sherman Act prohibits acts to "monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States." 15 U.S.C. § 2.

159.    Defendants Simon Property Group, Inc., Simon Property Group, L.P., and Penn Square Mall, LLC have violated Section 2 of the Sherman Act by attempting to monopolize, monopolizing, and maintaining monopoly power in the market for leasable space in specialty retail malls and lifestyle centers in Oklahoma City.

160.    Leasable space in specialty retail malls and lifestyle centers in Oklahoma City constitutes a relevant antitrust market, and Defendants have acquired and maintained monopoly power in that market. On information and belief, Defendants control more than 70% of the leasable space in specialty retail malls and lifestyle centers in Oklahoma City (primarily through Penn Square Mall, LLC), which has enabled them to extract supracompetitive rental rates from tenants.

161.    Defendants have unlawfully monopolized the market for leasable space in specialty retail malls and lifestyle centers in Oklahoma City through the pattern of exclusionary conduct and anticompetitive acts described above. Defendants' actions increased, maintained, or protected their monopoly power. Not only is each of Defendants' actions anticompetitive on its own, but each has a cumulative effect that further harmed competition and caused substantial damage to Plaintiffs.

162.    The anticompetitive conduct that contributed to Defendants' acquisition or maintenance of monopoly power in the market for leasable space in specialty retail malls and lifestyle centers in Oklahoma City includes their unlawful tying of leasable space in markets throughout the United States to leasable space at Penn Square Mall, their pattern of pressuring tenants to withdraw from negotiations or leases with competing shopping centers in Oklahoma City, and their demands that retailers not open a store in Oklahoma City at all if they will not open a store at Penn Square Mall.

163.    Defendants' anticompetitive conduct has negatively altered the market for leasable space in specialty retail malls and lifestyle centers in Oklahoma City. Among other things, Defendants' anticompetitive conduct has forced retailers not to lease space at specialty retail malls and lifestyle centers in Oklahoma City other than Penn Square Mall, dissuaded some retailers from leasing space at any shopping center in Oklahoma City, subjected retailers to higher rents or other unfavorable terms when leasing space at Penn Square Mall, reduced the quality and quantity of retailers available for consumers to shop at when visiting specialty retail malls and lifestyle centers in Oklahoma City, and

dramatically diminished the ability of other specialty retail malls and lifestyle centers in Oklahoma City to compete with Defendants.

164.    Defendants have no lawful or pro-competitive purpose for this conduct that could justify its anticompetitive effects.

165.    Defendants' illegal conduct affected a not insubstantial amount of interstate commerce, including by inhibiting national retailers and dining establishments from freely choosing where to open locations in Oklahoma City and reducing the flow of consumers and spending across state lines.

166.    Defendants' exclusionary conduct made possible by their monopoly power in the market for leasable space in specialty retail malls and lifestyle centers in Oklahoma City has significantly diminished Plaintiffs' ability to compete with Penn Square Mall and attract retailers to OAK. As detailed earlier, Defendants' anticompetitive conduct forced retailers to choose to lease space from Penn Square Mall even if they preferred to (and in some cases, after they already announced an intention to) lease space at OAK. Plaintiffs were harmed by Defendants' anticompetitive conduct in ways that the antitrust laws were designed to prevent. Plaintiffs have suffered and will continue to suffer substantial damages and irreparable injury.

167.    As a direct and proximate cause of the acts and conduct of Defendants, Plaintiffs have been unable to complete lease transactions for retail space at OAK with the prospective tenants affected by Defendants' anticompetitive conduct, have been delayed in their ability to complete such transactions, or have been forced to complete transactions on less favorable terms than would have been available but for Defendants' conduct.

Defendants' unlawful conduct has also caused OAK to experience reduced foot traffic and lower residential and hotel occupancy rates.

168.    As a direct result of these harms, Plaintiffs have suffered substantial lost revenues and have been substantially delayed in their ability to pursue additional phases of development for OAK (including the construction and lease of additional retail space and highly desirable office space). Plaintiffs have been forced to incur (and are continuing to incur) additional costs as a result of this delay, and they have lost out on opportunities that they otherwise could have taken advantage of absent Defendants' unlawful conduct.

169.    Defendants' conduct has harmed the competitive process, degraded the quality of choices available to prospective tenants, and reduced the availability of shopping and entertainment options for consumers in Oklahoma City.

170.    Plaintiffs are entitled to an award of damages to remedy the harm that Plaintiffs have suffered to date, as well as to remedy future harm (including, but not limited to, lost profits, decreased market share, lost business opportunities, and delayed development) that Plaintiffs will suffer as a result of Defendants' anticompetitive conduct. Plaintiffs are also entitled to injunctive relief to remedy all irreparable harms that have been caused by Defendants and to stop Defendants' ongoing unlawful conduct.

## THIRD CAUSE OF ACTION

**Violation of Section 203 of the Oklahoma Antitrust Reform Act**
**(Okla. Stat. tit. 79, §§ 203, 205)**

**Against Simon Property Group, Inc., Simon Property Group, L.P., and Penn Square Mall, LLC**

171.    Plaintiffs incorporate by reference each allegation contained in the preceding paragraphs as if fully set forth here.

172.    Section 203 of the Oklahoma Antitrust Reform Act prohibits "[e]very act, agreement, contract, or combination in the form of a trust, or otherwise, or conspiracy in restraint of trade or commerce within this state." Okla. Stat. tit. 79, § 203. That section also makes it "unlawful for any person to monopolize, attempt to monopolize, or conspire to monopolize any part of trade or commerce in a relevant market within this state." *Id.*

173.    Defendants Simon Property Group, Inc., Simon Property Group, L.P., and Penn Square Mall, LLC have violated this section by attempting to monopolize and monopolizing a relevant market within the state of Oklahoma, as well as by engaging in unlawful tying.

174.    Leasable space in specialty retail malls and lifestyle centers in Oklahoma City constitutes a relevant antitrust market, and Defendants have worked together to acquire and maintain monopoly power in that market. On information and belief, Defendants control more than 70% of the leasable space in specialty retail malls and lifestyle centers in Oklahoma City, which has enabled them to extract supracompetitive rental rates from tenants.

175.    Defendants have unlawfully monopolized the market for leasable space in specialty retail malls and lifestyle centers in Oklahoma City through the pattern of exclusionary conduct and anticompetitive acts described above. Defendants' actions increased, maintained, or protected their monopoly power. Not only is each of Defendants'

actions anticompetitive on its own, but each has a cumulative effect that further harmed competition and caused substantial damage to OAK.

176.    The anticompetitive conduct that contributed to Defendants' acquisition or maintenance of monopoly power in the market for leasable space in specialty retail malls and lifestyle centers in Oklahoma City includes their unlawful tying of leasable space in markets throughout the United States to leasable space at Penn Square Mall, their pattern of pressuring tenants to withdraw from negotiations or leases with competing shopping centers in Oklahoma City, and their demands that retailers not open a store in Oklahoma City at all if they will not open a store at Penn Square Mall.

177.    Defendants' anticompetitive conduct has negatively altered the market for leasable space in specialty retail malls and lifestyle centers in Oklahoma City. Among other things, Defendants' anticompetitive conduct has forced retailers not to lease space at malls and lifestyle centers in Oklahoma City other than Penn Square Mall, dissuaded some retailers from leasing space at any mall in Oklahoma City, subjected retailers to higher rents or other unfavorable terms when leasing space at Penn Square Mall, reduced the quality and quantity of retailers available for consumers to shop at when visiting specialty retail malls and lifestyle centers in Oklahoma City, and dramatically diminished the ability of other specialty retail malls and lifestyle centers in Oklahoma City to compete with Penn Square Mall.

178.    Defendants have no lawful or pro-competitive purpose for this conduct that could justify its anticompetitive effects.

179.   Defendants' exclusionary conduct made possible by Defendants' monopoly power in the market for leasable space in specialty retail malls and lifestyle centers in Oklahoma City has significantly diminished OAK's ability to compete against Penn Square Mall and attract retailers to OAK. As detailed earlier, Defendants' anticompetitive conduct forced retailers to choose to lease space from Penn Square Mall even if they preferred to (and in some cases, after they already announced an intention to) lease space at OAK. OAK was harmed by Defendants' anticompetitive conduct in ways that the antitrust laws were designed to prevent. OAK suffered and will continue to suffer substantial damages and irreparable injury.

180.   As a direct and proximate cause of the acts and conduct of Defendants, Plaintiffs have been unable to complete lease transactions for retail space at OAK with the prospective tenants affected by Defendants' anticompetitive conduct, have been delayed in their ability to complete such transactions, or have been forced to complete transactions on less favorable terms than would have been available but for Defendants' conduct. Defendants' unlawful conduct has also caused OAK to experience reduced foot traffic and lower residential and hotel occupancy rates.

181.   As a direct result of these harms, Plaintiffs have suffered substantial lost revenues and have been substantially delayed in their ability to pursue additional phases of development for OAK (including the construction and lease of additional retail space and highly desirable office space). Plaintiffs have been forced to incur (and are continuing to incur) additional costs as a result of this delay, and they have lost out on opportunities that they otherwise could have taken advantage of absent Defendants' unlawful conduct.

182.    Defendants' conduct has harmed the competitive process, degraded the quality of choices available to prospective tenants, and reduced the availability of shopping and entertainment options for consumers in Oklahoma City.

183.    Plaintiffs are entitled to an award of damages to remedy the harm that Plaintiffs have suffered to date, as well as to remedy future harm (including, but not limited to, lost profits, decreased market share, lost business opportunities, and delayed development) that Plaintiffs will suffer as a result of Defendants' anticompetitive conduct. Plaintiffs are also entitled to injunctive relief to remedy all irreparable harms that have been caused by Defendants and to stop Defendants' ongoing unlawful conduct.

## FOURTH CAUSE OF ACTION

### Tortious Interference with Prospective Economic Advantage
### Against All Defendants

184.    Plaintiffs incorporate by reference each allegation contained in the preceding paragraphs as if fully set forth here.

185.    Plaintiffs possessed a qualifying expectancy with respect to numerous prospective tenants of OAK, including North Italia, Alo, RH, Retailer No. 3, Retailer No. 4, and Retailer No. 5 described above. Each prospective tenant had demonstrated an intention to lease space at OAK, and several had also agreed to terms within letters of intent. In view of all the circumstances, Plaintiffs had reasonable assurance that each of these tenants would lease space at OAK.

186.    On information and belief, Defendants Simon Property Group, Inc., Simon Property Group, L.P, Penn Square Mall, LLC, and David Simon had knowledge of

Plaintiffs' discussions with the prospective tenants, as evidenced by Defendants' outreach to such tenants, many of whom did not have pre-existing leases at Penn Square Mall, to discuss OAK and the Oklahoma City market. On information and belief, each Defendant acted to interfere with Plaintiffs' prospective business expectancies, including when Defendant David Simon personally spoke with prospective OAK tenants to dissuade them from leasing space at OAK or, in some cases, from opening a store in Oklahoma City altogether.

187.    Defendants wrongfully interfered with Plaintiffs' business expectancies by engaging in anticompetitive conduct to prevent the prospective tenants from leasing space at OAK, including by conditioning favorable leases to other SPG properties on prospective tenants' agreement not to lease space at OAK, and by threatening not to do business with prospective tenants or imposing less favorable lease terms in other markets if those tenants leased space at OAK.

188.    As a direct and proximate cause of the acts and conduct of Defendants, Plaintiffs have been unable to complete lease transactions for retail space at OAK with the prospective tenants affected by Defendants' interference, have been delayed in their ability to complete such transactions, or have been forced to complete transactions on less favorable terms than would have been available but for Defendants' conduct. Defendants' unlawful interference has also caused OAK to experience reduced foot traffic and lower residential and hotel occupancy rates.

189.    As a direct result of these harms, Plaintiffs have suffered substantial lost revenues and have been substantially delayed in their ability to pursue additional phases of

development for OAK (including the construction and lease of additional retail space and highly desirable office space). Plaintiffs have been forced to incur (and are continuing to incur) additional costs as a result of this delay, and they have lost out on opportunities that they otherwise could have taken advantage of absent Defendants' unlawful conduct.

190.    Plaintiffs are entitled to an award of damages to remedy the harm that Plaintiffs have suffered to date, as well as to remedy future harm (including, but not limited to, lost profits, decreased market share, lost business opportunities, and delayed development) that Plaintiffs will suffer as a result of Defendants' interference. Plaintiffs are also entitled to injunctive relief to remedy all irreparable harms that have been caused by Defendants and to stop Defendants' ongoing interference.

## **REQUEST FOR RELIEF**

191.    WHEREFORE, Plaintiffs respectfully request that this Court grant them the following relief:

A.    Judgment in favor of Plaintiffs and against Defendants on all claims;

B.    Compensatory damages to be proven at trial;

C.    Triple damages as required by 15 U.S.C. § 15(a) and section 205 of the Oklahoma Antitrust Reform Act;

D.    Punitive damages;

E.    Costs of suit, including attorney's fees and expenses, as required by 15 U.S.C. § 15(a) and section 205 of the Oklahoma Antitrust Reform Act, and otherwise to the full extent permitted by law;

F.    Pre-judgment interest on all such damages, monetary or otherwise;

G.    Equitable relief, including relief consistent with 15 U.S.C. § 26 and section

205 of the Oklahoma Antitrust Reform Act; and

H.    All other relief this Court finds appropriate.

## **DEMAND FOR JURY TRIAL**

192.    Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs demand a trial

by jury on all claims asserted in this Complaint that are so triable.

Dated February 11, 2026

Respectfully Submitted,


*/s/ M. Richard Mullins*
M. Richard Mullins (OBA # 13329)
Andrew J. Morris (OBA # 31658)
MCAFEE & TAFT A PROFESSIONAL
CORPORATION
8th Floor, Two Leadership Square
211 North Robinson
Oklahoma City, OK 73102-7103
(405) 235-9621; (405) 235-0439 (fax)
*Richard.Mullins@mcafeetaft.com*
*Andrew.Morris@mcafeetaft.com*

*Of Counsel:*

HUESTON HENNIGAN LLP
John C. Hueston (admitted *pro hac vice*)
Marshall A. Camp (admitted *pro hac vice*)
Justin M. Greer (admitted *pro hac vice*)
Raymond Magsaysay (admitted *pro hac vice*)
523 West 6th Street, Suite 400
Los Angeles, CA 90014
(213) 788-4340; (888) 866-4825 (fax)
*jhueston@hueston.com*
*mcamp@hueston.com*
*jgreer@hueston.com*
*rmagsaysay@hueston.com*

***ATTORNEYS FOR PLAINTIFFS: OAK LAND
AND DEVELOPMENT, LLC, OAK PHASE I
PROPERTY OWNER, LLC, OAK HOTEL
OWNER, LLC, OAK BLOCK 2, LLC, OAK
BLOCK 3, LLC, OAK SE CORNER, LLC,
NWPF, LLC, AND VERITAS
DEVELOPMENT, LLC***