# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF OKLAHOMA

|  |  |
|---|---|
| (1) OAK LAND AND DEVELOPMENT, LLC; (2) OAK PHASE I PROPERTY OWNER, LLC; (3) OAK HOTEL OWNER, LLC; (4) OAK BLOCK 2, LLC; (5) OAK BLOCK 3, LLC; (6) OAK SE CORNER, LLC; (7) NWPF, LLC; and (8) VERITAS DEVELOPMENT, LLC, <br><br> *Plaintiffs,* <br><br> - v. - <br><br> (1) SIMON PROPERTY GROUP, INC.; (2) SIMON PROPERTY GROUP, L.P.; (3) PENN SQUARE MALL, LLC; and (4) DAVID SIMON, <br><br> *Defendants.* | Case No.  5:25-cv-1444-PRW |

## DEFENDANTS' MOTION TO DISMISS
## PLAINTIFFS' FIRST AMENDED COMPLAINT

## TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT ............................................................................. 1

STATEMENT OF THE CASE ............................................................................. 4

      A.     The parties ................................................................................. 4

      B.     Plaintiffs open OAK and win tenants from Simon. ..................... 5

      C.     Simon successfully attracts two other tenants that OAK was
vying for. ................................................................................... 7

      D.     Three other unidentified retailers decline to lease space at OAK. ............... 8

      E.     Shortly after touting OAK's success, plaintiffs sue, accusing
defendants of antitrust violations. ............................................. 9

ARGUMENT................................................................................................... 10

I.     Plaintiffs do not have antitrust standing. ............................................. 11

      A.     The requirements for standing to sue under the antitrust laws................... 11

      B.     Plaintiffs have not alleged an antitrust injury............................. 12

      C.     Plaintiffs are not "efficient enforcers" of the antitrust laws....................... 14

II.    Plaintiffs fail to state a claim under the Sherman Act. ......................... 15

      A.     The Complaint fails to adequately allege a relevant market or
monopoly power for the tied product.......................................... 16

      B.     Plaintiffs fail to adequately allege a relevant market or market
power for the tying product. ...................................................... 22

      C.     The allegations of illegal tying are inadequate............................ 24

            1.     Plaintiffs' coercion allegations are conclusory
and implausible. ............................................................ 24

            2.     Plaintiffs' allegations of "enticements" and "package deals"
are not actionable. ......................................................... 29

      D.     Plaintiffs have not adequately alleged substantial foreclosure.................... 31

III.   Plaintiffs fail to adequately allege a state law claim. ............................ 33

      A.     Plaintiffs fail to adequately allege a violation of the Oklahoma
Antitrust Reform Act.................................................................. 33

B.    Plaintiffs fail to adequately allege tortious interference with a prospective business advantage..................................................................... 33

C.    David Simon should be dismissed. ............................................................ 35

CONCLUSION ........................................................................................................ 35

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Ashcroft* v. *Iqbal*,
    556 U.S. 662 (2009) ................................................................................ 10

*Aspen Title & Escrow* v. *Jeld-Wen*,
    677 F. Supp. 1477 (D. Or. 1987) ............................................................. 32

*Ass'n of Surgical Assistants* v. *Nat'l Bd.*
    *of Surgical Tech. & Surgical Assisting*,
    127 F.4th 178 (10th Cir. 2025) ...................................................... *passim*

*Ass'n of Surgical Assistants* v. *Nat'l Bd.*
    *of Surgical Tech. & Surgical Assisting*,
    2023 WL 7277313 (D. Colo. Sept. 29, 2023) ...................................... 21, 25

*Atl. Richfield Co.* v. *USA Petroleum Co.*,
    495 U.S. 328 (1990) ................................................................................ 11

*Beal Corp. Liquidating Tr.* v. *Valleylab, Inc.*,
    927 F. Supp. 1350 (D. Colo. 1996) .......................................................... 31

*Bell Atl. Corp.* v. *Twombly*,
    550 U.S. 544 (2007) ...................................................................... *passim*

*Brock* v. *Thompson*,
    948 P.2d 279 (Okla. 1997) ....................................................................... 34

*Brunswick Corp.* v. *Pueblo Bowl-O-Mat, Inc.*,
    429 U.S. 477 (1977) ................................................................................ 11

*Buccaneer Energy (USA) Inc.* v. *Gunnison Energy Corp.*,
    846 F.3d 1297 (10th Cir. 2017) ...................................................... *passim*

*Campfield* v. *State Farm Mut. Auto. Ins. Co.*,
    532 F.3d 1111 (10th Cir. 2008) ................................................... 16, 17, 19

*Cargill, Inc.* v. *Monfort of Colo., Inc.*,
    479 U.S. 104 (1986) ................................................................................ 12

*C.D.* v. *Indep. Sch. Dist. No. 103*,
    2024 WL 3975844 (W.D. Okla. Aug. 28, 2024) ....................................... 26

*Chase Mfg., Inc.* v. *Johns Manville Corp.*,
  84 F.4th 1157 (10th Cir. 2023) ............................................................ 15–16, 18 n.7, 23

*Chi. Pro. Sports Ltd. P'ship* v. *Nat'l Basketball Ass'n*,
  961 F.2d 667 (7th Cir. 1992) ............................................................................... 14

*Colo. Interstate Gas Co.* v. *Nat. Gas Pipeline Co. of Am.*,
  885 F.2d 683 (10th Cir. 1989) ............................................................. 16 n.6, 18 & n.7

*Compliance Mktg., Inc.* v. *Drugtest, Inc.*,
  2010 WL 1416823 (D. Colo. Apr. 7, 2010) ...................................................... 16, 19, 34

*Concord Assocs., L.P.* v. *Ent. Props. Tr.*,
  817 F.3d 46 (2d Cir. 2016) ...................................................................................... 21

*Copperweld Corp.* v. *Indep. Tube Corp.*,
  467 U.S. 752 (1984) ......................................................................................... 25 n.10

*De Aleman* v. *Allstate Fire & Cas. Ins. Co.*,
  2021 WL 1962893 (D. Colo. Feb. 12, 2021) ............................................................. 26

*Eastman Kodak Co.* v. *Image Tech. Servs.*,
  504 U.S. 451 (1992) ......................................................................................... 22, 31

*Emrich Aerial Spraying LLC* v. *City of Pawhuska*,
  2025 WL 2987889 (N.D. Okla. Oct. 23, 2025) ......................................................... 33

*Fox Motors, Inc.* v. *Mazda Distribs. (Gulf), Inc.*,
  806 F.2d 953 (10th Cir. 1986) ............................................................................... 13

*Green Country Food Mkt., Inc.* v. *Bottling Grp. LLC*,
  371 F.3d 1275 (10th Cir. 2004) ............................................................................. 33

*Gumwood HP Shopping Partners* v. *Simon Prop. Grp.*,
  2013 WL 3214983 (N.D. Ind. Mar. 13, 2013) ...................................................... 18 n.8

*In re Cox Enters.*,
  871 F.3d 1093 (10th Cir. 2017) ............................................................................. 30

*In re Epipen Mktg., Sales Pracs. & Antitrust Litig.*,
  44 F.4th 959 (10th Cir. 2022) .......................................................................... 12, 15

*In re Overstock Sec. Litig.*,
  2021 WL 4267920 (D. Utah Sept. 20, 2021) ...................................................... 27 n.11

*It's My Party, Inc.* v. *Live Nation, Inc.*,
    811 F.3d 676 (4th Cir. 2016) .................................................................. 30, 31

*Jefferson Par. Hosp. Dist. No. 2* v. *Hyde*,
    466 U.S. 2 (1984) ........................................................................24–25, 30, 31

*Kaufman* v. *Time Warner*,
    836 F.3d 137 (2d Cir. 2016) ........................................................... 22, 24, 30

*Lawter & Assocs., PLLC* v. *Sw. Bell Advert. L.P.*,
    2008 WL 11338506 (W.D. Okla. June 13, 2008) ....................................... 24

*Long Island Anesthesiologists PLLC* v. *United Healthcare Ins. Co.*,
    2023 WL 8096909 (E.D.N.Y. Nov. 21, 2023) ............................................ 27

*Loven* v. *Church Mut. Ins. Co.*,
    452 P.3d 418 (Okla. 2019) ......................................................................... 34

*Mayfield SWD, L.L.C.* v. *Blevins*,
    2011 WL 195656 (W.D. Okla. Jan. 19, 2011) ............................................ 12

*Morrow Dev. Corp.* v. *Am. Bank and Trust Co.*,
    875 P.2d 411 (Okla. 1994) .................................................................... 34, 35

*Multistate Legal Stud., Inc.* v. *Harcourt Brace
    Jovanovich Legal & Pro. Publ'ns, Inc.*,
    63 F.3d 1540 (10th Cir. 1995) .............................................................. 15, 29

*N. Brevard Cnty. Hosp. Dist.* v. *C.R. Bard, Inc.*,
    162 F.4th 1268 (10th Cir. 2025) ..........................................................*passim*

*Northumberland Cnty. Ret. Sys.* v. *Kenworthy*,
    2013 WL 5230000 (W.D. Okla. Sept. 16, 2013) .................................... 5 n.2

*Novell, Inc.* v. *Microsoft Corp.*,
    731 F.3d 1064 (10th Cir. 2013) .......................................... 15, 16, 18 n.7, 35

*Occusafe, Inc.* v. *EG&G Rocky Flats, Inc.*,
    54 F.3d 618 (10th Cir. 1995) ..................................................................... 34

*Overbeck* v. *Quaker Life Ins. Co.*,
    757 P.2d 846 (Okla. Civ. App. 1984) ......................................................... 34

*Pac. Bell Tel. Co.* v. *linkLine Commc'ns, Inc.*,
    555 U.S. 438 (2009) ................................................................................... 30

*Race* v. *JPMorgan Chase Bank*,
2025 WL 1267155 (D. Colo. Apr. 11, 2025)...............................................26

*Risk* v. *Allstate Life Ins. Co.*,
2006 WL 2021597 (N.D. Okla. July 17, 2006) ..........................................33

*Rockbit Indus. U.S.A., Inc.* v. *Baker Hughes, Inc.*,
802 F. Supp. 1544 (S.D. Tex. 1991) .........................................................24

*Smith* v. *United States*,
561 F.3d 1090 (10th Cir. 2009) .............................................................5 n.2

*Suture Express, Inc.* v. *Owens & Minor Distrib., Inc.*,
851 F.3d 1029 (10th Cir. 2017) ................................................... 12, 15, 22

*Tal* v. *Hogan*,
453 F.3d 1244 (10th Cir. 2006) .................................................................13

*TKO Energy Servs., LLC* v. *M-I L.L.C.*,
539 F. App'x 866 (10th Cir. 2013) ...........................................................33

*TV Commc'ns Network, Inc.* v. *Turner Network Television, Inc.*,
964 F.2d 1022 (10th Cir. 1992) .................................................................14

*Unijax, Inc.* v. *Champion Int'l, Inc.*,
683 F.2d 678 (2d Cir. 1982).......................................................................35

*Verizon Commc'ns Inc.* v. *Law Offices of Curtis V. Trinko, LLP*,
540 U.S. 398 (2004).....................................................................................15

## Statutes & Rules

The Sherman Antitrust Act of 1890, 15 U.S.C. §§ 1, 2 ................................*passim*

The Oklahoma Antitrust Reform Act, Okla. Stat. Tit. 79 ........................ 4, 9, 33

Fed. R. Civ. P. 8.............................................................................................28

Fed. R. Civ. P. 12(b)(6) ................................................................................... 1

## Other Authorities

Herbert Hovenkamp, *Federal Antitrust Policy:*
*The Law of Competition and Its Practice* (7th ed. 2024)............................20

Defendants move to dismiss the First Amended Complaint (the "Complaint") (Dkt. 26) under Fed. R. Civ. P. 12(b)(6), and, in support thereof, state as follows:

## PRELIMINARY STATEMENT

The Supreme Court has held repeatedly that the antitrust laws protect competition, not competitors. This lawsuit is an affront to that principle. In this litigation, a new competitor seeks to use the antitrust laws to shield itself from legitimate competition and blame a rival real estate developer for its inability to close deals with a few prospective tenants. The Complaint fails to state a claim and should be dismissed with prejudice.

Plaintiffs are the owners and operators of OAK, a new mixed-use real estate development in Oklahoma City they built across the street from Penn Square Mall. When OAK opened in 2024, plaintiffs trumpeted their success in winning high-profile tenants from Penn Square, including Pottery Barn, Williams Sonoma, and RH (formerly Restoration Hardware). But competition is not a one-way street, and a few prospective tenants OAK was pursuing decided to locate at Penn Square, including a North Italia restaurant, an Alo apparel store, and another unidentified retail brand that allegedly contemplated leasing space at OAK but hasn't done so.

Plaintiffs' theory of liability is that defendants engaged in "tying" in violation of Sections 1 and 2 of the Sherman Act. According to the Complaint, defendants leveraged their properties in other cities to force prospective tenants with whom they had business relations into leasing space at Penn Square or not leasing space at OAK. Plaintiffs claim restraint of trade in, and monopolization of, a market they define as "[l]easable space in specialty retail malls and lifestyle centers in Oklahoma City."

Plaintiffs' antitrust claims fail on multiple grounds.  At the threshold, plaintiffs lack antitrust standing to bring these claims.  This is an incurable defect.  The "harms" alleged are not harms to competition but to a competitor and thus are not harms the antitrust laws redress.  Plaintiffs complain they have been harmed because competitive pressure from Simon required OAK to offer *better* terms to tenants than OAK wanted to offer.  But that is not an antitrust injury.  It is the procompetitive result of competition, which is good for tenants, the relevant consumers.  Moreover, even if plaintiffs could overcome these hurdles, they would still lack standing because they are not an "efficient enforcer" of the antitrust laws.  Under Tenth Circuit law, the efficient enforcers would be the tenants supposedly coerced to take leases at Penn Square.  No tenant has sued.

Plaintiffs' antitrust claims are defective for additional reasons.  *First*, plaintiffs fail to define a legally sufficient market for the "tied product."  The Tenth Circuit has held that an antitrust complaint must be dismissed if the relevant market is not defined with specificity and by reference to interchangeability and cross-elasticity of demand. Plaintiffs, however, never bother with this required analysis nor allege what retail properties fall within the relevant market.  As shown below, plaintiffs have put forward an impermissibly narrow and ill-conceived market definition for the tied product that has been heavily manipulated to exclude obvious competitors and grossly inflate Penn Square's alleged market share.  This is fatal to plaintiffs' claims.

*Second*, plaintiffs don't even try to identify a relevant market for the "tying product."  Plaintiffs broadly allege the tying market is "other cities in which [Simon] operates," which is more than 200 cities across the globe, including more than 150 cities

in the United States.  Which cities plaintiffs are referencing is anyone's guess.  This deficiency makes it impossible to assess whether "leasable space in specialty retail malls and lifestyle centers" makes sense as a product market in those other locales or whether these other "cities" can constitute proper geographic markets.  This deficiency also makes it impossible to assess whether defendants have the requisite market power in those alleged markets to force a tie on tenants in Oklahoma City.  This is also fatal.

*Third*, the Complaint contains no factual detail regarding defendants' alleged coercion of tenants.  Plaintiffs point broadly to supposed "threats" but never supply the basic facts — who from defendants made them, who from the tenant heard them, who relayed them to plaintiffs, when they were made, or which other Simon properties were implicated.  Indeed, of the six prospective tenants plaintiffs discuss, three are not even identified by name.  These empty and unsupported coercion allegations, illustrated by plaintiffs' indiscriminate use of the "on information and belief" formulation no fewer than 43 times, are implausible and violate the Supreme Court's directive that an antitrust complaint contain "some specificity" in order to survive a motion to dismiss and open the floodgates to the onerous discovery that plagues antitrust lawsuits.

*Fourth*, as the Tenth Circuit recently reiterated, to support a tying claim, plaintiffs must allege that a "substantial volume" of commerce was foreclosed.  The allegations here don't come close.  Even taking plaintiffs' flawed market definition at face value, competitors *are* entering the alleged market.  In addition to the recent entry of OAK, plaintiffs allege two other competing shopping centers opened in 2012.  And on plaintiffs' accounting, OAK has won the business of tenants that Penn Square vied for

-3-

as well.  That a few prospective tenants representing a tiny fraction of leasable space in the alleged market — and an even smaller percentage of the universe of restaurants and retailers which might lease space in Oklahoma City — chose to go across the street to Penn Square is not, and cannot be, foreclosure of a "substantial volume" of commerce.

Plaintiffs also tack on state law claims for violation of the Oklahoma Antitrust Reform Act and tortious interference with prospective economic advantage.  But the state antitrust claim mirrors the federal antitrust claims, and, if the federal claims fail, then the state antitrust claim fails too.  The tortious interference claim, the only claim brought against David Simon, is likewise premised on the alleged anticompetitive conduct underpinning the antitrust claims and must be dismissed for failure to plead those underlying claims.  Mr. Simon should also be dismissed because the Complaint barely sets forth any facts about his conduct and fails to allege that he did anything wrong.

## STATEMENT OF THE CASE

### A.    The parties

Plaintiffs are companies that developed, own, and operate OAK, a "retail and mixed-use project" in Oklahoma City.  ¶ 1.[1]  OAK combines luxury residences, hotel accommodations, and retail shopping.  ¶ 2.

Defendants Simon Property Group, Inc. and its subsidiary operating partnership, Simon Property Group, L.P. (together with the other entity defendant, "Simon") own and operate shopping, dining, entertainment, and mixed-use properties in the U.S. and abroad.

---

[1] Citations in the form of "¶ __" are to the Complaint.  Internal quotation marks are omitted unless otherwise noted.

-4-

¶¶ 20–22, 39; Ex. 1 (Simon Prop. Grp., Inc., Form 10-K (Feb. 21, 2025) ("Simon 10-K") (cited at ¶ 22)).[2]  Simon owns or has interests in 194 income-producing properties in 37 states and Puerto Rico and across more than 150 U.S. cities.  ¶ 37; Simon 10-K at 29–41.  Defendant David Simon is Simon's Chairman, President, and CEO.  ¶ 24.

The Simon property at issue in this case is Penn Square Mall, which is operated by defendant Penn Square Mall, LLC.  ¶¶ 6, 23.  Opened in 1960, Penn Square has approximately one million square feet of leasable space.  ¶¶ 6, 56; Ex. 2 at 2 (*Rating Action*, Moody's Ratings (Nov. 25, 2025) (cited at ¶ 58 n.23)).

### B.    Plaintiffs open OAK and win tenants from Simon.

Plaintiffs opened OAK in September 2024.  ¶ 3.  Within months, well-established national brands, including The Capital Grille, Lively Hotel, Mesero, Pottery Barn, Shake Shack, Tempur-Pedic, Tommy Bahama Marlin Bar, and Williams Sonoma, had launched at OAK.  *See* Ex. 3 at 2 (*Culinary Dropout coming to OAK*, OKC Talk (June 23, 2025) (cited at ¶ 88 n.33)); *Directory*, OAK, https://www.oakokc.com/directory/.

Pottery Barn and Williams Sonoma were big wins for OAK — both had previously been Penn Square tenants.  OAK's competitive successes made local headlines, with the *Journal Record* reporting in November 2023 that "*Oak development lures retailers from Penn Square Mall.*"  *See* Ex. 4 at 1.

---

[2] The Court may take notice of "documents incorporated into the complaint by reference," *Smith* v. *United States*, 561 F.3d 1090, 1098 (10th Cir. 2009), and of "federally regulated filings, including SEC filings," *Northumberland Cnty. Ret. Sys.* v. *Kenworthy*, 2013 WL 5230000, at *3 (W.D. Okla. Sept. 16, 2013).

OAK also won out over Simon in competing for RH, one of the most sought-after home furnishing brands in the country.  ¶¶ 137, 141.  Plaintiffs allege they "engaged in years of negotiations with RH and made significant financial commitments to persuade RH to open a store at OAK."  ¶ 139.  OAK's RH win was also broadly publicized.  *The Oklahoman* quoted OAK's developer Ryan McNeill as saying that three of OAK's "anchor" tenants were "galvanizing retailers that have unique and special coattails . . . . And RH is the bell cow.  . . .  These are not best just in the market, but best in class in the country."  Ex. 5 at 3 (Steve Lackmeyer, *Restoration Hardware, Arhaus and Capital Grille to Anchor OAK Development*, The Oklahoman (Oct. 25, 2022)).

There are no allegations that defendants "coerced" tenants that have signed leases at OAK, despite those OAK tenants having numerous locations with Simon:

| Tenants that Signed at OAK[3] | Locations in Simon Properties[4] |
|---|---|
| **Arhaus** | 26 |
| **Pottery Barn** | 41 |
| **RH (Restoration Hardware)** | 10 |
| **Shake Shack** | 30 |
| **Tempur-Pedic** | 19 |
| **The Capital Grille** | 5 |
| **Tommy Bahama** | 47 |
| **Williams Sonoma** | 23 |

---

[3] *Directory*, https://www.oakokc.com/directory/.  Affiliated brands are grouped together.

[4] The location counts are based on Simon's publicly available store locator as of February 19, 2026.  *Exceptional Brands*, Simon Malls, https://www.simon.com/brands.  *See Ass'n of Surgical Assistants* v. *Nat'l Bd. of Surgical Tech. & Surgical Assisting*, 127 F.4th 178, 183–84 (10th Cir. 2025) ("*ASA*") (noting that it is "not uncommon for courts to take judicial notice of factual information found on the world wide web").

C.    **Simon successfully attracts two other tenants
that OAK was vying for.**

While OAK has been successful in luring some Simon tenants to its property, it was not successful with a few others after Simon vied for their business.  In particular, OAK was unable to secure deals with North Italia, an Italian restaurant chain owned by The Cheesecake Factory, Inc., and Alo, an athleisure apparel retailer.

*Cheesecake*:  In 2022, OAK began negotiating with Cheesecake about opening North Italia and Culinary Dropout (another Cheesecake-owned chain).  ¶ 85. Cheesecake, however, which had a Cheesecake Factory restaurant at Penn Square, ultimately accepted the terms offered by Simon to open a North Italia location at Penn Square.  ¶¶ 94–95.  As for Culinary Dropout, plaintiffs do not allege it is opening at Penn Square.  ¶¶ 81–98.  Rather, they claim that losing North Italia "would make it difficult to open Culinary Dropout at OAK," without explaining how or why.  ¶ 94.

*Alo*:  Plaintiffs allege that they began negotiating with Alo about opening a location at OAK in 2023.  ¶ 103.  Even though OAK and Alo had not yet executed a binding lease, OAK began posting "Coming Soon" graphics on what it hoped would be Alo's storefront.  ¶¶ 104, 108.  Around that time, Simon engaged Alo in negotiations about opening a location at Penn Square instead, with David Simon calling Alo's owner to pitch him on leasing space at Penn Square.  As part of the negotiations, defendants allegedly offered concessions at "at least one other SPG-owned property in another state."  ¶¶ 109–10.  Simon won the business, and Alo opened at Penn Square.  ¶ 113.

The Complaint contains no information comparing the respective lease terms offered to North Italia and Alo at either Penn Square or OAK and thus provides no basis to infer that those leases at Penn Square are economically inferior to what they would have been at OAK. If anything, plaintiffs allege that Cheesecake and Alo were induced to sign leases at Penn Square based on more attractive offers extended by Simon as a result of competing for their business. ¶¶ 94–95, 110–11.

**D.      Three other unidentified retailers decline to lease space at OAK.**

The Complaint also alleges that three unnamed retailers were considering OAK at various points in time but declined to lease space there. ¶¶ 116–36. There is no allegation that any of the unidentified retailers ever progressed to the stage of negotiating a lease agreement. Unnamed "Retailer No. 3" allegedly expressed interest in OAK and was provided a draft letter of intent but never signed it and hasn't opened a location in Oklahoma City. ¶¶ 116–17. Unnamed "Retailer No. 4" allegedly toured both OAK and Penn Square in 2024 but chose to lease space from Penn Square a year later. ¶¶ 125, 129. And unnamed "Retailer No. 5" supposedly "indicated to [p]laintiffs" four years ago that it was "set to approve a plan to lease space at OAK" but didn't follow through and hasn't leased space in Oklahoma City. ¶¶ 132–34, 136.

The Complaint provides no explanation for why the names of these unidentified retailers need to be concealed. Nor does the Complaint provide any information on the unnamed "representatives" to whom it attributes statements concerning Simon, including in what, if any, capacity they "represented" any of the unnamed or named tenants.

**E.    Shortly after touting OAK's success, plaintiffs sue, accusing defendants of antitrust violations.**

On September 16, 2025, Ryan McNeill — the "founder" of plaintiff Veritas and the developer who "spearheaded" OAK (¶ 64) — authored an article in *Urban Land* touting OAK's competitive "success" and boasting of a "stellar retail lineup."  McNeill wrote that OAK's tenants were "reporting off-the-charts sales," including the tenants that OAK had won from "vintage" Penn Square Mall.  And McNeill wrote that OAK had already obtained a "critical mass of retailers" that were of a "quality and caliber" unparalleled in Oklahoma City.  Ex. 6 at 5, 6 (Ryan McNeill, *The Key Figures That Define Oklahoma City's OAK Development*, Urban Land (Sept. 16, 2025)).

A few months later, however, on December 2, 2025, plaintiffs filed this lawsuit, accusing defendants of a campaign "to destroy" OAK by depriving it of a few desired tenants.  ¶ 1.  Plaintiffs allege that defendants won these tenants not through legitimate competition, but through unlawful "tying" in violation of Section 1 and Section 2 of the Sherman Act, violation of Section 203 of the Oklahoma Antitrust Reform Act, and tortious interference with prospective economic advantage.  ¶¶ 145–90.  The First Cause of Action of the Complaint asserts claims for "Unlawful Tying" in violation of Sections 1 and 2, and the Second Cause of Action asserts a claim for monopolization under Section 2 in which the alleged anticompetitive conduct is tying.  ¶¶ 8, 162.

Plaintiffs allege that OAK and Penn Square compete in a relevant market they improperly define as the "market for leasable space in specialty retail malls and lifestyle centers in Oklahoma City."  ¶ 150.  According to plaintiffs, "[d]efendants control more

than 70% of the leasable space" in this alleged market, thus giving defendants "monopoly power." ¶ 160. Plaintiffs do not provide any information on how they calculated a 70% market share. But to get to their 70% figure, they have necessarily excluded obvious competitors like Quail Springs Mall and Sooner Mall, among others.

Plaintiffs' theory of wrongdoing is that Simon used threats or enticements involving unidentified properties it owns and operates in other unidentified cities to coerce tenants to lease space at Penn Square or not lease space at OAK. Plaintiffs complain that, as a result of defendants' actions, they have had to compete more vigorously for tenants and lower prices to win business. As plaintiffs allege, they "have been forced to complete transactions on less favorable terms than would have been available but for Defendants' conduct." ¶ 153.

## ARGUMENT

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft* v. *Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp.* v. *Twombly*, 550 U.S. 544, 570 (2007)). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* at 678. Determining whether a complaint states a plausible claim is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* at 679.

*Twombly* itself was an antitrust case, and in affirming the dismissal of the complaint for insufficient factual content, the Supreme Court observed that discovery in an antitrust case can be a "sprawling, costly, and hugely time-consuming undertaking."

*Twombly*, 550 U.S. at 560 n.6.  Accordingly, because of the potential for spurious antitrust claims to impose enormous litigation costs, the Tenth Circuit "'insist[s] upon some specificity in pleading before allowing a potentially massive factual controversy to proceed' in these cases."  *ASA*, 127 F.4th at 186 (quoting *Twombly*, 550 U.S. at 558).

The Complaint fails to satisfy these pleading standards.  Plaintiffs do not adequately allege antitrust standing, relevant markets, monopoly or market power, coercion, or substantial foreclosure.

## I.    Plaintiffs do not have antitrust standing.

### A.    The requirements for standing to sue under the antitrust laws

To have standing to sue under the antitrust laws, a plaintiff must plausibly allege "antitrust injury," which is an "injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful."  *Atl. Richfield Co.* v. *USA Petroleum Co.*, 495 U.S. 328, 334 (1990).

Less than two months ago, the Tenth Circuit addressed this rule in setting forth the requirements for antitrust standing in a tying case.  The Court began by reiterating the cardinal principle that "antitrust laws were enacted for 'the protection of competition, not competitors.'"  *N. Brevard Cnty. Hosp. Dist.* v. *C.R. Bard, Inc.*, 162 F.4th 1268, 1276 (10th Cir. 2025) (quoting *Brunswick Corp.* v. *Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 488 (1977)).  Accordingly, "the substantive prohibitions on anticompetitive conduct are concerned not with its effect upon any individual in the marketplace, but rather [] its effect generally upon competition in a particular market."  *Id.*  If a plaintiff does not plead an adequate harm *to competition* — as opposed to itself — then it fails to plead an

"antitrust injury" and lacks standing to proceed. *Id.*; *see also In re Epipen Mktg., Sales Pracs. & Antitrust Litig.*, 44 F.4th 959, 985 (10th Cir. 2022) (antitrust law is "indifferent to the preservation of inefficient competitors"); *Mayfield SWD, L.L.C.* v. *Blevins*, 2011 WL 195656, at *5 (W.D. Okla. Jan. 19, 2011) ("An allegation that [plaintiff] has lost some of its business to defendants does not make out" an antitrust injury).

Moreover, as the Supreme Court has long held, "[a] showing of antitrust injury is necessary, but not always sufficient, to establish [antitrust] standing[.]" *Cargill, Inc.* v. *Monfort of Colo., Inc.*, 479 U.S. 104, 110 n.5 (1986). As the Tenth Circuit went on to hold in *North Brevard*, under the "efficient enforcer" principle, "only plaintiffs who best vindicate the central interest in protecting the economic freedom of participants in the relevant market have a right to sue." 162 F.4th at 1275. "[T]he existence of other parties who 'would be more directly harmed by' the anticompetitive conduct will ordinarily defeat a plaintiff's antitrust standing." *Id.* at 1274. And "ordinarily it is the tying product purchaser whose self-interest is best aligned with the public interest, and therefore best positioned to perform the office of private attorney general." *Id.* at 1277.

On a straightforward application of these principles, plaintiffs do not have standing to assert their Sherman Act claims.

## B.     Plaintiffs have not alleged an antitrust injury.

Plaintiffs have failed to allege that the complained-of conduct "actually injured competition" as opposed to "merely a competitor," *i.e.*, themselves. *Suture Express, Inc.* v. *Owens & Minor Distrib., Inc.*, 851 F.3d 1029, 1044 (10th Cir. 2017). Plaintiffs have not been foreclosed from entering any market; to the contrary, their project has opened

-12-

for business, and they have solidified it with high-profile national brands, including two that were formerly tenants located at Penn Square and others which do substantial business with Simon across the country.

While plaintiffs complain that their profit margins have suffered and that they have been forced to offer terms to tenants "that were much less favorable *to Plaintiffs*," these are quintessential harms *to a competitor*, not competition. ¶ 84 (emphasis added). In other words, OAK is complaining that OAK has been compelled to offer better deals through the stress of competition to the very tenant consumers that the antitrust laws are designed to protect. That is the opposite of a cognizable antitrust injury: it is *pro*competitive "price competition," which is "decidedly not the evil associated with purchase-based tying arrangements." *Fox Motors, Inc.* v. *Mazda Distribs. (Gulf), Inc.*, 806 F.2d 953, 958 (10th Cir. 1986); *Tal* v. *Hogan*, 453 F.3d 1244, 1258 (10th Cir. 2006) ("The primary concern of the antitrust laws is the corruption of the competitive process, not the success or failure of a particular firm.").[5]

Nor have plaintiffs otherwise pleaded harm to competition. While plaintiffs allege, "on information and belief," that leases at Penn Square are "supracompetitive," the allegation reduces to the recital of an antitrust buzz word. ¶ 60. The Complaint fails to present any information about the "rental rates" or other lease terms that any tenant

---

[5] As for unnamed Retailers Nos. 3 and 5 — whose discussions with OAK never advanced beyond preliminary phases to lease negotiations — plaintiffs ask the Court to draw the illogical inference that the defendants possessed sufficient leverage to coerce these retailers to stay out of OAK but insufficient leverage to attract them to Penn Square. ¶¶ 117–20, 133–36. Plaintiffs likewise invite the Court to draw the illogical inference that plaintiffs would win the business of every prospective tenant they pitch.

entered into at Penn Square, let alone compare them to what was being offered at OAK or elsewhere.  *TV Commc'ns Network, Inc.* v. *Turner Network Television, Inc.*, 964 F.2d 1022, 1026 (10th Cir. 1992) ("The use of antitrust 'buzz words' does not supply the factual circumstances necessary to support . . . conclusory allegations.").

### C.    Plaintiffs are not "efficient enforcers" of the antitrust laws.

Plaintiffs also lack standing because they are not an "efficient enforcer" of the antitrust laws with respect to the alleged tying.  *N. Brevard*, 162 F.4th, at 1277.  Under *North Brevard*, the efficient enforcers are the "tying product purchasers" — namely, the tenants who were allegedly "forced" to purchase the tied product to get the tying product — as they were "more directly harmed" by the alleged wrongdoing.  *Id.* at 1274–75.

"Whenever producers [*i.e.*, competitors] invoke the antitrust laws and consumers are silent," the standing "inquiry becomes especially pressing."  *Chi. Pro. Sports Ltd. P'ship* v. *Nat'l Basketball Ass'n*, 961 F.2d 667, 670 (7th Cir. 1992).  This case shows why.  Because it is brought by a competitor, not a tying product purchaser, the Complaint is devoid of the details necessary to support an illegal tying arrangement — details that the tenants would be positioned to supply (if they had any truth), as it is the tenants that directly dealt with Simon and could say definitively whether they intended to go to OAK and whether their deals at Penn Square were really inferior.  And here, the identified tenants are multi-billion dollar brands that are more than capable of protecting their rights.  Cheesecake, for example, is alleged to generate revenues roughly comparable to Simon's.  ¶¶ 39, 82.  If these tenants aren't claiming they were coerced into going to Penn Square to take an inferior lease, the antitrust laws are not served by allowing a

frustrated competitor to stand in their shoes and assert a slew of factually bereft "on information and belief" allegations in a transparent effort to insulate itself from the disappointments of rigorous competition.  *See In re EpiPen*, 44 F.4th at 985 (quoting *Novell, Inc.* v. *Microsoft Corp.*, 731 F.3d 1064, 1072 (10th Cir. 2013) (Gorsuch, J.)) ("[u]nder the consumer welfare standard, we . . . seek to protect[] the process of competition, but we do it with the interests of consumers, not competitors, in mind").

## II.      Plaintiffs fail to state a claim under the Sherman Act.

In addition to their failure to allege antitrust standing, plaintiffs' claims must also be dismissed for failure to adequately plead the elements of a Sherman Act claim.  "Since tying arrangements can be used for good or for ill (*i.e.*, can have procompetitive or anticompetitive effects), the arrangement itself is only problematic when it is used to unreasonably restrain trade."  *Suture Express, Inc.*, 851 F.3d at 1037.  To succeed on a Section 1 tying claim, plaintiffs must allege "(1) two separate products, (2) a tie — or conditioning of the sale of one product on the purchase of another, (3) sufficient economic power in the tying product market, and (4) a substantial volume of commerce affected in the tied product market."  *Multistate Legal Stud., Inc.* v. *Harcourt Brace Jovanovich Legal & Pro. Publ'ns, Inc.*, 63 F.3d 1540, 1546 (10th Cir. 1995).

To succeed on a Section 2 monopoly claim, a plaintiff must prove more than just monopolization, which by itself is not illegal.  *In re EpiPen*, 44 F.4th at 981 (citing *Verizon Commc'ns Inc.* v. *Law Offices of Curtis V. Trinko, LLP*, 540 U.S. 398, 407 (2004)).  Rather, it must establish a "trio of elements," in sum, "(1) monopoly power, (2) exclusionary conduct, and (3) antitrust injury."  *Chase Mfg., Inc.* v. *Johns Manville*

*Corp.*, 84 F.4th 1157, 1168–69 (10th Cir. 2023). Tying can be a form of "exclusionary conduct" under Section 2 where it "has little or no value beyond the capacity to protect the monopolist's market power." *Novell*, 731 F.3d at 1072.[6]

Plaintiffs fail to plausibly allege the elements of their Sherman Act claims. Plaintiffs fail to plead a legally sufficient relevant market or monopoly power for the tied product; they fail to plead a legally sufficient relevant market or market power for the tying product; they fail to plausibly allege forcible coercion with any degree of specificity; and they fail to plead foreclosure of a substantial volume of commerce.

### A.    The Complaint fails to adequately allege a relevant market or monopoly power for the tied product.

In pleading monopoly power, it is a "threshold requirement" that plaintiffs "defin[e] the relevant market." *ASA*, 127 F.4th at 186. Likewise, in a Section 1 tying case, absent allegations of a conspiracy between competitors, the Tenth Circuit requires plaintiffs to allege a relevant market in the tied product market so that the court can "analyze the alleged anticompetitive conduct restraining trade." *Id.* at 186–87; *see also Campfield* v. *State Farm Mut. Auto. Ins. Co.*, 532 F.3d 1111, 1119–20 (10th Cir. 2008); *Compliance Mktg., Inc.* v. *Drugtest, Inc.*, 2010 WL 1416823, at *11 (D. Colo. Apr. 7, 2010) (plaintiff could not plead substantial foreclosure where it had failed to allege a relevant market for the tied product).

---

[6] To show attempted monopolization under Section 2, plaintiffs must also establish a "dangerous probability of success in monopolizing the relevant market" and a "specific intent to monopolize." *Colo. Interstate Gas Co.* v. *Nat. Gas Pipeline Co. of Am.*, 885 F.2d 683, 693 (10th Cir. 1989).

The Tenth Circuit requires "specificity" in "defining the relevant market," which comprises: "(1) the product market and (2) the geographic market." *ASA*, 127 F.4th at 186–87. "A plaintiff cannot arbitrarily choose the product market relevant to its claims; instead, the plaintiff must justify any proposed market by defining it 'with reference to the rule of reasonable interchangeability and cross-elasticity of demand.'" *Buccaneer Energy (USA) Inc.* v. *Gunnison Energy Corp.*, 846 F.3d 1297, 1313 (10th Cir. 2017). "Where the plaintiff fails to define its proposed relevant market with reference to the rule of reasonable interchangeability and cross-elasticity of demand . . . the relevant market is legally insufficient and a motion to dismiss may be granted." *Campfield*, 532 F.3d at 1118. Likewise, a plaintiff must specify a geographic market that is "the area of effective competition" or "the narrowest market which is wide enough so that products from adjacent areas . . . cannot compete on substantial parity with those included in the market." *ASA*, 127 F.4th at 189.

Under these standards, plaintiffs' market definition is defective. Plaintiffs allege in conclusory fashion that the relevant market for the tied product is "[l]easeable space in specialty retail malls and lifestyle centers in Oklahoma City." ¶¶ 150, 160. Plaintiffs never explain what is or isn't a "specialty retail mall" and never identify the properties in Oklahoma City that fall within the classification. Simon's filings with the SEC don't use the term or reflect Simon owning any "specialty retail malls." Simon 10-K at 5, 29–42. Nor is there any allegation that the term has a commonly understood meaning in the industry. *See Buccaneer*, 846 F.3d at 1313 (affirming dismissal on market definition grounds where plaintiff "never clearly defined" the relevant product market).

-17-

Plaintiffs likewise do not explain how they calculated the more than 70% market share they attribute to Penn Square or identify what properties in Oklahoma City are in the denominator of that fraction. The reason for the lack of specificity is clear. As plaintiffs know, "lower courts generally require a minimum market share of between 70% and 80%" to indicate monopoly power. *Colo. Interstate Gas Co.*, 885 F.2d at 694 n.18.[7] Plaintiffs' conclusory and unexplained market share allegations are designed to disguise that their proposed market is reverse-engineered to omit obvious competitors and inflate Penn Square's market share to conveniently fall within that target range. For example, whatever the phrase "specialty retail mall" might mean to plaintiffs, it doesn't include other "enclosed malls" in and around Oklahoma City, including obvious Penn Square competitors like Quail Springs Mall and Sooner Mall, among others.[8]

That sleight of hand, and in particular the omission of Quail Springs Mall, is fatal to plaintiffs' 70% market share calculation and illustrates the absurdity of their proffered definition. Quail Springs is a three-level enclosed mall with more than 1.1 million square

---

[7] Market share is relevant but insufficient to establish monopoly power. *Id.* "Monopoly power requires the power to control prices and the power to exclude competition." *ASA*, 127 F.4th at 190. Plaintiffs generally must show "the defendant possesse[s] sufficient market power to raise prices substantially above a competitive level without losing so much business that the gambit becomes unprofitable." *Novell*, 731 F.3d at 1070. That means "more than the mere ability to raise price only slightly, or only on occasion, or only to a few of a seller's many customers." *Chase Mfg.*, 84 F.4th at 1180. Plaintiffs have not even tried to satisfy these standards.

[8] Plaintiffs are clearly attempting to model their allegations off the *Gumwood* case, involving events from almost two decades ago. But they skirt the market definition in *Gumwood* ("enclosed malls and lifestyle centers") because it would devastate their monopolization claim. *Gumwood HP Shopping Partners* v. *Simon Prop. Grp.*, 2013 WL 3214983, at *10 (N.D. Ind. Mar. 13, 2013).

feet of leasable space just six miles from Penn Square, featuring "an exciting lineup of specialty stores."[9]  If anything, it is *bigger* than Penn Square.  Yet plaintiffs do not mention it in their pleading, let alone offer the required interchangeability analysis.  That is because the inclusion of Quail Springs in the market would drive plaintiffs' market share calculation to levels nowhere close to a "monopoly."  This sort of gerrymandering of the relevant market requires dismissal.  *Campfield*, 532 F.3d at 1119 (affirming dismissal where plaintiffs "circumscribe[d] the market to a few buyers in an effort to manipulate those buyers' market share"); *Compliance Mktg.*, 2010 WL 1416823, at *8 (plaintiffs may not "artificially create antitrust claims by narrowly defining the relevant market to create the appearance of an antitrust injury").

Plaintiffs' market share calculation is also infirm because plaintiffs never explain what is included in the numerator of their 70% fraction.  Plaintiffs appear to be including all leasable space at Penn Square in their calculation, even though much of that space is occupied by department stores, like JCPenney and Dillard's, and an AMC movie theater — tenants that likely can't be considered "specialty retailers."  If the space those tenants occupy at Penn Square is included in the numerator of plaintiffs' market share calculation, plaintiffs have no basis for excluding other Oklahoma City department stores and movie theaters from the relevant market.

The problems continue.  Plaintiffs' market definition appears to exclude the outdoor retail shopping centers throughout Oklahoma City that offer large numbers of

---

[9] *Quail Spring Mall*, GGP: Our Properties, https://www.ggp.com/en/our-properties/quail-springs-mall-469/.

retail and dining options, like the shopping center immediately adjacent to Penn Square.

Plaintiffs also plead no facts explaining why freestanding retail space is not a viable

substitute for leasable space at "specialty retail malls" or "lifestyle centers."  There is no

explanation why restaurants or retailers must be in a mall or lifestyle center.  To the

contrary, Cheesecake itself discloses that it has many freestanding locations throughout

the U.S. and is "highly flexible" as to where it opens new locations.  The Cheesecake

Factory, Form 10-K at 6 (Feb. 24, 2025), https://perma.cc/3HMH-ET7E (cited at ¶ 82

n.29) ("The Cheesecake Factory concept has demonstrated success in a variety of layouts

. . . , site locations (e.g., urban or suburban shopping malls, lifestyle centers, retail strip

centers, office complexes, entertainment centers and urban street locations — either

freestanding or in-line) and trade areas.").

Plaintiffs' proposed geographic market is also flawed.  Plaintiffs delineate the

geographic market as "Oklahoma City" without explanation or analysis, arbitrarily

excluding Oklahoma City's broader metro area without addressing why the formal

boundaries of the city demarcate "the area of effective competition" as a matter of

economics.  Nor do plaintiffs address why retail destinations outside city limits but within

the trade area and readily accessible by citizens of Oklahoma City (like Sooner Mall) are

outside their geographic market.  Plaintiffs' failure to plead facts or analysis to support

their geographic market is likewise grounds to dismiss.  Herbert Hovenkamp, *Federal

Antitrust Policy: The Law of Competition and Its Practice* 140 n.139 (7th ed. 2024) ("If

pleadings are not supported by sufficient facts or it is obvious that the plaintiff's alleged

geographic market is too small, the court may dismiss the complaint on a Rule 12(b)(6) motion.").

Moreover, the geographic market in this case must be defined by reference to the relevant consumers — here, the tenants.  Individual shoppers are not the relevant consumers of the product in the alleged product market:  that is, they don't lease "leasable space in specialty retail malls and lifestyle centers in Oklahoma City."  ¶ 150.  Restaurants and retailers do.  And those restaurants and retailers can select locations to build out their brands anywhere they choose.  There is no allegation of any imperative for national brands to be in Oklahoma City at all, especially since retailers can and do reach consumers through e-commerce.  Indeed, Retailers Nos. 3, 4, and 5, like many other national brands, are not alleged to have any brick-and-mortar presence in Oklahoma City.  Fatally, plaintiffs make no attempt to account, via an interchangeability analysis or otherwise, for the extent to which national brands would forgo Oklahoma City in favor of other locations in the face of a price increase.  *Ass'n of Surgical Assistants* v. *Nat'l Bd. of Surgical Tech. & Surgical Assisting*, 2023 WL 7277313, at *6 (D. Colo. Sept. 29, 2023), *aff'd*, 127 F.4th 178 (10th Cir. 2025) (dismissing tying claims for "inadequate . . . geographic market definition[]"); *see also Concord Assocs., L.P.* v. *Ent. Props. Tr.*, 817 F.3d 46, 53–54 (2d Cir. 2016) (affirming dismissal where proposed geographic market was "too narrow" and excluded various neighboring states and counties that were reasonably interchangeable).

In short, the Complaint rests entirely on a heavily manipulated and overly narrow market definition that excludes obvious competitors and violates the Tenth Circuit's

directive that a "plaintiff must justify [the] proposed market by defining it with reference to the rule of reasonable interchangeability and cross-elasticity of demand." *Buccaneer*, 846 F.3d at 1313.  The grossly inflated market share calculation that undergirds plaintiffs' monopoly allegations is premised on this legally insufficient market definition and is likewise defective.  These defects are fatal to plaintiffs' antitrust claims.

> **B.    Plaintiffs fail to adequately allege a relevant market or market power for the tying product.**

In a tying case, the plaintiffs must define a relevant market not only for the *tied* product, but also for the *tying* product.  As the Tenth Circuit noted in *North Brevard*, to ensure that enforcement is focused on conduct that is anticompetitive, the Supreme Court requires proof that "the seller of the products [] have 'appreciable economic power' in the tying market." *N. Brevard*, 162 F.4th at 1273 n.5 (quoting *Eastman Kodak Co.* v. *Image Tech. Servs.*, 504 U.S. 451, 462 (1992)).  In short, the plaintiff must allege that the defendant had "the power to *force* a purchaser to do something that he would not do in a competitive market." *Suture Express*, 851 F.3d at 1039 (emphasis added).  "Without the leverage of market power, a seller's inefficient tie-in will fail because a rational consumer will buy the tying product from the seller's competitor." *Kaufman* v. *Time Warner*, 836 F.3d 137, 143 (2d Cir. 2016).

Plaintiffs fail to meet these requirements.  *First*, they never identify a tying product market with specificity.  The most plaintiffs say is that the "tying product markets" are the "markets for leasable space in specialty retail malls and lifestyle centers in other cities in which [Simon] properties operate," ¶ 150, a proposed definition

encompassing more than 150 other cities in the U.S. alone and leaving the Court to guess where the tying product markets at issue might be.  Because plaintiffs have "failed to plead a legally sufficient [tying] market, it is impossible to assess whether [Simon has] monopoly or market power in the relevant market," requiring dismissal.  *ASA*, 127 F.4th at 190 (affirming dismissal on this basis); *see also Chase Mfg.*, 84 F.4th at 1179 ("Without a sufficiently identified tying product, we cannot assess if [defendant] had market power over it — much less whether any anticompetitive conduct arose.").

*Second*, even if plaintiffs had identified a specific tying market, plaintiffs don't address how their one-size-fits-all product market definition can be exported to those other places.  Is one supposed to understand, for example, that prime urban retail corridors such as Fifth Avenue in New York City, Michigan Avenue in Chicago, M Street in Washington, D.C., Union Square in San Francisco, and Rodeo Drive in Los Angeles don't compete with "specialty retail malls," even though those streets are lined with retailers any center like OAK would love to have as tenants?  If that's plaintiffs' assumption, it's illogical and legally insufficient.

*Third*, even if plaintiffs could clear these definitional hurdles, the Tenth Circuit requires antitrust plaintiffs to plead market share to show market power.  That only makes sense:  "if market power is to be evaluated," it logically "must be shown how much of the relevant market a defendant controls."  *Buccaneer*, 846 F.3d at 1315.  Here, while plaintiffs purport to allege Simon's market share in Oklahoma City, they conspicuously don't even try to allege Simon's market share in the *tying* markets. Because plaintiffs have "not demonstrate[d] [d]efendants' market share" in those alleged

tying markets, there is no way to assess the market power element of plaintiffs' claims, requiring dismissal.  *Buccaneer*, 846 F.3d at 1316; *see also Rockbit Indus. U.S.A., Inc.* v. *Baker Hughes, Inc.*, 802 F. Supp. 1544, 1549–50 (S.D. Tex. 1991) (same).

In the absence of market share allegations, plaintiffs resort to empty rhetoric about Simon's "extraordinary market power" (¶ 95) and claim Simon is the "largest public, retail-focused real estate company in the United States" (¶ 37).  *See also* ¶ 7.  But those allegations do not suffice.  "'[L]argest' says little about the extent of market share pertinent to a Sherman Act analysis and, in any event, plaintiffs allege nothing about market share or power in the particular markets."  *Lawter & Assocs., PLLC* v. *Sw. Bell Advert. L.P.*, 2008 WL 11338506, at *3 (W.D. Okla. June 13, 2008) (granting motion to dismiss); *see also Kaufman*, 836 F.3d at 147 (affirming dismissal because plaintiffs were "required to allege facts supporting an inference [of] market power . . . in each specified geographic market" but failed to do so).

### C.    The allegations of illegal tying are inadequate.

In addition to their lack of standing and failure to plead a legally sufficient market or market power for the tied or tying products, plaintiffs have failed to adequately allege the critical element of coercion to support a claim of illegal tying.

#### 1.    Plaintiffs' coercion allegations are conclusory and implausible.

The Supreme Court has held that "the essential characteristic of an invalid tying arrangement lies in the seller's exploitation of its control over the tying product to *force* the buyer into the purchase of a tied product."  *Jefferson Par. Hosp. Dist. No. 2* v. *Hyde*, 466 U.S. 2, 12 (1984), *abrogated on other grounds by Ill. Tool Works Inc.* v. *Indep. Ink,*

*Inc.*, 547 U.S. 28 (2006) (emphasis added).  Here, however, the allegations of forcing rest on bare assertions and are void of the specificity required to survive a motion to dismiss under *Twombly*.  *ASA*, 127 F.4th at 186.

The tying allegations with respect to all the identified and unidentified tenants in the Complaint are brought under Section 1 of the Sherman Act and thus must involve "concerted conduct by two or more separate entities."  *Buccaneer*, 846 F.3d at 1306.  In this case, that means a contract, combination, or conspiracy between Simon and the tenants who were supposedly coerced.  In *ASA*, the district court, citing *Twombly*, dismissed coercion allegations as "lack[ing] sufficient particularity as to the time, place, or persons who may have been involved in coming to an illegal agreement."  *Ass'n of Surgical Assistants*, 2023 WL 7277313 at *8.  The coercion allegations in this case suffer the same infirmity.[10]

*Cheesecake (CAKE)*:  Plaintiffs allege "on information and belief" that defendants "threatened to delay or cancel new leases for CAKE brand restaurants at other properties owned by [Simon]" and "threatened to not renew some . . . or to otherwise impose unfavorable renewal terms, if CAKE did not acquiesce to Defendants' demand that North Italia lease space at Penn Square Mall instead of at OAK."  ¶ 94.

These conclusory and vague allegations are unsupported by any facts.  Plaintiffs don't state who from Simon made these threats, who from Cheesecake was threatened,

---

[10] To the extent plaintiffs allege an intra-corporate conspiracy among defendants, the allegations are not actionable.  Section 1 requires concerted action among separate economic actors.  *Copperweld Corp.* v. *Indep. Tube Corp.*, 467 U.S. 752, 771 (1984) (holding that parent and subsidiary are incapable of conspiring under Section 1).

when the threats were made, how they were communicated, or which other Simon properties in other cities were implicated. In other words, what is missing is any specificity underpinning the claim of coercion leading to an illegal agreement between Simon and Cheesecake. This is the who, what, when, where that *Twombly* expressly requires in an antitrust case. 550 U.S. at 565 n.10. "Conclusory allegation[s] of [an] agreement" between Simon and others do not "supply facts adequate to show illegality." *ASA*, 127 F.4th at 191 (quoting *Twombly*, 550 U.S. at 556–57).

What is more, plaintiffs' invocation of "on information and belief" pleading to allege threats by Simon, and Cheesecake's acquiescence to those threats, violates pleading rules. While *Twombly* "does not prevent a plaintiff from pleading facts alleged upon information and belief where the facts are peculiarly within the possession and control of the defendant," *Race* v. *JPMorgan Chase Bank*, 2025 WL 1267155, at *4 (D. Colo. Apr. 11, 2025), here, the alleged facts are not peculiarly within defendants' knowledge. By definition, they would also be known to Cheesecake, which hasn't sued.

The other circumstance in which a plaintiff may plead on information and belief is "where the belief is based on factual information that makes the inference of culpability plausible." *De Aleman* v. *Allstate Fire & Cas. Ins. Co.*, 2021 WL 1962893, at *4 (D. Colo. Feb. 12, 2021). But "dismissal is appropriate where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct," *id.*, and an allegation made on information and belief is not entitled to a presumption of truth if the complaint fails to adequately "set[] forth the factual basis for the plaintiff's belief," *C.D.* v. *Indep. Sch. Dist. No. 103*, 2024 WL 3975844, at *3 n.3 (W.D. Okla. Aug. 28, 2024).

Here, the Complaint supplies no factual basis for plaintiffs' belief as to the truth of the threats alleged in Paragraph 94, which, notably, are not even attributed to the unnamed Cheesecake "representative" mentioned therein.  Instead, Plaintiffs' pervasive use of "on information and belief" allegations are mere cover for guesswork and speculation.  *Long Island Anesthesiologists PLLC* v. *United Healthcare Ins. Co.*, 2023 WL 8096909, at *5 (E.D.N.Y. Nov. 21, 2023) ("A litigant cannot merely plop 'upon information and belief' in front of a conclusory allegation and thereby render it non-conclusory.").

*Alo*:  The allegations regarding Alo are similarly flawed.  Plaintiffs allege in Paragraphs 110 and 111 "on information and belief" that before OAK's lease with Alo was executed, defendants used Simon's "enormous power over Alo's portfolio and growth plans to force it to submit to Defendants' demands, including conditioning favorable offers and deal terms pertaining to at least one other SPG-owned property in another state on Alo's agreement not to go forward with OAK and to instead lease space at Penn Square Mall."  But once again, plaintiffs provide no specificity to support this vague and conclusory allegation.  There is no "factual matter" (*Twombly*) to indicate what was offered to Alo by Simon, which property was involved, who made the offer, when the offer was made, or who at Alo acceded to it.  And beyond vague statements attributed to an unidentified Alo "representative," plaintiffs provide no "factual basis" to support "on information and belief" pleading.[11]

---

[11] Where a plaintiff cites an unnamed source for allegations, the Complaint must provide basic information about that person to confirm reliability, such as where they work and how they know the information attributed to them. *See In re Overstock Sec. Litig.*, 2021 WL 4267920, *7-8 (D. Utah Sept. 20, 2021), *aff'd*, 119 F.4th 787 (10th Cir. 2024)

*The Unidentified Retailers*:  The allegations concerning the unidentified retailers are infirm for the same reasons, and in addition, for failure to even identify the retailers, a patent violation of Rule 8.  For Retailer No. 3, there is no allegation that Simon said or did anything directed toward Retailer No. 3's supposed interest in OAK; rather, all that's alleged is that some unidentified "representative" of the retailer indicated to some unidentified person at OAK in some unspecified way that Retailer No. 3 was "concern[ed] that [Simon] would be displeased if it learned that Retailer No. 3 was considering opening a store at OAK."  ¶ 119.  This conclusory allegation doesn't constitute coercion, let alone an illegal agreement with Simon.  And again, there is no alleged "factual basis" for the on-information-and-belief allegations.

The allegations concerning Retailers Nos. 4 and 5 are similarly flawed.  Plaintiffs allege "on information and belief" that someone threatened Retailer No. 4's founder by saying that the retailer "[n]eeds to come to Penn Square Mall or don't come to Oklahoma at all."  ¶ 127.  But the Complaint contains no facts as to who from Simon supposedly said that or who the "representative" is that reported it to OAK or why that person would have any basis to be a source for the allegation.  And as for Retailer No. 5, plaintiffs once again make conclusory allegations "on information and belief" of unspecified "threats and enticements" with no details as to place or person and no factual basis for their on-information-and-belief pleading.  ¶ 133.

---

(refusing to credit allegations attributed to anonymous source where the complaint "provides no title, no dates of employment, no job description," and nothing regarding the manner in which the unnamed source learned the relevant information).

In addition to being devoid of specificity, plaintiffs' coercion allegations are implausible for an additional reason. Numerous tenants with broad relationships with Simon have nonetheless taken space at OAK, including Shake Shack, Tommy Bahama, Pottery Barn, Williams Sonoma, RH, and others. Plaintiffs offer no explanation for how these tenants ended up at OAK if Simon was engaged in an "anticompetitive campaign . . . to wield SPG's enormous economic power to destroy OAK." ¶ 1. None of the Simon tenants who chose to bring their business to OAK have sued to allege that Simon has retaliated against them in any way.

The logical and compelling inference is that these multi-billion dollar brands, including the ones that went to Penn Square, evaluated their options and independently chose what they determined was best for their business. *Multistate Legal*, 63 F.3d at 1556 ("[A]mbiguous conduct that is as consistent with permissible competition as with illegal conspiracy does not by itself support an inference of antitrust conspiracy.").[12]

### 2.    Plaintiffs' allegations of "enticements" and "package deals" are not actionable.

Throughout the Complaint, plaintiffs interlace conclusory allegations of threats with equally conclusory allegations that Simon "enticed" prospective tenants to come to

---

[12] Plaintiffs cite two regulatory matters from years ago that weren't even tying cases; rather, they involved "radius restriction" provisions at outlet centers. Both are irrelevant. Plaintiffs invoke an order issued by the FTC in connection with its review of a Simon acquisition, omitting that the FTC found that such provisions are common at outlet centers. *In the Matter of Simon Prop. Grp.*, No. C-4307 (F.T.C. Nov. 10, 2010). Similarly, plaintiffs point to a 2017 consent decree with the New York Attorney General about radius restrictions at an outlet center but ignore that Simon admitted no wrongdoing and voluntarily agreed to shorten the radius restrictions at that outlet center. *In the Matter of Simon Prop. Grp.*, No. 17-154 (NYAG Aug. 21, 2017).

Penn Square, using "package deals" and "favorable offers," even calling the alleged inducements a form of "bribery."[13]  *See, e.g.*, ¶¶ 8, 94 (claiming a CAKE representative described defendants' actions as "tantamount to 'bribery' — that [d]efendants were offering to 'pay all these monies'"); ¶ 110 (alleging that Simon "condition[ed] favorable offers and deal terms pertaining to at least one other SPG-owned property . . . on Alo's agreement not to go forward with OAK and to instead lease space at Penn Square Mall").

Even if credited, these allegations do not state a claim.  "As a general rule, businesses are free to choose the parties with whom they will deal, as well as the prices, terms, and conditions of that dealing." *Pac. Bell Tel. Co.* v. *linkLine Commc'ns, Inc.*, 555 U.S. 438, 448 (2009).  "[U]nlike price-fixing and market division between competitors, 'there is nothing inherently anticompetitive about packaged sales.'" *In re Cox Enters.*, 871 F.3d 1093, 1098–99 (10th Cir. 2017) (quoting *Jefferson Par.*, 466 U.S. at 25). Again, the key element of a tying claim is "*actual coercion to force* buyers to purchase the tied product." *Kaufman*, 836 F.3d at 141 (emphasis added).  "[M]erely offering two products in a single package, allowing each to enhance the appeal of the other, is not itself coercive." *It's My Party, Inc.* v. *Live Nation, Inc.*, 811 F.3d 676, 684 (4th Cir. 2016).  "If a consumer wants to purchase a bundle of the alleged tying and tied products, the seller is simply satisfying consumer demand." *Kaufman*, 836 F.3d at 142.

---

[13] To the extent the term "bribery" is being used to suggest anything beyond sweetening deal terms for the tenant to win its business, the allegation is wholly unsupported and nothing more than irresponsible invective.

-30-

Thus, if a landlord with properties in different cities throughout the world wishes to discuss its portfolio with buyers looking to lease multiple properties in different places, that is a competitive efficiency that in no way implicates "the anticompetitive harms animating the doctrine." *It's My Party*, 811 F.3d at 684. By the same measure, a national or international brand may value the efficiencies of doing business with a landlord that can offer multiple properties. Stripped of the rhetoric, that is exactly the dynamic that plaintiffs are alleging here — that various prospective tenants favored a "package" offered by Simon over the terms offered by OAK. As free-market actors, that is their prerogative, and "[i]t is paternalistic for . . . a competitor . . . to just assume that taking two products together is not the result of independent decision-making." *Id.* at 689.

**D.      Plaintiffs have not adequately alleged substantial foreclosure.**

For a tying claim to be viable, "the tying arrangement must affect a 'substantial volume of commerce' in the tied market." *N. Brevard*, 162 F.4th at 1273 n.5 (quoting *Eastman Kodak*, 504 U.S. at 462). Put differently, the "arrangement must foreclose to competitors of the tied product a substantial volume of commerce." *Beal Corp. Liquidating Tr.* v. *Valleylab, Inc.*, 927 F. Supp. 1350, 1367 (D. Colo. 1996). "If only a single purchaser were 'forced' with respect to the purchase of a tied item, the resultant impact on competition would not be sufficient to warrant the concern of antitrust law." *Jefferson Par.*, 466 U.S. at 16.

Here, there is no plausible allegation that defendants foreclosed a substantial volume of commerce. To the contrary, according to plaintiffs, at least three new competitors — OAK, the Triangle, and Classen Curve — have entered the alleged market

since 2012, with Classen Curve and the Triangle filling their tenant rosters with dozens of restaurants and retailers. ¶ 57.[14]

While over a period of years, three tenants are alleged to have chosen to open at Penn Square rather than OAK, and two are alleged to have opened at neither, that is not a "substantial volume of commerce." *N. Brevard*, 162 F.4th at 1273 n.5. Plaintiffs don't attempt to quantify a dollar amount of commerce purportedly affected. And by any measure, even under plaintiffs' implausibly narrow market definition, the leasable space represented by this small number of prospective tenants would constitute a *de minimis* fraction of an alleged market of roughly 1.5 million square feet of leasable space. *See, e.g.*, *Aspen Title & Escrow* v. *Jeld-Wen*, 677 F. Supp. 1477, 1489 (D. Or. 1987) (dismissing tying claim for lack of substantial foreclosure where "less than 2% of the market has been foreclosed").

And of course, the leasable space at issue is in no way gone from the market. OAK can still lease those storefronts to anyone from the vast universe of retailers and restaurants that might do business in Oklahoma City, if it hasn't already.[15]

---

[14] *Directory*, Classen Curve, https://www.classencurve.com/directory/. Plaintiffs allege that defendants "lobb[ied]" at a zoning meeting against the opening of OAK. ¶¶ 72–75. But plaintiffs opened their center despite the alleged lobbying, and in any case, the *Noerr-Pennington* doctrine makes lobbying inactionable under the First Amendment.

[15] As for RH, although plaintiffs won the business, they complain of a "delay" in lease execution allegedly caused by Simon. ¶ 141. But delay is not foreclosure, and in any event, the delay allegations are frivolous. Plaintiffs' negotiations with RH had been dragging on **for three years** before defendants are even alleged to have engaged with RH. ¶¶ 138–41. Plaintiffs offer no facts to support their conclusory assertion, once again "on information and belief," that it was defendants' conduct, rather than other factors like the intervening COVID-19 shutdown, that account for RH's timing.

III.    **Plaintiffs fail to adequately allege a state law claim.**

    A.    **Plaintiffs fail to adequately allege a violation of
the Oklahoma Antitrust Reform Act.**

Plaintiffs' claims for violation of the Oklahoma Antitrust Reform Act ("OARA"),

Okla. Stat. Tit. 79, §§ 203, 205, mirror their federal antitrust claims and as such fail for

the same reasons the federal antitrust claims fail.  The OARA is required to be

"interpreted in a manner consistent with Federal Antitrust Law 15 U.S.C., Section 1 et

seq. and the case law applicable thereto."  *See* Okla. Stat. Tit. 79, § 212; *see also Green

Country Food Mkt., Inc.* v. *Bottling Grp. LLC*, 371 F.3d 1275, 1281 (10th Cir. 2004);

*Emrich Aerial Spraying LLC* v. *City of Pawhuska*, 2025 WL 2987889, at *9 (N.D. Okla.

Oct. 23, 2025) (holding that because plaintiff's Sherman Act claims failed, the OARA

claims failed for the same reasons).  For that reason, this court "consider[s] plaintiff's

state and federal antitrust claims together."  *Risk* v. *Allstate Life Ins. Co.*, 2006 WL

2021597, at *4 (N.D. Okla. July 17, 2006).  Accordingly, plaintiffs' state-law antitrust

claim should be dismissed on the same grounds as plaintiffs' federal claims.  *See id.* at

*4–7 (dismissing OARA claim on this basis); *TKO Energy Servs., LLC* v. *M-I L.L.C.*,

539 F. App'x 866, 873–74 (10th Cir. 2013) (holding that "failure to state a claim under

federal antitrust law doomed TKO's claim under state antitrust law").

    B.    **Plaintiffs fail to adequately allege tortious interference with
a prospective business advantage.**

Plaintiffs' tortious interference with prospective economic advantage claim is

premised on the same alleged anticompetitive conduct underpinning the infirm antitrust

claims and must be dismissed.  ¶¶ 186–87.  To state a claim for tortious interference, a

plaintiff must allege:  (1) the existence of a valid business relation or expectancy; (2) knowledge of the relationship or expectancy on the part of the interferer; (3) an intentional interference inducing or causing a breach or termination of the relationship or expectancy; and (4) resulting damage to party whose relationship has been disrupted. *Loven* v. *Church Mut. Ins. Co.*, 452 P.3d 418, 425 (Okla. 2019).

Because plaintiffs' antitrust law claims fail, their tortious interference claim fails as well.  In *Loven*, the Oklahoma Supreme Court held "the element of intentional interference clearly requires a showing of bad faith."  *Id.* at 426.  The claim is not actionable if the so-called "interference" is lawful.  *Brock* v. *Thompson*, 948 P.2d 279, 293 & n.59 (Okla. 1997).  And "legitimate and fair competition" is "always lawful." *Overbeck* v. *Quaker Life Ins. Co.*, 757 P.2d 846, 849 (Okla. Civ. App. 1984); *see also Morrow Dev. Corp.* v. *Am. Bank and Tr. Co.*, 875 P.2d 411, 417 (Okla. 1994) (defendant's conduct is privileged unless defendant's "primary intent" was to interfere rather than to act in its own "legitimate economic interests.").

Here, because "[p]laintiffs have failed to allege adequately that Defendants have violated the Sherman Act or any state antitrust statute [and] assert no other grounds that Defendants acted improperly, they have failed to allege adequately claims for tortious interference."  *Compliance Mktg.*, 2010 WL 1416823, at *18; *see also Occusafe, Inc.* v. *EG&G Rocky Flats, Inc.*, 54 F.3d 618, 623 (10th Cir. 1995) (competing is "not 'improper' for purposes of a claim for intentional interference in prospective economic advantage").  The claim fails for the further independent reason that plaintiffs make no effort to show that defendants' "primary intent" was to harm OAK rather than act for

their own legitimate economic interest in leasing space to tenants. *Morrow*, 875 P.2d at 417; *see also* ¶ 59 (alleging that defendants were looking to fill vacancies at Penn Square and make the mall more competitive).

### C. David Simon should be dismissed.

David Simon should be dismissed from the case. Mr. Simon is only named on the tortious interference claim. None of the requisite elements for a claim are pleaded against him. The ***only*** allegation against him, also "on information and belief," is that he called the CEO of Alo to "pressure him into pulling out of opening a store at OAK and to instead open a location at Penn Square Mall." ¶ 109. Plaintiffs allege nothing else about the substance of that call. There are no allegations of threats or tying or the like. And sales "pressure" is not enough to state a claim. *Unijax, Inc.* v. *Champion Int'l, Inc.*, 683 F.2d 678, 685 (2d Cir. 1982) (the "use of strong persuasion, encouragement, or cajolery to the point of obnoxiousness to induce [a customer] to buy [a] full line of products does not . . . amount to actual coercion").

Ultimately, all that's alleged is that David Simon, in his capacity as CEO of Simon, was competing for Alo's business. That in no way evinces "bad faith," and it is not actionable. As then-Judge Gorsuch wrote in *Novell*, "[e]xperience teaches that independent firms competing against one another is almost always good for the consumer and thus warrants a strong presumption of legality." 731 F.3d at 1073.

### CONCLUSION

For the foregoing reasons, plaintiffs' First Amended Complaint should be dismissed in its entirety and with prejudice.

Dated:  February 19, 2026

Respectfully submitted,

/s/ Thomas G. Wolfe
Eric S. Eissenstat, OBA # 10282
Thomas G. Wolfe, OBA # 11576
PHILLIPS MURRAH P.C.
424 N.W. 10th Street, Suite 300
Oklahoma City, OK  73103
Telephone:  (405) 235-4100
Eseissenstat@phillipsmurrah.com
Tgwolfe@phillipsmurrah.com

William Savitt (*pro hac vice* pending)
Stephen R. DiPrima (*pro hac vice* pending)
Adam L. Goodman (*pro hac vice* pending)
Lorenzo A. H. Villegas (*pro hac vice* pending)
WACHTELL, LIPTON, ROSEN & KATZ
51 West 52nd Street
New York, NY  10019
Telephone:  (212) 403-1000
WDSavitt@WLRK.com
SRDiPrima@WLRK.com
ALGoodman@WLRK.com
LVillegas@WLRK.com

*Attorneys for Defendants Simon Property Group, Inc., Simon Property Group, L.P., Penn Square Mall, LLC, and David Simon*

## CERTIFICATE OF SERVICE

I hereby certify that on this 19th day of February 2026, a true and correct copy of the foregoing **DEFENDANTS' MOTION TO DISMISS PLAINTIFFS' FIRST AMENDED COMPLAINT** was e-filed with the Court through CM/ECF and served on all counsel of record.

/s/ Thomas G. Wolfe
Thomas G. Wolfe