**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF OKLAHOMA**

|  |  |
|---|---|
| (1) OAK LAND AND DEVELOPMENT, LLC; (2) OAK PHASE I PROPERTY OWNER, LLC; (3) OAK HOTEL OWNER, LLC; (4) OAK BLOCK 2, LLC; (5) OAK BLOCK 3, LLC; (6) OAK SE CORNER, LLC; (7) NWPF, LLC; and (8) VERITAS DEVELOPMENT, LLC, <br><br> *Plaintiffs,* <br><br> - v. - <br><br> (1) SIMON PROPERTY GROUP, INC.; (2) SIMON PROPERTY GROUP, L.P.; and (3) PENN SQUARE MALL, LLC, <br><br> *Defendants.* | Case No.  5:25-cv-1444-PRW |

**DEFENDANTS' MOTION TO DISMISS
PLAINTIFFS' SECOND AMENDED COMPLAINT**

**TABLE OF CONTENTS**

**Page**

PRELIMINARY STATEMENT ..................................................................................... 1

STATEMENT OF THE CASE ...................................................................................... 4

    A.    The parties ...................................................................................... 4

    B.    In 2024, plaintiffs open OAK and win tenants from Simon. ........................ 4

    C.    Simon successfully attracts three other tenants that OAK was vying for. ........................................................................................ 6

    D.    Two retailers decline to lease space at OAK. ......................................... 7

    E.    After touting their success at OAK, plaintiffs sue, accusing defendants of antitrust violations. .................................................... 7

ARGUMENT ............................................................................................................ 8

I.    Plaintiffs fail to state a claim under the Sherman Act (Causes I–IV). ................ 8

    A.    Plaintiffs fail to adequately allege a relevant market or market power for the tying product. .................................................................. 9

    B.    The Complaint fails to adequately allege a relevant market or anything close to monopoly power for the tied product. ........................ 14

    C.    The allegations of illegal "coercion" are also inadequate. ...................... 23

    D.    Plaintiffs have not adequately alleged substantial foreclosure .................. 28

II.    Plaintiffs do not have antitrust standing (Causes I–IV). ............................... 30

    A.    Plaintiffs have not alleged an antitrust injury. ...................................... 31

    B.    Plaintiffs are not an "efficient enforcer" of the antitrust laws. ................ 32

III.    Plaintiffs fail to adequately allege a state law claim (Causes V–VI). .............. 33

    A.    Plaintiffs fail to adequately allege a violation of the Oklahoma Antitrust Reform Act. ..................................................................... 33

    B.    Plaintiffs fail to adequately allege tortious interference with a prospective business advantage. ........................................................ 34

CONCLUSION ....................................................................................................... 35

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Allen* v. *IM Sols., LLC*,
94 F. Supp. 3d 1216 (E.D. Okla. 2015) ................................................................... 35

*Ashcroft* v. *Iqbal*,
556 U.S. 662 (2009) ................................................................................................. 8

*Aspen Title & Escrow* v. *Jeld-Wen*,
677 F. Supp. 1477 (D. Or. 1987) ........................................................................... 29

*Ass'n of Surgical Assistants* v. *Nat'l Bd.
of Surgical Tech. & Surgical Assisting*,
127 F.4th 178 (10th Cir. 2025) ....................................................................... *passim*

*Ass'n of Surgical Assistants* v. *Nat'l Bd.
of Surgical Tech. & Surgical Assisting*,
2023 WL 7277313 (D. Colo. Sep. 29, 2023) .................................................... 20, 25

*Atl. Richfield Co.* v. *USA Petroleum Co.*,
495 U.S. 328 (1990) ............................................................................................... 30

*Beal Corp. Liquidating Tr.* v. *Valleylab, Inc.*,
927 F. Supp. 1350 (D. Colo. 1996) ........................................................................ 28

*Belfiore* v. *N.Y. Times Co.*,
826 F.2d 177 (2d Cir. 1987) .................................................................................. 16

*Bell Atl. Corp.* v. *Twombly*,
550 U.S. 544 (2007) ..................................................................................... 8, 24, 25

*Brock* v. *Thompson*,
948 P.2d 279 (Okla. 1997) ..................................................................................... 34

*Buccaneer Energy (USA) Inc.* v. *Gunnison Energy Corp.*,
846 F.3d 1297 (10th Cir. 2017) ........................................................... 10, 12, 13, 16

*Campfield* v. *State Farm Mut. Auto. Ins. Co.*,
532 F.3d 1111 (10th Cir. 2008) ................................................................. 10, 14, 21

*Cargill, Inc.* v. *Monfort of Colo., Inc.*,
479 U.S. 104 (1986) ........................................................................................... 30–31

*Chase Mfg., Inc.* v. *Johns Manville Corp.*,
  84 F.4th 1157 (10th Cir. 2023) .................................................................. 9, 11, 22

*Chi. Pro. Sports Ltd. P'ship* v. *Nat'l Basketball Ass'n*,
  961 F.2d 667 (7th Cir. 1992) ................................................................................ 32

*Christy Sports* v. *Deer Valley Resort Co.*,
  555 F.3d 1188 (10th Cir. 2009) ...................................................... 14, 21 n.8

*Colo. Interstate Gas Co.* v. *Nat. Gas Pipeline Co. of Am.*,
  885 F.2d 683 (10th Cir. 1989) .......................................................... 9 n.4, 20

*Compliance Mktg.* v. *Drugtest, Inc.*,
  2010 WL 1416823 (D. Colo. Apr. 7, 2010).......................................... 15, 34

*Concord Assocs., L.P.* v. *Ent. Props. Tr.*,
  817 F.3d 46 (2d Cir. 2016)........................................................................ 20

*Discon Inc.* v. *NYNEX Corp.*,
  86 F. Supp. 2d 154 (W.D.N.Y. 2000)........................................................ 12, 19

*Four Corners Nephrology Assocs., P.C.* v. *Mercy Med. Ctr. of Durango*,
  2008 WL 2355533 (D. Colo. May 22, 2008).............................................. 12

*Fox Motors, Inc.* v. *Mazda Distribs. (Gulf), Inc.*,
  806 F.2d 953 (10th Cir. 1986) .................................................................. 31

*Freeland* v. *Nippon Steel*,
  2026 WL 747417 (N.D. Cal. Mar. 17, 2026).............................................. 33

*Gumwood HP Shopping Partners* v. *Simon Prop. Grp.*,
  2013 WL 3214983 (N.D. Ind. Mar. 13, 2013)...................................... 25 n.9

*Ill. Tool Works Inc.* v. *Indep. Ink, Inc.*,
  547 U.S. 28 (2006)..................................................................................... 9, 23

*In re Cox Enters.*,
  871 F.3d 1093 (10th Cir. 2017) ................................................................ 24

*In re Epipen Mktg., Sales Pracs. & Antitrust Litig.*,
  44 F.4th 959 (10th Cir. 2022) .................................................................. 9

*In re Harley-Davidson Aftermarket Parts Mktg., Sales Pracs. & Antitrust Litig.*,
  151 F.4th 922 (7th Cir. 2025) .................................................................. 12

*In re Super Prem. Ice Cream Distrib.*,
  691 F. Supp. 1262 (N.D. Cal. 1988)........................................................ 16

-iii-

*It's My Party, Inc.* v. *Live Nation, Inc.*,
811 F.3d 676 (4th Cir. 2016) ................................................................ 24

*Jefferson Par. Hosp. Dist. No. 2* v. *Hyde*,
466 U.S. 2 (1984) ................................................................ 23, 24, 29

*Kaufman* v. *Time Warner*,
836 F.3d 137 (2d Cir. 2016) ............................................... 10, 14, 24

*Klein* v. *Grynberg*,
44 F.3d 1497 (10th Cir. 1995) ............................................................ 35

*Lawter & Assocs., PLLC* v. *Sw. Bell Advert. L.P.*,
2008 WL 11338506 (W.D. Okla. June 13, 2008) ............................... 14

*Loven* v. *Church Mut. Ins. Co.*,
452 P.3d 418 (Okla. 2019) ................................................................ 34

*Mayfield SWD, L.L.C.* v. *Blevins*,
2011 WL 195656 (W.D. Okla. Jan. 19, 2011) .................................... 30

*Morrow Dev. Corp.* v. *Am. Bank & Tr. Co.*,
875 P.2d 411 (Okla. 1994) ................................................................ 35

*Multistate Legal Stud., Inc.* v.
*Harcourt Brace Jovanovich Legal & Pro. Publ'ns, Inc.*,
63 F.3d 1540 (10th Cir. 1995) ...................................................... 8–9, 28

*Murrow Furniture Galleries, Inc.* v. *Thomasville Furniture Indus., Inc.*,
889 F.2d 524 (4th Cir. 1989) ............................................................ 16

*N. Brevard Cnty. Hosp. Dist.* v. *C.R. Bard, Inc.*,
162 F.4th 1268 (10th Cir. 2025) ................................................. *passim*

*Northumberland Cnty. Ret. Sys.* v. *Kenworthy*,
2013 WL 5230000 (W.D. Okla. Sep. 16, 2013) ............................ 4 n.1

*Novell Inc.* v. *Microsoft Corp.*,
731 F.3d 1064 (10th Cir. 2013) .................................................. 9, 22, 32

*Occusafe, Inc.* v. *EG&G Rocky Flats*,
54 F.3d 618 (10th Cir. 1995) ....................................................... 34–35

*Overbeck* v. *Quaker Life Ins. Co.*,
757 P.2d 846 (Okla. Civ. App. 1984) ................................................ 34

*Pac. Bell Tel. Co.* v. *linkLine Commc'ns, Inc.*,
555 U.S. 438 (2009) ................................................................ 24

*Rick-Mik Enters., Inc.* v. *Equilon Enters., LLC*,
    532 F.3d 963 (9th Cir. 2008) ................................................................................ 14

*Risk* v. *Allstate Life Ins. Co.*,
    2006 WL 2021597 (N.D. Okla. July 17, 2006) ................................................ 33, 34

*Rockbit Indus. U.S.A., Inc.* v. *Baker Hughes, Inc.*,
    802 F. Supp. 1544 (S.D. Tex. 1991) ..................................................................... 13

*Smith* v. *United States*,
    561 F.3d 1090 (10th Cir. 2009) ......................................................................... 4 n.1

*Smith Wholesale Co., Inc.* v. *Philip Morris USA, Inc.*,
    219 F. App'x 398 (6th Cir. 2007) .......................................................................... 22

*Smugglers Notch Homeowners' Ass'n, Inc.* v. *Smugglers' Notch Mgmt. Co.*,
    414 F. App'x 372 (2d Cir. 2011) ........................................................................... 11

*Suture Express, Inc.* v. *Owens & Minor Distrib., Inc.*,
    851 F.3d 1029 (10th Cir. 2017) .................................................................. 9–10, 31

*Tal* v. *Hogan*,
    453 F.3d 1244 (10th Cir. 2006) ............................................................................ 32

*TKO Energy Servs.* v. *M-I L.L.C.*,
    539 F. App'x 866 (10th Cir. 2013) ........................................................................ 34

*Verizon Commc'ns Inc.* v. *L. Offs. of Curtis V. Trinko, LLP*,
    540 U.S. 398 (2004) .............................................................................................. 9

**Rules & Statutes**

The Sherman Antitrust Act of 1980, 15 U.S.C. §§ 1, 2 ....................................................... 7

The Oklahoma Antitrust Reform Act, Okla. Stat. tit. 79 ............................................... 3, 33

Fed. R. Civ. P. 12(b)(6) ................................................................................................... 1

**Other Authorities**

Herbert Hovenkamp, *Federal Antitrust Policy: The Law of Competition and
    Its Practice* (7th ed. 2024) ............................................................................... 20

Defendants move to dismiss the Second Amended Complaint (the "Complaint" or the "SAC") (Dkt. 43) under Fed. R. Civ. P. 12(b)(6) and state as follows:

<strong>PRELIMINARY STATEMENT</strong>

The Supreme Court has repeatedly held that the antitrust laws protect competition, not competitors. This lawsuit is an affront to that settled principle. In this action, a new competitor seeks to use the antitrust laws to shield itself from competition and blame an established real estate developer for its inability to close deals with a few prospective tenants. The Complaint fails to state a claim and should be dismissed with prejudice.

Plaintiffs are the owners and operators of OAK, a new mixed-use real estate development in Oklahoma City they built across the street from Penn Square Mall. When OAK opened in 2024, plaintiffs trumpeted their initial success in winning high-profile tenants over Penn Square, including Pottery Barn, Williams Sonoma, and RH (formerly Restoration Hardware). But competition is not a one-way street, and a few other tenants OAK was pursuing decided to locate at Penn Square instead.

Refusing to accept that competition involves wins and losses, or that building a successful property takes time, plaintiffs resorted to litigation. They claim that defendant Simon Property Group engaged in illegal "tying" by threatening leases on other properties in other cities to coerce tenants into coming to Penn Square or forgoing OAK. Plaintiffs claim restraint of trade in, and actual or attempted monopolization of, a market they define as "leasable space in high-quality retail malls and lifestyle centers in Oklahoma City that cater to upscale lifestyle retailers and premium dining establishments." Their claims fail on multiple independent grounds.

-1-

*First*, plaintiffs do not identify what Simon properties in what other cities were used to coerce tenants in Oklahoma City and thus fail to plead a relevant market or market power for the "tying product." Plaintiffs broadly suggest that the tying markets are "other cities in which [Simon] operate[s]," but that is more than 150 cities in the U.S. alone. Which cities plaintiffs might be referencing is anyone's guess. Plaintiffs thus fail to adequately plead *any* tying product market, let alone one properly defined through the interchangeability analysis required by the Tenth Circuit, and fail to provide the requisite market shares for any such market. These deficiencies alone warrant dismissal.

*Second*, plaintiffs fail to define a legally sufficient product or geographic market for the "tied product." In response to defendants' motion to dismiss, which pointed out the many ways in which plaintiffs' market definition was inappropriately contrived, plaintiffs have abandoned their old market definition in favor of a new one. But their latest formulation is even more illogical and ill-conceived, and, like the old definition, has been heavily gerrymandered and manipulated to exclude obvious competitors and grossly inflate Penn Square's alleged market share.

*Third*, plaintiffs point broadly to supposed coercive "threats" but repeatedly fail to supply the most basic facts—who from defendants made them, who from the tenant heard them, who relayed them to plaintiffs, and which other Simon properties were implicated. These conclusory allegations of coercion are implausible and violate the Supreme Court's directive that an antitrust complaint contain sufficient specificity to survive a motion to dismiss. They reduce to nothing more than a claim that Simon has negotiated "package" deals involving properties in other locations, which does not violate the antitrust laws.

-2-

*Fourth*, as the Tenth Circuit recently reiterated, to support a tying claim, plaintiffs must allege that a "substantial volume" of commerce was foreclosed.  The allegations here don't come close.  Even taking plaintiffs' flawed market definition at face value, competitors *have entered* and *are entering* the alleged market.  In addition to the recent entry of OAK, plaintiffs allege that two other competing properties, Classen Curve and The Triangle, opened around 2012, and new developments are being built throughout the area.  At best, plaintiffs claim that a few prospective tenants capable of occupying a tiny fraction of leasable space in the alleged market—and an even smaller percentage of the universe of tenants which might lease space in Oklahoma City—leased space across the street at Penn Square.  That is not foreclosure of a substantial volume of commerce.

*Finally*, plaintiffs lack antitrust standing.  The "harms" alleged are not harms to competition but to a competitor and thus are not harms the antitrust laws redress.  Plaintiffs complain they have been harmed because competitive pressure from Simon required OAK to offer *better* terms to tenants than OAK wanted to offer.  But that is not an antitrust injury.  It is the procompetitive result of competition.  And even if plaintiffs could overcome these hurdles, they would still lack standing because they are not an "efficient enforcer" of their antitrust claims.  Under Tenth Circuit law, the efficient enforcers are the tenants who were supposedly coerced.  Yet no tenant has sued.

Plaintiffs also tack on state law claims for violation of the Oklahoma Antitrust Reform Act and tortious interference with prospective economic advantage.  These state law claims are premised on the same allegations of tying underpinning the federal antitrust claims and must also be dismissed for failure to plead those claims.

-3-

## STATEMENT OF THE CASE

### A.      The parties

Plaintiffs developed, own, and operate OAK, a "retail and mixed-use project" in Oklahoma City.  ¶ 1.  OAK combines luxury residences, a hotel, and retail shopping.  ¶ 2.

Defendants Simon Property Group, Inc. and its subsidiary operating partnership, Simon Property Group, L.P., (together with their affiliate Penn Square Mall, LLC, "Simon") own and operate shopping, dining, entertainment, and mixed-use properties in the U.S. and abroad.  ¶¶ 22–24; Ex. 1 at 60 (Simon Prop. Grp., Inc., Form 10-K (Feb. 21, 2025) (cited at ¶ 24)).[1]  As of December 31, 2024, Simon owned or had interests in 194 properties across more than 150 U.S. cities.  ¶ 40; Ex. 1 at 29–41.[2]

The Simon property at issue in this case is Penn Square Mall.  ¶¶ 6, 25.  Opened in 1960, Penn Square has approximately one million square feet of leasable space, much of which is leased to department stores and an AMC movie theater.  *See* ¶ 63; Ex. 2 at 8–9 (*Morgan Stanley Capital I Trust 2016-PSQ*, S&P Global Ratings) (cited at ¶ 65).

### B.      In 2024, plaintiffs open OAK and win tenants from Simon.

Plaintiffs opened OAK in September 2024.  ¶ 3 n.1.  Within months, well-established national brands, including The Capital Grille, Pottery Barn, Shake Shack, Tommy Bahama Marlin Bar, and Williams Sonoma, had launched at OAK.  *See* Ex. 3 at

---

[1] The Court may take notice of "documents incorporated into the complaint by reference," *Smith* v. *United States*, 561 F.3d 1090, 1098 (10th Cir. 2009), and of "federally regulated filings, including SEC filings," *Northumberland Cnty. Ret. Sys.* v. *Kenworthy*, 2013 WL 5230000, at *3 (W.D. Okla. Sep. 16, 2013).

[2] On April 22, 2026, plaintiffs voluntarily dismissed defendants' former CEO David Simon, who recently passed away, from the action.  Dkt. 46.

2 (cited at ¶ 104 n.37); *Directory*, OAK, https://perma.cc/PM8W-HK9J.  Pottery Barn and Williams Sonoma were big wins for OAK, as both had previously been Penn Square tenants.  ¶ 69.  OAK's competitive successes made local headlines, with the *Journal Record* reporting that "*Oak development lures retailers from Penn Square Mall.*"  *See* Ex. 4 at 1.  OAK also beat out Simon for RH, one of the most sought-after furniture brands in the country.  ¶¶ 165, 169.  As OAK's developer Ryan McNeill told *The Oklahoman*, three of OAK's "anchor" tenants were "galvanizing retailers that have unique and special coattails . . . .  And RH is the bell cow.  . . .  These are not best just in the market, but best in class in the country."  Ex. 5 at 3 (Steve Lackmeyer, *Restoration Hardware, Arhaus and Capital Grille to Anchor OAK Development*, The Oklahoman (Oct. 25, 2022)).

OAK has successfully attracted national brands despite their extensive commercial relationships with Simon, as shown below:

| Tenants at OAK | Locations with Simon[3] |
|---|---|
| **Arhaus** | 27 |
| **Pottery Barn** | 43 |
| **Shake Shack** | 32 |
| **Tempur-Pedic** | 19 |
| **The Capital Grille** | 5 |
| **Tommy Bahama** | 47 |
| **Williams Sonoma** | 23 |

---

[3] The location counts group-affiliated brands and is based on Simon's publicly available store locator.  *Exceptional Brands*, Simon Malls, https://www.simon.com/brands.  *See Ass'n of Surgical Assistants* v. *Nat'l Bd. of Surgical Tech. & Surgical Assisting*, 127 F.4th 178, 183–84 (10th Cir. 2025) ("*ASA*") (noting that it is "not uncommon for courts to take judicial notice of factual information found on the world wide web").

There are no allegations that Simon tried to "coerce" any of these tenants.

### C. Simon successfully attracts three other tenants that OAK was vying for.

While OAK has been successful in luring some Simon tenants to its property, it was unsuccessful with a few others. OAK was unable to secure deals with North Italia, an Italian restaurant chain owned by The Cheesecake Factory, Inc., Alo, an athleisure apparel retailer, and Aritzia, a women's clothing retailer.

*Cheesecake*: In 2022, OAK began negotiating with Cheesecake about opening North Italia and Culinary Dropout locations. ¶ 101. Cheesecake, however, already had a restaurant at Penn Square, and opted to open a North Italia location there, too. Ex. 2 at 9; ¶ 115. As for Culinary Dropout, plaintiffs claim that losing North Italia "would make it difficult to open Culinary Dropout at OAK," without explaining why. ¶ 113.

*Alo*: Plaintiffs allege that they began negotiating with Alo in 2023. ¶ 126. Although Alo had not yet executed a lease, OAK began posting "Coming Soon" graphics on what it hoped would be Alo's storefront. ¶¶ 127, 131. Around that time, Simon persuaded Alo to open at Penn Square instead. ¶ 132.

*Aritzia*: Aritzia toured both OAK and Penn Square in October 2024. ¶ 152. After expressing some interest in OAK, Aritzia advised OAK in 2025 that they were "working with" Simon instead. ¶ 156.

The Complaint contains no information comparing the financial and nonfinancial lease terms offered to North Italia, Alo, and Aritzia at either Penn Square or OAK and

thus provides no basis to infer that OAK's proposals were superior from the tenants' perspective to the terms offered at Penn Square.

### D.    Two retailers decline to lease space at OAK.

Having previously concealed their identities, the Complaint now alleges that Vuori and Nike considered OAK but declined to lease space there.  ¶¶ 143–64.  Plaintiffs do not allege that these retailers ever began negotiating a lease with OAK or that they opened somewhere else in Oklahoma City thereafter.  Vuori was provided a draft letter of intent by OAK but never signed it.  ¶¶ 144–48.  And Nike supposedly indicated that it was "set to review a plan to lease space at OAK" but didn't follow through.  ¶¶ 161–62.

### E.    After touting their success at OAK, plaintiffs sue, accusing defendants of antitrust violations.

On September 16, 2025, Ryan McNeill published an article in *Urban Land* touting OAK's competitive "success."  McNeill boasted that OAK's tenants were "reporting off-the-charts sales," including the tenants that OAK had won from "vintage" Penn Square, and that OAK had already obtained a "critical mass of retailers" that were of a "quality and caliber" unparalleled in Oklahoma City.  Ex. 6 at 5.

But in December 2025, plaintiffs sued, accusing defendants of working "to destroy" OAK.  Dkt. 1 ¶ 1.  Defendants moved to dismiss the First Amended Complaint ("FAC"), Dkt. 34, and plaintiffs amended again, Dkt. 43.  In the SAC, plaintiffs continue to allege that defendants' "conduct constitutes a classic 'tying' arrangement."  ¶ 8.  Plaintiffs allege that such conduct is in violation of Sections 1 and 2 of the Sherman Act, ¶¶ 176–222 (Causes I–IV).  Plaintiffs also bring state antitrust and tortious interference

claims premised on the same tying allegations. ¶¶ 223–42 (Causes V–VI). Plaintiffs complain that they have "been forced to complete transactions on less favorable terms than would have been available but for [d]efendants' conduct." ¶ 187.

**ARGUMENT**

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft* v. *Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp.* v. *Twombly*, 550 U.S. 544, 570 (2007)). *Twombly* was itself an antitrust case, and in affirming dismissal for insufficient factual pleading, the Supreme Court observed that antitrust discovery can be a "sprawling, costly, and hugely time-consuming undertaking." *Twombly*, 550 U.S. at 560 n.6. Accordingly, because of the potential for spurious antitrust claims to impose enormous litigation costs, the Tenth Circuit "'insist[s] upon some specificity in pleading before allowing a potentially massive factual controversy to proceed' in these cases." *ASA*, 127 F.4th at 186 (quoting *Twombly*, 550 U.S. at 558).

The Complaint fails to satisfy these pleading standards. Plaintiffs do not adequately plead relevant product or geographic markets for the tying or tied products, monopoly or market power, coercion, substantial foreclosure, or antitrust standing.

I.      **Plaintiffs fail to state a claim under the Sherman Act (Causes I–IV).**

To assert a Section 1 tying claim, plaintiffs must allege "(1) two separate products, (2) a tie—or conditioning of the sale of one product on the purchase of another, (3) sufficient economic power in the tying product market, and (4) a substantial volume of commerce affected in the tied product market." *Multistate Legal Stud., Inc.* v.

-8-

*Harcourt Brace Jovanovich Legal & Pro. Publ'ns, Inc.*, 63 F.3d 1540, 1546 (10th Cir. 1995).

To assert a Section 2 monopoly claim, a plaintiff must allege more than just monopolization, which by itself is not illegal. *In re Epipen Mktg., Sales Pracs. & Antitrust Litig.*, 44 F.4th 959, 981 (10th Cir. 2022) (citing *Verizon Commc'ns Inc.* v. *L. Offs. of Curtis V. Trinko, LLP*, 540 U.S. 398, 407 (2004)). Rather, it must establish "(1) monopoly power, (2) exclusionary conduct, and (3) antitrust injury." *Chase Mfg., Inc.* v. *Johns Manville Corp.*, 84 F.4th 1157, 1168–69 (10th Cir. 2023). Tying can be a form of "exclusionary conduct" under Section 2 where it "has little or no value beyond the capacity to protect the monopolist's market power." *Novell Inc.* v. *Microsoft Corp.*, 731 F.3d 1064, 1072 (10th Cir. 2013).[4]

### A.  Plaintiffs fail to adequately allege a relevant market or market power for the tying product.

As the Supreme Court has held, "in all cases involving a tying arrangement, the plaintiff must prove that the defendant has market power in the tying product." *Ill. Tool Works Inc.* v. *Indep. Ink, Inc.*, 547 U.S. 28, 46 (2006); *see also N. Brevard Cnty. Hosp. Dist.* v. *C.R. Bard, Inc.*, 162 F.4th 1268, 1273 n.5 (10th Cir. 2025). In short, the plaintiff must allege that the defendant had "the power to *force* a purchaser to do something that he would not do in a competitive market." *Suture Express, Inc.* v. *Owens & Minor*

---

[4] To show attempted monopolization under Section 2, plaintiffs must establish a "dangerous probability of success in monopolizing the relevant market" and a "specific intent to monopolize." *Colo. Interstate Gas Co.* v. *Nat. Gas Pipeline Co. of Am.*, 885 F.2d 683, 693 (10th Cir. 1989).

*Distrib., Inc.*, 851 F.3d 1029, 1039 (10th Cir. 2017) (emphasis added). "Without the leverage of market power, a seller's inefficient tie-in will fail because a rational consumer will buy the tying product from the seller's competitor." *Kaufman* v. *Time Warner*, 836 F.3d 137, 143 (2d Cir. 2016).

"[T]he plaintiff must justify any proposed market by defining it 'with reference to the rule of reasonable interchangeability and cross-elasticity of demand.'" *Buccaneer Energy (USA) Inc.* v. *Gunnison Energy Corp.*, 846 F.3d 1297, 1313 (10th Cir. 2017). Likewise, a plaintiff must define a geographic market that is "the area of effective competition." *ASA*, 127 F.4th at 189. Failure to do so requires dismissal. *Campfield* v. *State Farm Mut. Auto. Ins. Co.*, 532 F.3d 1111, 1118 (10th Cir. 2008) ("Where the plaintiff fails to define its proposed relevant market with reference to the rule of reasonable interchangeability and cross-elasticity of demand . . . the relevant market is legally insufficient and a motion to dismiss may be granted.").

Plaintiffs fail to satisfy these requirements. *First*, they never attempt to identify a tying product market with "specificity," as required by the Tenth Circuit. *ASA*, 127 F.4th at 186. The most plaintiffs say is that the "tying product markets" are the "markets for leasable space in high-quality retail malls and lifestyle centers that cater to upscale lifestyle retailers and premium dining establishments *in other cities* in which [Simon] properties operate," ¶ 181 (emphasis added). But that proposed definition encompasses more than 150 other cities in the U.S. alone and lacks any geographic specificity, leaving the Court to guess where the tying product markets at issue might be located. Because plaintiffs have "failed to plead a legally sufficient [tying] market, it is impossible to

-10-

assess whether [Simon has] monopoly or market power in the relevant market," requiring

dismissal. *ASA*, 127 F.4th at 190 (affirming dismissal); *Chase Mfg.*, 84 F.4th at 1179

("Without a sufficiently identified tying product, we cannot assess if [defendant] had

market power over it—much less whether any anticompetitive conduct arose.").[5]

*Second*, plaintiffs don't address how their one-size-fits-all product market

definition—focused exclusively on a supposed subset of "high-quality retail malls and

lifestyle centers"—can be exported to other unidentified areas.  Does their product

definition make sense in those other locations?  What other retail properties in those

places compete with the unidentified Simon properties at issue?  The Complaint leaves

these critical questions unanswered.  *See, e.g.*, *Smugglers Notch Homeowners' Ass'n, Inc.*

v. *Smugglers' Notch Mgmt. Co.*, 414 F. App'x 372, 375–76 (2d Cir. 2011) (dismissing

for failure to plausibly allege that tying markets of vacation properties and recreational

facilities were not interchangeable with substitutes in nearby ski areas).

To illustrate the problem:  Is one supposed to understand that prime urban retail

corridors in key metropolitan areas, such as New York City's Fifth Avenue, Chicago's

Michigan Avenue, Georgetown's M Street, San Francisco's Union Square, and Beverly

Hills' Rodeo Drive, don't compete with "high-quality retail malls" or lifestyle centers,

even though those streets are lined with retailers that OAK would want as tenants?

---

[5] The only city plaintiffs mention by name is Las Vegas, alleging that Alo went to Penn Square as part of a package deal where it would get expanded space at the Forum Shops at Caesars Palace.  ¶¶ 136–37.  Plaintiffs, however, make no effort to describe the Las Vegas market or identify Simon's market share there, rendering the identification of Las Vegas meaningless for purposes of pleading this element of a tying claim.

That's implausible, but it's what plaintiffs ask the Court to assume. *In re Harley-Davidson Aftermarket Parts Mktg., Sales Pracs. & Antitrust Litig.*, 151 F.4th 922, 933 (7th Cir. 2025) (rejecting a "narrowly defined market" for the tying product as "implausible").

And it makes no sense to define the geographic boundaries of the tying markets by reference to the political boundaries of the "cities" in which the unidentified Simon properties operate. "The Supreme Court has expressly held that political boundaries, such as state and municipal boundaries, cannot be used artificially to circumscribe a relevant market, because relevant markets are defined in terms of economic realities, not political divisions." *Discon Inc.* v. *NYNEX Corp.*, 86 F. Supp. 2d 154, 162 (W.D.N.Y. 2000) (citing *United States* v. *Conn. Nat. Bank,* 418 U.S. 656, 670–71 (1974)); *Four Corners Nephrology Assocs., P.C.* v. *Mercy Med. Ctr. of Durango*, 2008 WL 2355533, at *5 (D. Colo. May 22, 2008) (rejecting tying claim where plaintiffs failed to provide "analysis or evidence of the geographic market for the … alleged tying product").

*Third*, even if plaintiffs could clear these definitional hurdles, the Tenth Circuit requires antitrust plaintiffs to plead market power in the tying market and that requires an allegation of market share. *ASA*, 127 F.4th at 190 ("[A]ssessing market and monopoly power necessitates an examination of market share."). That only makes sense: "if market power is to be evaluated," as is required in tying cases, it "must be shown how much of the relevant market a defendant controls." *Buccaneer*, 846 F.3d at 1315. Here, however, plaintiffs fail to allege Simon's market share in any of their "tying markets." Because plaintiffs have "not demonstrate[d] [d]efendants' market share" in the alleged

tying markets, there is no way to assess the market power element of plaintiffs' claims, requiring dismissal.  *Buccaneer*, 846 F.3d at 1316; *see also Rockbit Indus. U.S.A., Inc. v. Baker Hughes, Inc.*, 802 F. Supp. 1544, 1549–50 (S.D. Tex. 1991) (same).

Plaintiffs try to mitigate this defect by alleging that Simon controls "approximately 52% of all high-quality malls nationwide."  ¶ 41.  But that allegation is insufficient to show market power in any tying market for multiple reasons.  Plaintiffs' Complaint does not allege a "nationwide" market; rather, it alleges tying product markets "in other cities."  And plaintiffs have not alleged "mall" markets in those other cities; rather, their alleged product market also includes "lifestyle centers."  ¶ 181.  Thus, plaintiffs' "nationwide" mall metric is mismatched and incomplete.

Plaintiffs' 52% figure is also contradicted by the very materials on which Plaintiffs rely.  Plaintiffs arrive at 52% by claiming that, "[a]ccording to Green Street Advisors," a research firm that publishes reports on mall valuation using a proprietary grading system, "[Simon] owns or controls 79 of the approximately 153 malls in the United States graded 'A-' or better—approximately 52% of all high-quality malls nationwide."  ¶ 41.  But Green Street's 2025 Mall Outlook reports *236* A- or better malls, not 153.  *See* Ex. 7 at 10 (cited at ¶ 32).  Notwithstanding their claim, plaintiffs have excluded A- malls from their calculation of total U.S. malls.  Correcting for this material error cuts Simon's percentage of "high-quality malls" to 33%.  And even that corrected statistic grossly overstates Simon's retail real estate presence:  Plaintiffs omit that, according to the same Green Street report, malls represent only about 5% of retail space in the U.S.  *Id.* at 11.

Plaintiffs try to excuse their failure to plead market power in the alleged tying markets by observing that Simon is a big company—the "largest public, retail-focused real estate company in the United States." ¶ 40.  But "'largest' says little about the extent of market share pertinent to a Sherman Act analysis" where "plaintiffs allege nothing about market share or power in the particular markets" at issue.  *Lawter & Assocs., PLLC* v. *Sw. Bell Advert. L.P.*, 2008 WL 11338506, at *3 (W.D. Okla. June 13, 2008) (granting motion to dismiss); *see also Kaufman*, 836 F.3d at 147 (affirming dismissal of tying claims because plaintiffs failed "to allege facts supporting an inference [of] market power . . . in each specified geographic market" for the alleged tying product); *Rick-Mik Enters., Inc.* v. *Equilon Enters., LLC*, 532 F.3d 963, 972 (9th Cir. 2008).

Plaintiffs' failure to specify tying markets or allege market power in those specific markets dooms the tying theory on which all their federal antitrust claims are predicated.

### B.    The Complaint fails to adequately allege a relevant market or anything close to monopoly power for the tied product.

In a Section 1 tying case, absent allegations of a conspiracy between competitors, the Tenth Circuit requires pleading a relevant market in the tied product market so that the court can "analyze the alleged anticompetitive conduct restraining trade." *ASA*, 127 F.4th at 186–87; *see also Campfield*, 532 F.3d at 1119–20.  And in pleading monopolization under Section 2, "defining the relevant market" is a "threshold requirement." *ASA*, 127 F.4th at 186; *see also Christy Sports* v. *Deer Valley Resort Co.*, 555 F.3d 1188, 1192 (10th Cir. 2009).

-14-

**1.      The Complaint fails to adequately allege a relevant product market.**

As defendants showed in their first motion to dismiss, plaintiffs may not "artificially create antitrust claims by narrowly defining the relevant market to create the appearance of an antitrust injury." *Compliance Mktg.* v. *Drugtest, Inc.*, 2010 WL 1416823, at *8 (D. Colo. Apr. 7, 2010). In the face of that motion, plaintiffs have abandoned their old product market. Gone from their pleading is any reference to "specialty retail," which was the cornerstone of their first attempt at market definition. But plaintiffs' new market definition is just as vague and amorphous as the old one. And once again, it is clearly designed to try to justify the arbitrary exclusion of obvious competitors and manufacture an inflated alleged market share to support spurious claims of "monopoly."

For starters, plaintiffs do not clearly articulate what constitutes an "upscale lifestyle retailer" or a "premium dining establishment," terms not alleged to have any ascribed meaning in their respective industries. Plaintiffs instead provide a short list of retailers and restaurants they contend meet the descriptions but provide no criteria for differentiating what's in and what's out. ¶¶ 35–38. The lack of specificity is amplified by the fact that plaintiffs identify only a few tenants on their list that are actually at Penn Square, while failing to explain the presence of scores of retailers at Penn Square that they probably wouldn't consider "upscale" (*e.g.*, Foot Locker, Gap, Champs Sports) and the many restaurants that they probably wouldn't consider "premium" (*e.g.*, Burger King, Panda Express, Cinnabon). Plaintiffs' product definition is nothing more than a hand-picked list of tenants OAK would like to partner with.

-15-

Plaintiffs' "you know it when you see it" approach to market definition is impermissible. *See Buccaneer*, 846 F.3d at 1313 (affirming dismissal on market definition grounds where plaintiff "never clearly defined" the relevant product market). Courts routinely hold that it is improper to define a product definition using vague and subjective terms like "upscale." In *Belfiore* v. *N.Y. Times Co.*, for instance, the court held that the plaintiffs' allegation that the New York Times monopolized the market for "general interest daily newspapers directed primarily to upscale readers" was "implausible as a theoretical matter" and "an awkward attempt to conform their theory to the facts they allege." 826 F.2d 177, 180 (2d Cir. 1987).

Courts likewise hold that it is improper to link the definition of a relevant product market to the "premium" nature of those products. *See In re Super Prem. Ice Cream Distrib.*, 691 F. Supp. 1262, 1268–69 (N.D. Cal. 1988), *aff'd*, 895 F.2d 1417 (9th Cir. 1990) (holding there was no distinct market for "super premium" or "luxury" ice cream); *Murrow Furniture Galleries, Inc.* v. *Thomasville Furniture Indus., Inc.*, 889 F.2d 524, 528 (4th Cir. 1989) (rejecting alleged market of "name brand" or "better branded" furniture). This is because distinctions based on price and product quality variances are "economically meaningless where the differences are actually a spectrum of price and quality differences." *Murrow*, 889 F.2d at 528.

In purporting to identify the "high-quality retail malls" that "cater" to "upscale" retailers and "premium" restaurants, plaintiffs now rely on a portion of a report from Green Street as a basis for excluding other malls in the Oklahoma City area, such as Quail Springs Mall and Sooner Mall. *See, e.g.*, ¶¶ 32, 36, 41, 65. But Green Street

doesn't purport to define antitrust markets, and it doesn't even grade most lifestyle centers (including OAK itself).  Plaintiffs also misstate what Green Street actually says. Plaintiffs claim that "Quail Springs Mall and Sooner Mall are assigned letter grades below B."  ¶ 65.  But that is not true.  Both are graded "B" by Green Street.  *See* Ex. 8 at 4 (*Penn Square Mall Profile*, Green Street).  And while plaintiffs suggest that "A" malls don't compete with "B" malls, Green Street itself disagrees.  It lists Quail Springs, Sooner, and Penn Square as "nearby competitors," in addition to Shawnee Mall and Oakwood Mall, which plaintiffs don't even mention.  *Id.*[6]

Plaintiffs also ignore the significant overlap in tenants between Quail Springs and Penn Square, including department stores, movie theatres, restaurants, and retailers. *Thirty-five* of Penn Square's tenants are also at Quail Springs.  *See Directory*, Quail Springs, https://perma.cc/28K6-PLSU.  And while plaintiffs try to distinguish Quail Springs by alleging that its "tenant roster is instead anchored by department stores such as Dillard's and JCPenney," ¶ 66, stores plaintiffs view as down market, they fail to acknowledge that Penn Square is also anchored by Dillard's and JCPenney.  Given this tenant overlap, it is implausible to suggest that Penn Square and Quail Springs are in different markets.

Plaintiffs also attempt to exclude various other centers in the Oklahoma City metropolitan area from their product market definition.  Most egregiously, plaintiffs

---

[6] The Morgan Stanley debt document that plaintiffs incorporate by reference likewise confirms that Quail Springs is a "*primary* competitor" of Penn Square.  Ex. 2 at 11 (emphasis added).

claim that Chisholm Creek and The Half are out of the market because "they are primarily entertainment- and dining-oriented destinations." ¶ 67. That distinction makes no sense: plaintiffs' product-market definition encompasses "premium dining establishments" and plaintiffs' chief grievance in this action is about an Italian restaurant that is opening at Penn Square. ¶ 66. That plaintiffs attempt to exclude Chisholm Creek and The Half on this illogical basis only underscores that plaintiffs are manipulating their market definition and share calculations to suit this action rather than pleading a market based on actual commercial realities.

Plaintiffs likewise plead no facts explaining why freestanding street and other retail and restaurant space is not a viable substitute for leasable space at "high-quality enclosed malls and lifestyle centers." ¶ 38. Plaintiffs offer the conclusory claim that tenants prefer a "brand-consistent shopping experience," ¶ 67, but they plead no facts or other information to suggest that many of the brands plaintiffs identify as "upscale"— including Aritzia, Uniqlo, Vuori, and Zara—don't have freestanding street locations (as well as locations at strip centers and outlets). Indeed, Cheesecake itself discloses that it has many freestanding locations throughout the U.S., is "highly flexible" as to where it locates, and "has demonstrated success in a variety of layouts." The Cheesecake Factory, Form 10-K at 6 (Feb. 24, 2025), https://perma.cc/3HMH-ET7E (cited at ¶ 98 n.33).

### 2. The Complaint fails to adequately define the relevant geographic market.

Plaintiffs' geographic market is also indefensibly narrow and contrived. Plaintiffs delineate the geographic market as "Oklahoma City" without explanation or analysis,

-18-

arbitrarily excluding Oklahoma City's broader metro area without addressing why the formal boundaries of the city demarcate "the area of effective competition." *ASA*, 127 F.4th at 189. That geographic market, like the geographic market for the tying market, violates the Supreme Court's mandate that plaintiffs define relevant markets "in terms of economic realities, not political divisions." *Discon Inc.*, 86 F. Supp. 2d at 162.

Plaintiffs' geographic market boundary results in nonsensical exclusions. The Complaint, for example, excludes not only Sooner Mall in Norman, but also all the retail and dining space in Edmond, which is a short drive from Penn Square and part of the Oklahoma City metropolitan area. It's a critical omission because Edmond is a dense, fast-growing, and affluent part of the Oklahoma City metropolitan area—in other words, it includes consumers OAK hopes to attract. And retail centers in Edmond, like Spring Creek Plaza, carry several of the same national retailers as Penn Square, including, for instance, J. Jill, White House Black Market, and Chico's. *See Directory*, Spring Creek, https://perma.cc/KV59-U3QF. Edmond is also seeing new competitors enter the market, like Rose Creek Plaza, which describes itself as a "mixed-use lifestyle development that will bring a variety of high-end retail, dining and services to north Oklahoma City." *See Home Page*, Rose Creek, https://perma.cc/P33Q-QZ9F; *see also* ¶ 3 n.1; Ex. 9.

And if plaintiffs are now arbitrarily limiting the tenants participating in their proposed market to national brands, ¶ 67 (dismissing Nichols Hills Plaza because it "does not attract national upscale lifestyle retail brands"), plaintiffs must account for the fact that many national brands, which currently have no presence in Oklahoma City, can continue to forgo Oklahoma City in the face of a price increase, especially since they can

-19-

reach Oklahoma City consumers through online retail.  *See Concord Assocs., L.P.* v. *Ent. Props. Tr.*, 817 F.3d 46, 53–54 (2d Cir. 2016) (affirming dismissal where proposed geographic market was "too narrow" and excluded various neighboring states and counties that were reasonably interchangeable).

Plaintiffs' failure to define a cognizable geographic market requires dismissal. *Ass'n of Surgical Assistants* v. *Nat'l Bd. of Surgical Tech. & Surgical Assisting*, 2023 WL 7277313, at *6 (D. Colo. Sep. 29, 2023); Herbert Hovenkamp, *Federal Antitrust Policy: The Law of Competition and Its Practice* 140 n.139 (7th ed. 2024).

### 3.    Plaintiffs fail to allege market power in the tied market.

It is settled that "lower courts generally require a minimum market share of between 70% and 80%" to indicate monopoly power.  *Colo. Interstate Gas Co*., 885 F.2d at 694 n.18.  Here, plaintiffs allege that Penn Square has a 75% market share in Oklahoma City, with no explanation as to how that figure was derived.  ¶ 73.  On review, however, it is clear plaintiffs have manipulated the relevant market and the math to hit that target range.  Their market share allegation is deeply flawed and implausible.

*First*, plaintiffs have inflated their alleged market share figure by limiting their market to a few select properties and arbitrarily excluding competitors like Quail Springs, Sooner Mall, Chisholm Creek, Nichols Hills Plaza, and Spring Creek Plaza, among others.  To put plaintiffs' gerrymandering in perspective, inclusion of Quail Springs and Sooner alone in their proposed market would reduce Penn Square's share to below 36%,

nowhere near a "monopoly."[7]  And that does not even take into account plaintiffs'

exclusion of street retail, power centers, mixed-use developments, and other lifestyle

centers.  This sort of gerrymandering of the relevant market requires dismissal.

*Campfield*, 532 F.3d at 1119 (affirming dismissal where plaintiffs "circumscribe[d] the

market to a few buyers in an effort to manipulate those buyers' market share").[8]

*Second*, plaintiffs' treatment of leasable space at Penn Square is infirm.  Plaintiffs

appear to include every inch of leasable space at Penn Square in the numerator of their

75% market share figure.  But that makes no sense.  Most of the space at Penn Square is

occupied by department stores (which occupy large spaces that are not suitable for

retailers or restaurants), movie theaters (same), restaurants, a food court, and retailers that

plaintiffs never allege to be "upscale" retailers or "premium" restaurants.  Moreover,

however those tenants are characterized, if their space at Penn Square is included in the

numerator of the 75% figure, there is no basis for excluding space leased to the same or

similar establishments elsewhere from the denominator.  For example, there is no

justifiable reason why the Dillard's, JCPenney, or AMC at Penn Square is included in the

calculation but the Dillard's, JCPenney, or AMC at Quail Springs isn't.

The Oklahoma City metro area also has a huge number of restaurants, many of

which are every bit as nice as Shake Shack or the Cheesecake brands.  Yet none of this

---

[7] *See* https://www.ggp.com/en/our-properties/quail-springs-mall-469 (1.1+ million square feet at Quail Springs); https://www.ggp.com/en/our-properties/sooner-mall-508 (500,000+ square feet at Sooner).

[8] Plaintiffs' failure to plead anything approaching monopoly power likewise dooms their attempt claim.  *Christy Sports*, 555 F.3d at 1192.

leased space is included in the denominator of plaintiffs' market share calculation. No one would suggest that the only "premium" restaurants in Oklahoma City are at Penn Square, OAK, Classen Curve, and The Triangle. The Capital Grille, for instance, vies for business with dozens of steakhouses around town. Yet plaintiffs never explain why the space leased to these and other nice restaurants in Oklahoma City is excluded.

In any event, market share alone is insufficient to establish monopoly power. *ASA*, 127 F.4th at 190. "Monopoly power requires the power to control prices and the power to exclude competition." *Id.* Plaintiffs "generally must show the defendant possesse[s] sufficient market power to raise prices substantially above a competitive level without losing so much business that the gambit becomes unprofitable." *Novell*, 731 F.3d at 1070. That means "more than the mere ability to raise price only slightly, or only on occasion, or only to a few of a seller's many customers." *Chase Mfg.*, 84 F.4th at 1180. A firm "lacks market power when its competitors have excess production capacity and can produce more than the market demands at a competitive price." *Smith Wholesale Co., Inc.* v. *Philip Morris USA, Inc.*, 219 F. App'x 398, 410 (6th Cir. 2007).

The Complaint here contains no facts substantiating the notion that Penn Square has raised or could raise prices substantially above a competitive level. To the contrary, plaintiffs allege Penn Square is in "deteriorating condition" and suffering from "acute financial distress." ¶¶ 69–70. Nor do plaintiffs explain why excess capacity (leasable space) at OAK and other retail properties does not constrain pricing.

C.    **The allegations of illegal "coercion" are also inadequate.**

1.    **Plaintiffs' allegations of "enticements" and "package deals" are not actionable forms of "coercion."**

Much of the Complaint is premised on the notion that Simon and its tenant customers should not be permitted to negotiate multiple leases across different cities at the same time. Plaintiffs complain that Simon "induce[d]" prospective tenants to come to Penn Square using "package deals," "preferred terms," and "favorable offers," even calling the alleged inducements a form of "bribery." *See, e.g.*, ¶¶ 8, 113, 134.

Even taken at face value, these allegations do not give rise to an antitrust violation. The Supreme Court has held that "the essential characteristic of an invalid tying arrangement lies in the seller's exploitation of its control over the tying product to *force* the buyer into the purchase of a tied product." *Jefferson Par. Hosp. Dist. No. 2* v. *Hyde,* 466 U.S. 2, 12 (1984), *abrogated on other grounds by Ill. Tool Works Inc.* v. *Indep. Ink, Inc.*, 547 U.S. 28 (2006) (emphasis added). That type of actionable coercion is *not* what plaintiffs here are alleging when they complain, for example, that Alo forwent a lease at OAK because it preferred to obtain Simon's agreement to a "much-needed expansion of Alo's store at the Forum Shops . . . in Las Vegas," which "would double Alo's space and revenue potential." ¶¶ 136–37. Nor is it what plaintiffs are alleging when they complain Vuori was averse to going to OAK because "[d]oing so would have meant forgoing portfolio-wide inducements," worth "millions of dollars." ¶ 147.

While plaintiffs may be frustrated they currently lack the multi-property portfolio to strike similar deals with national brands, nothing stops them from developing one, and

-23-

"[a]s a general rule, businesses are free to choose the parties with whom they will deal, as well as the prices, terms, and conditions of that dealing." *Pac. Bell Tel. Co.* v. *linkLine Commc'ns, Inc.*, 555 U.S. 438, 448 (2009). "[U]nlike price-fixing and market division between competitors, 'there is nothing inherently anticompetitive about packaged sales.'" *In re Cox Enters.*, 871 F.3d 1093, 1098–99 (10th Cir. 2017) (quoting *Jefferson Par.*, 466 U.S. at 25). "[M]erely offering two products in a single package, allowing each to enhance the appeal of the other, is not itself coercive." *It's My Party, Inc.* v. *Live Nation, Inc.*, 811 F.3d 676, 684 (4th Cir. 2016). "If a consumer wants to purchase a bundle of the alleged tying and tied products, the seller is simply satisfying consumer demand." *Kaufman*, 836 F.3d at 142.

Tenants may value the efficiencies of doing business with a landlord that can offer leasing space at multiple properties. That is the tenants' prerogative, and "[i]t is paternalistic for . . . a competitor . . . to just assume that taking two products together is not the result of independent decision-making." *It's My Party*, 811 F.3d at 689. To hold otherwise would privilege OAK's bottom line over the commercial preferences of the very retailers and restaurants it purports to "protect" through this lawsuit.

> **2.    Plaintiffs' coercion allegations are conclusory and implausible.**

To the extent plaintiffs rely on anything other than tenant inducements, their allegations of coercion rest on vague assertions devoid of the specificity required to survive a motion to dismiss under *Twombly*. *ASA*, 127 F.4th at 186. In *ASA*, the district court, citing *Twombly*, dismissed coercion allegations as "lack[ing] sufficient particularity as to the time, place, or persons who may have been involved in coming to

an illegal agreement." *Ass'n of Surgical Assistants*, 2023 WL 7277313, at *8.  The

coercion allegations in this case suffer these same infirmities while also failing to identify

a tying product or market, core components of any illegal tying agreement.[9]

     *Cheesecake (CAKE)*:  Plaintiffs allege defendants "threatened to delay or cancel

new leases for CAKE brand restaurants at other properties owned by [Simon]" and

"threatened to impose unfavorable renewal terms."  ¶ 113.  Plaintiffs don't state who

made these threats, how they were communicated, or which Simon properties were

implicated.  Likewise, plaintiffs quote an anonymous CAKE executive as claiming that

"renewals . . . have been tossed into the dumpster fire" and that "two deals . . . are

threatened to be torn up."  ¶ 111.  But when it comes to identifying what renewals or

deals were at issue, plaintiffs, again, have nothing to offer.  Those critical details, they

claim, are "within the exclusive possession and control of Defendants and CAKE."

¶ 114.  Plaintiffs' far-fetched speculation that CAKE and other tenants are too afraid to

supply the requisite details does not alleviate plaintiffs of their pleading burden.

*Twombly*, 550 U.S. at 565 n.10.  "[C]onclusory allegation[s] of [an] agreement" between

Simon and others do not "supply facts adequate to show illegality."  *ASA*, 127 F.4th at

191 (quoting *Twombly*, 550 U.S. at 556–57).

---

[9] Plaintiffs are attempting to model their allegations off the *Gumwood* case, involving events from almost two decades ago.  Plaintiffs even quote documents from the *Gumwood* case ("go nuclear") in a highly misleading attempt to suggest that they bear on the present allegations.  ¶ 10.  But unlike in *Gumwood*, plaintiffs here do not identify the specific tying markets at issue.  *See Gumwood HP Shopping Partners* v. *Simon Prop. Grp.*, 2013 WL 3214983, at *10 (N.D. Ind. Mar. 13, 2013).

*Aritzia*:  The allegations concerning Aritzia are similarly infirm.  Plaintiffs allege that an unnamed Aritzia executive told them on an October 2024 phone call that "[d]efendants had told Aritzia that it 'need[s] to come to Penn Square Mall or not come to Oklahoma' at all."  ¶ 154.  Notably, in the FAC, plaintiffs alleged that Simon had "contacted [Aritzia's] founder" and delivered this message.  *See* FAC ¶ 127.  But that allegation has vanished.  Now, plaintiffs don't say who is alleged to have heard this and provide no other context.  Similarly, plaintiffs allege that "in light of [Simon's] . . . threat to Aritzia's existing and planned locations at SPG properties," Aritzia needed to defer consideration of leasing space at OAK.  ¶ 155.  But again, plaintiffs don't say which "locations" were under threat or how.  Instead, they disclaim knowledge of the "precise terms of Defendants' threats and the specific SPG properties used as leverage."  *Id.*  That does not suffice.

*Alo*:  Plaintiffs do not allege that Simon coerced Alo, but rather they describe a national retailer prioritizing its ability to negotiate a package deal involving Penn Square and a "much-needed expansion" in Las Vegas, at "one of the highest-grossing retail properties in the United States," over opening at OAK's partially leased and unproven lifestyle center.  ¶ 136.  Plaintiffs also concede that Alo's "co-owner" was *not* in favor of signing with OAK.  ¶ 140 (alleging that "'literally everyone at the company' *other than Alo's co-owner* 'was committed to getting [the OAK deal] done'" (emphasis added)).

*Vuori*:  There is no allegation that Simon interfered with Vuori's supposed interest in OAK.  Rather, all that's alleged is that some unidentified Vuori executive indicated to some unidentified person at OAK in some unspecified way that Vuori was "concern[ed]

-26-

that [Simon] would be displeased if it learned that Vuori was considering opening a store at OAK." ¶ 146.  This conclusory allegation doesn't constitute coercion, let alone an illegal agreement with Simon.

*Nike*:  The allegations concerning Nike are similarly flawed.  Plaintiffs once again make conclusory allegations "on information and belief" of unspecified "threats and enticements," implicating "approximately 30 other deals," with no details as to place or person, no identification of any of the "30 other deals" supposedly at issue, and no factual basis for their "on information and belief" pleading.  ¶ 161.  Plaintiffs also invoke an email they "received . . . stating that they needed 'to throw the BRAKES' on further discussions with OAK because Nike needed to 'kowtow to SIMON.'"  ¶ 162.  Plaintiffs do not say who they received this email from nor what the unidentified person's basis for making the claim may have been.  There is, in fact, no well-pleaded allegation that Nike and Simon interacted with respect to OAK or Penn Square *at all*.

Unable to plead the requisite details, plaintiffs resort to anonymous accusations that Simon "really is like a mafia" and will "'bury' anyone who brings 'any sort of . . . legal challenges.'"  ¶¶ 59–61.  But innuendo is no substitute for facts.

*          *          *

In addition to lacking specificity, plaintiffs' coercion allegations are implausible.  Numerous tenants with extensive relationships with Simon have taken space at OAK, including Shake Shack, Tommy Bahama, Pottery Barn, Williams Sonoma, RH, and others.  Plaintiffs offer no plausible explanation for how these tenants ended up at OAK if Simon was engaged in an "anticompetitive campaign . . . to wield SPG's enormous

-27-

economic power to destroy OAK." ¶ 1.  Moreover, the Complaint has no explanation for Classen Curve's success over the past decade-plus.  Plaintiffs do not claim that Simon "coerced" a single prospective or existing Classen Curve tenant.[10]

The logical and compelling inference—and the one consistent with plaintiffs' own telling—is that the multi-billion-dollar companies discussed in the Complaint, including the ones that went to Penn Square, evaluated their options and freely chose what they determined was best for their business.  *Multistate Legal*, 63 F.3d at 1556 ("[A]mbiguous conduct that is as consistent with permissible competition as with illegal conspiracy does not by itself support an inference of antitrust conspiracy.").[11]

### D.    Plaintiffs have not adequately alleged substantial foreclosure.

Finally, for a tying claim to be viable, "the tying arrangement must affect a 'substantial volume of commerce' in the tied market."  *N. Brevard*, 162 F.4th at 1273 n.5.  Put differently, the "arrangement must foreclose to competitors of the tied product a substantial volume of commerce."  *Beal Corp. Liquidating Tr.* v. *Valleylab, Inc.*, 927 F. Supp. 1350, 1367 (D. Colo. 1996).  "If only a single purchaser were 'forced' with respect

---

[10] Plaintiffs' allegation that Simon only coerced certain retailers whose loss would be "most devastating" for OAK makes no sense.  ¶¶ 94–95.  If Simon was attempting to build or maintain a monopoly through "coercion" (or to "destroy" OAK), and had the power over tenants that plaintiffs claim, it would make no sense for Simon to allow brands like RH, Pottery Barn, or Williams Sonoma, which OAK has touted as marquee anchor tenants, to open at OAK.  The Complaint's allegations of monopolization and intent to monopolize are incoherent.

[11] Plaintiffs cite two regulatory matters from years ago that weren't even tying cases; rather, they involved commonly used "radius restriction" provisions at outlet centers. Both are irrelevant.  *In the Matter of Simon Prop. Grp.*, No. C-4307 (F.T.C. Nov. 10, 2010); *In the Matter of Simon Prop. Grp.*, No. 17-154 (NYAG Aug. 21, 2017).

to the purchase of a tied item, the resultant impact on competition would not be sufficient to warrant the concern of antitrust law." *Jefferson Par.*, 466 U.S. at 16.

Here, there is no plausible allegation defendants foreclosed a substantial volume of commerce. At least three competitors—OAK, The Triangle, and Classen Curve—are alleged to have entered the market since 2012, with the latter two filling their tenant rosters with dozens of restaurants and retailers. ¶ 64.[12] And a recent article the Complaint incorporates by reference describes an "influx" of other new commercial properties with retailers and restaurants coming online in and around Oklahoma City. Ex. 9 at 1.

While over a period of years, three tenants are alleged to have chosen to open at Penn Square rather than OAK, and two are alleged to have opened at neither, that is not a "substantial volume of commerce." Plaintiffs still don't attempt to quantify the dollar amount of rental income they claim to have lost, as it would be minuscule relative to the overall market. And space for a few prospective tenants constitutes a *de minimis* fraction of an alleged market of roughly 1.5 million square feet of leasable space. *See, e.g., Aspen Title & Escrow* v. *Jeld-Wen*, 677 F. Supp. 1477, 1489 (D. Or. 1987) (dismissing tying claim where "less than 2% of the market ha[d] been foreclosed").[13]

---

[12] *Directory*, Classen Curve, https://perma.cc/L6A9-RB42. Notably, Cheesecake maintains a Flower Child restaurant (a Cheesecake brand) at The Triangle.

[13] While plaintiffs refer to the average revenues at Cheesecake restaurants, that commerce is not "foreclosed" at all. ¶ 120. It's just at a different location.

And of course, the leasable space for the handful of tenants OAK lost has in no way vanished from OAK.  OAK can still lease that space to any of the vast number of retailers and restaurants that might do business in Oklahoma City, if it hasn't already.[14]

## II.    Plaintiffs do not have antitrust standing (Causes I–IV).

To have standing to sue under the antitrust laws, a plaintiff must plausibly allege "antitrust injury," which is an "injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful."  *Atl. Richfield Co.* v. *USA Petroleum Co.*, 495 U.S. 328, 334 (1990) (emphasis omitted).

The Tenth Circuit recently addressed this rule in setting forth the requirements for antitrust standing in a tying case.  The Court began by reiterating the cardinal principle that "antitrust laws were enacted for 'the protection of competition, not competitors.'" *N. Brevard*, 162 F.4th at 1276.  Accordingly, if a plaintiff does not plead an adequate harm *to competition*—as opposed to itself—then it fails to plead an "antitrust injury" and lacks standing to proceed.  *Id.*; *see also Mayfield SWD, L.L.C.* v. *Blevins*, 2011 WL 195656, at *5 (W.D. Okla. Jan. 19, 2011) ("[a]n allegation that [plaintiff] has lost some of its business to defendants does not make out" an antitrust injury).

Moreover, "[a] showing of antitrust injury is necessary, but not always sufficient, to establish [antitrust] standing."  *Cargill, Inc.* v. *Monfort of Colo., Inc.*, 479 U.S. 104,

---

[14] Moreover, malls are two-sided markets that cater to both tenants and shoppers.  And there is no foreclosure for shoppers, who can still go to North Italia irrespective of which side of the street it's on.  As for RH, although plaintiffs won the business, they complain of a "delay" in lease execution.  ¶ 169.  But delay is not foreclosure, and in any event, the delay allegations are frivolous.  Plaintiffs' negotiations with RH had been dragging on *for three years* before defendants are even alleged to have engaged with RH.  ¶¶ 166–69.

110 n.5 (1986).  As the Tenth Circuit held in *North Brevard*, under the "efficient enforcer" principle, "only plaintiffs who best vindicate the central interest in protecting the economic freedom of participants in the relevant market have a right to sue."  162 F.4th at 1275.  "[T]he existence of other parties who 'would be more directly harmed by' the anticompetitive conduct will ordinarily defeat a plaintiff's antitrust standing."  *Id.* at 1274.  And "ordinarily it is the tying product purchaser whose self-interest is best aligned with the public interest, and therefore best positioned to perform the office of a private attorney general."  *Id.* at 1277.

### A.    Plaintiffs have not alleged an antitrust injury.

Plaintiffs fail to allege that the complained-of conduct "actually injured competition" as opposed to "merely a competitor."  *Suture Express*, 851 F.3d at 1044.  Plaintiffs have not been foreclosed from entering any market.  To the contrary, their project is open, and they have solidified it with high-profile national brands.

While plaintiffs complain that their profit margins have suffered, that they have failed to meet their projections, and that they have been forced to offer terms to tenants "that were much less favorable *to Plaintiffs*," these are, at most, harms *to a competitor*, not to competition.  ¶¶ 11, 100 (emphasis added).  In other words, OAK is complaining that it has been compelled to offer better deals through the stress of competition to the very tenant consumers that the antitrust laws are designed to protect.  That is the opposite of a cognizable antitrust injury:  it is *pro*competitive "price competition."  *Fox Motors, Inc.* v. *Mazda Distribs. (Gulf), Inc.*, 806 F.2d 953, 958 (10th Cir. 1986).  "The primary concern of the antitrust laws is the corruption of the competitive process, not the success

or failure of a particular firm." *Tal* v. *Hogan*, 453 F.3d 1244, 1258 (10th Cir. 2006); *see also Novell*, 731 F.3d at 1073 (Gorsuch, J.) ("Experience teaches that independent firms competing against one another is almost always good for the consumer and thus warrants a strong presumption of legality.").

### B.    Plaintiffs are not an "efficient enforcer" of the antitrust laws.

Plaintiffs also lack standing because they are not "efficient enforcer[s]" of the antitrust laws with respect to the alleged tying. *N. Brevard*, 162 F.4th at 1277. Under *North Brevard*, the efficient enforcers are the "tying product purchasers"—namely, the tenants who were allegedly "forced" to purchase the tied product to get the tying product —as they were "more directly harmed" by the alleged wrongdoing. *Id.* at 1274–75.

"Whenever," as here, "producers [*i.e.*, competitors] invoke the antitrust laws and consumers are silent," the standing "inquiry becomes especially pressing." *Chi. Pro. Sports Ltd. P'ship* v. *Nat'l Basketball Ass'n*, 961 F.2d 667, 670 (7th Cir. 1992). This case shows why. Because it is brought by a competitor, not a tying product purchaser (*i.e.*, a tenant), the Complaint is devoid of the details necessary to support an illegal tying arrangement—details that the tenants could supply (if they had any truth), as it is the tenants that dealt directly with Simon and could say definitively whether they intended to go to OAK, what other properties in what other locales were used to threaten them, and whether their deals at Penn Square were really inferior to what OAK was offering.

On the tying theory plaintiffs allege, there is no shortage of tenants who could pursue claims. Plaintiffs' response is that the tenant victims must be afraid of Simon, so much so that they won't even provide basic information about the alleged coercion. ¶ 13.

-32-

But the tenants at issue are multi-billion-dollar companies that are more than capable of protecting their rights. For example, Nike is a $65 billion company with annual revenues *nine times* Simon's, https://www.morningstar.com/stocks/xnys/nke; Cheesecake generates revenues roughly comparable to Simon's, ¶¶ 43, 98; and Aritzia is valued at over $12 billion, https://www.morningstar.com/stocks/xtse/atz. If these multi-billion-dollar companies aren't claiming coercion, the antitrust laws are not served by allowing a frustrated competitor to stand in their shoes and assert a slew of factually bereft allegations in an effort to insulate itself from the pressures of the marketplace. *See Freeland* v. *Nippon Steel*, 2026 WL 747417, at *4 (N.D. Cal. Mar. 17, 2026) (dismissing on antitrust standing grounds because "[t]his is not a case lacking potential plaintiffs").

### III.    Plaintiffs fail to adequately allege a state law claim (Causes V–VI).

#### A.    Plaintiffs fail to adequately allege a violation of the Oklahoma Antitrust Reform Act.

Plaintiffs' claim for violation of the Oklahoma Antitrust Reform Act ("OARA"), Okla. Stat. tit. 79, §§ 203, 205, mirrors their federal antitrust claims and as such fails for the same reasons the federal antitrust claims fail. The OARA is required to be "interpreted in a manner consistent with Federal Antitrust Law 15 U.S.C., Section 1 et seq. and the case law applicable thereto." *See* Okla. Stat. tit. 79, § 212. For that reason, this court "consider[s] plaintiff's state and federal antitrust claims together." *Risk* v. *Allstate Life Ins. Co.*, 2006 WL 2021597, at *4 (N.D. Okla. July 17, 2006). Accordingly, plaintiffs' OARA claim should be dismissed on the same grounds as plaintiffs' federal

claims. *See id.* at *4–7 (dismissing on this basis); *TKO Energy Servs.* v. *M-I L.L.C.*, 539 F. App'x 866, 873–74 (10th Cir. 2013) (affirming dismissal on this basis).

### B. Plaintiffs fail to adequately allege tortious interference with a prospective business advantage.

Plaintiffs' tortious interference with prospective economic advantage claim is premised on the same alleged anticompetitive conduct underpinning the infirm antitrust claims and must be dismissed. ¶¶ 238–39. To state a claim for tortious interference, a plaintiff must allege: "(1) the existence of a valid business relation or expectancy; (2) knowledge of the relationship or expectance on the part of the interferer; (3) an intentional interference inducing or causing a breach or termination of the relationship or expectancy; and (4) resultant damage to the party whose relationship has been disrupted." *Loven* v. *Church Mut. Ins. Co.*, 452 P.3d 418, 425 (Okla. 2019).

Because plaintiffs' antitrust law claims fail, their tortious interference claim fails as well. In *Loven*, the Oklahoma Supreme Court held "the element of intentional interference clearly requires a showing of bad faith." *Id.* at 426. The claim is not actionable if the so-called "interference" is lawful. *Brock* v. *Thompson*, 948 P.2d 279, 293 n.59 (Okla. 1997). And "legitimate and fair competition" is "always lawful." *Overbeck* v. *Quaker Life Ins. Co.*, 757 P.2d 846, 849 (Okla. Civ. App. 1984).

Here, because "[p]laintiffs have failed to allege adequately that Defendants have violated the Sherman Act or any state antitrust statute [and] assert no other grounds that Defendants acted improperly, they have failed to allege adequately claims for tortious interference." *Compliance Mktg.*, 2010 WL 1416823, at *18; *see also Occusafe, Inc.* v.

*EG&G Rocky Flats*, 54 F.3d 618, 623 (10th Cir. 1995) (competing is "not 'improper' for purposes of a claim for intentional interference in prospective economic advantage").

The claim fails for the further independent reason that plaintiffs cannot show that defendants' "*primary intent*" was to harm OAK rather than act in defendants' own legitimate economic interest in leasing space to tenants. *Morrow Dev. Corp.* v. *Am. Bank & Tr. Co.*, 875 P.2d 411, 417 (Okla. 1994); *see also* ¶ 72 (alleging defendants were seeking to fill vacancies at Penn Square and make the mall more competitive). Plaintiffs allege that an "Alo representative" told them that the "message from Simon wasn't like come to our mall," but rather "don't do the competing center." ¶ 138. But that claim is insufficient in the face of plaintiffs' corresponding allegations that Alo is a highly "desirable," "rapidly growing," and "key" tenant, for which Simon made concessions elsewhere to attract to Penn Square. ¶¶ 122, 124, 139.

As for Vuori and Nike—the only prospective tenants who have not come to Penn Square or OAK—neither had a sufficiently likely contractual relationship with OAK to plead tortious interference with prospective economic advantage. *Allen* v. *IM Sols., LLC*, 94 F. Supp. 3d 1216, 1222 (E.D. Okla. 2015); *Klein* v. *Grynberg*, 44 F.3d 1497, 1506 (10th Cir. 1995). Plaintiffs' boilerplate recital that it had a "reasonable assurance that each of these tenants would lease space at OAK" is insufficient. ¶ 237.

## CONCLUSION

For the foregoing reasons, the Court should dismiss plaintiffs' Second Amended Complaint in its entirety and with prejudice.

Dated:  June 2, 2026

Respectfully submitted,

/s/  Thomas G. Wolfe
Eric S. Eissenstat, OBA # 10282
Thomas G. Wolfe, OBA # 11576
PHILLIPS MURRAH P.C.
424 N.W. 10th Street, Suite 300
Oklahoma City, OK  73103
Telephone:  (405) 235-4100
Eseissenstat@phillipsmurrah.com
Tgwolfe@phillipsmurrah.com

William Savitt (*pro hac vice*)
Stephen R. DiPrima (*pro hac vice*)
Adam L. Goodman (*pro hac vice*)
Lorenzo A. H. Villegas (*pro hac vice*)
WACHTELL, LIPTON, ROSEN & KATZ
51 West 52nd Street
New York, NY  10019
Telephone:  (212) 403-1000
WDSavitt@WLRK.com
SRDiPrima@WLRK.com
ALGoodman@WLRK.com
LVillegas@WLRK.com

*Attorneys for Defendants Simon Property
Group, Inc., Simon Property Group, L.P., and
Penn Square Mall, LLC*

## CERTIFICATE OF SERVICE

I hereby certify that on this 2nd day of June 2026, a true and correct copy of the foregoing **DEFENDANTS' MOTION TO DISMISS PLAINTIFFS' SECOND AMENDED COMPLAINT** was e-filed with the Court through CM/ECF and served on all counsel of record.

/s/ Thomas G. Wolfe

Thomas G. Wolfe